Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN SCHLAEGEL, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| PALO ALTO NETWORKS INC., NIKESH ARORA, DIPAK GOLECHHA and LEE KLARICH, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Martin Schlaegel ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendant Palo Alto Networks, Inc. ("Palo Alto Networks" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE AND SUMMARY OF THE ACTION**

1. This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, Palo Alto Network common stock during the period from August 18, 2023 through February 20, 2024, inclusive (the "Class Period"), who were damaged thereby (the "Class"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10 b-5.

2. Palo Alto Networks is a multinational cybersecurity company that offers an enterprise cybersecurity platform for network security, cloud security, and various cloud-delivered security.

3. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material facts, including that: (1) the Company's consolidation and platformization initiatives were not driving increased market share to a significant degree; (2) the Company would need to ramp up platformization and free product offerings to entice customers to adopt more of their platforms; (3) the Company's high growth in billings was not sustainable; (4) new AI offerings were not facilitating greater platformization and consolidation; and (5) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about customer demand, billings, and platformization, as well as related financial results, growth, and prospects.

4.      After the market closed on February 20, 2024, Palo Alto Networks announced its financial results for the second quarter of 2024 and lowered its third quarter and full-year billings and revenue guidance, with expected billings growth between 2-4% and total revenue growth between 13-15%. In an earnings call on the same day, Defendant Arora explained that "our guidance is a consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership." Defendant Arora also revealed that U.S. federal government deals for several large projects did not close and resulted in "a significant shortfall in our U.S. federal government business" that is expected to continue into the third and fourth quarters of 2024. Defendant Arora further claimed, "[t]he situation started off towards the end of Q1 were worsened in Q2."

5.      On this news, the price of Palo Alto Networks common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

7.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

8.      This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

9. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

10. In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

11. Plaintiff, as set forth in the accompanying certification, which is incorporated by reference herein, purchased Palo Alto Networks common stock during the Class Period and has been damaged thereby.

12. Defendant Palo Alto Networks, Inc. is a multinational cybersecurity company headquartered in Santa Clara, California. The Company's stock trades on the Nasdaq under the ticker symbol "PANW."

13. Defendant Nikesh Arora ("Arora") has served as Chairman and Chief Executive Officer ("CEO") of Palo Alto Networks at all relevant times.

14. Defendant Dipak Golechha ("Golechha") has served as the Chief Financial Officer ("CFO") of Palo Alto Networks at all relevant times.

15. Defendant Lee Klarich ("Klarich") has served as the Chief Product Officer of Palo Alto Networks at all relevant times.

16. Collectively, Defendants Arora, Golechha, and Klarich are referred to throughout this complaint as the "Individual Defendants."

17. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be

misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

18.     Palo Alto Networks and the Individual Defendants are referred to herein, collectively, as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

19.     Palo Alto Networks is a global cybersecurity company that provides platforms and services to help secure enterprise users, networks, clouds, and endpoints. The Company focuses on four fundamental areas: network security, cloud security, security operations, and Unit 42 to provide threat intelligence and security consulting. Its subscription offerings include cloud-delivered security services, secure access service edge, cloud security, and security operations.

20.     The company's security operations offerings include various subscriptions, including Cortex XSIAM (which uses AI technology), Cortex XDR, Cortex XSOAR, and Cortex Xpanse. The Cortex XSIAM offering is marketed as the "AI security automation platform for the modern SOC, harnessing the power of AI to radically improve security outcomes and transform security operations." At the beginning of the Class Period, Defendant Arora advertised XSIAM and the Company's AI initiatives, stating "[w]e continue to drive platformization and capitalize on the opportunity the changing landscape presents for products like XSIAM." He also represented that Palo Alto Networks was "uniquely positioned in the industry" to be able to deliver AI-based outcomes to customers. In November 2023, Defendant Klarich also touted the progress of XSIAM and the greater potential in harnessing AI to benefit the Company, highlighting "very strong" interest from customers fueled by its AI technology and automation for the "fastest sort of growth of a new product that we've ever seen."

21. Leading up to the Class Period, Palo Alto Networks reported steady growth in revenue and billings, which the Company defines as a "key financial metric" that "provides investors with an important indicator of the health and visibility of our business because it includes subscription and support revenue, which is recognized ratably over the contractual service period, and product revenue, which is recognized at the time of hardware shipment or delivery of software license." In the past five years, Palo Alto Networks significantly increased its offerings to become a more comprehensive cybersecurity platform, and as a result, driving the consolidation of customers across multiple platforms became a core strategy.

22. Throughout the Class Period, the Company represented that consolidation and "platformization" efforts were driving growth, including Defendant Arora's statement in November 2023 that "[w]e launched an AI-enabled cloud manager in network security to continue our consolidation and platformization efforts towards Zero Trust." Zero trust is a strategic approach to cybersecurity that continuously validates every stage of a digital interaction. Defendant Golechha also stated that, "we see strong demand in the market and continue to see customers make a technical selection of offerings across our portfolio."

23. At the same time, Palo Alto Networks was racing to compete with cybersecurity-focused peers (including CrowdStrike, Zscaler, and Cloudflare), as well as Microsoft, which had recently boosted its cybersecurity business with expanded AI capabilities. In November 2023, Microsoft unveiled a new generative AI solution, Microsoft Security Copilot, also advertised as built on the principles of Zero Trust, to create a "flywheel of protection to change the asymmetry of the digital threat landscape[.]" CrowdStrike also revealed a new generative AI cybersecurity tool called Charlotte AI in May 2023, followed by another AI and automation-based tool, Falcon for IT, in September 2023.

24. Despite representing to investors that there was "strong demand in the market," "strong interest across our next-generation security portfolio," and that "platformization is continuing to drive large deal momentum," Palo Alto Networks was struggling to compete in a competitive environment. As a result of Defendants' misleading statements and omissions about the Company's

platformization efforts and customer demand, investors were unaware that Palo Alto Networks was being pushed to ramp up customer incentives to the detriment of its own financial performance and that the Company's high growth in its key billings metric was not sustainable.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

25. The Class Period starts on August 18, 2023, when Palo Alto Networks held an earnings call about its reported financial results for its fiscal 2023 fourth quarter. On the call, Defendant Arora advertised the Company's platformization initiative, stating:

> This quarter, we added more new ARR than any other pure-play cybersecurity company. ***Our platformization is continuing to drive large deal momentum***. One way to illustrate the traction of our next-generation security capability across network security, cloud security and SOC automation, so look at the makeup of some of our largest deals.
>
> * * *
>
> ***We continue to drive platformization and capitalize on the opportunity the changing landscape presents for products like XSIAM***. We continued with our go-to-market transformation. For example, we consolidated our SASE sales team into our core a year ago, and we had a strong outcome, as you saw, with some large transactions and opportunities across the pipeline.

26. Defendant Arora further touted the Company's platformization, stating:

> We talked about platformization or you've heard that word, you will keep hearing it to the next sort of 45 minutes from our team because we believe that's the way to deliver security, is resonating with our customers. ***Our customers are seeing it. My team is going to show you some amazing UI.***
>
> I think you're going to start seeing not only just we're talking about this sort of the next level of platformization. You will start seeing, right after me, how we actually bring it to life. So I cannot be more excited about some of the work we're doing on the

> product side, stuff that we haven't shown anybody yet. You are going to see it today because it's important for us not just to talk about it, be able to show you how we're going to deliver.
>
> ***So you will see a next level of integration and how we can deliver security outcomes. You'll see sneak peeks into how we're going to leverage AI copilots in each of our products to create the simplicity and usability that security has not had, to be honest, so far. So I couldn't be more excited about how our teams are going to keep driving more and more platformization, more and more integration***, where things of integrating best-of-breed vendors as sort of DIY or do it yourself or do it home is going to be a thing of the past.

27. Defendant Arora also addressed Palo Alto Networks' evolving capabilities in AI, stating:

> ***And over the next possibly 3, 6, 9 months, you will see more and more capability delivered to our customers using that generative AI framework or predictive AI or precision AI framework.*** I think in the next 3 to 5 years, that is going to fundamentally change what Palo Alto is able to do out there in the market. And as I said, we cannot do this without the best people.

28. During a conference call on September 7, 2023, an analyst asked whether the Company could achieve the security "equivalent of a Workday or a Salesforce or a ServiceNow" after the development of "consolidated platforms in cybersecurity[,]" as Defendant Arora had previously stated, with the "3 platforms [network security, cloud security, and SOC transformation] you have today?" Defendant Arora responded: "***Yes. Yes. I think our newest platform around the SOC is -- has tremendous potential. I think that's kind of the integrated platform***. Most of our competitors in that space are 15-year old tech. I think it's the CrowdStrike, Palo Alto, SentinelOne moment that happened to endpoints, which is happening to SOC except to standard SOCs."

29. During an earnings call on November 15, 2023, Defendant Arora again touted the Company's progress in platformization and consolidation, stating:

On the macroeconomic front, business practices continue to adapt and adjust to new normal with higher interest rates for longer. Internally, on the product side, we've had one of the strongest starts to our fiscal year. In addition to various recognitions, we have delivered strong innovation across all 3 platforms. *We launched an AI-enabled cloud manager in network security to continue our consolidation and platformization efforts towards Zero Trust.*

30. Defendant Arora further stated:

*We continue to see strong interest across our next-generation security portfolio, and we're making progress on our platformization journey.* I'll highlight a few deals to talk about the diversity of opportunity, cross-platform buys as well as the geographical distribution of our deals.

*For example, a federal government agency signed a $25 million expansion transaction, including adding Cortex XDR and Prisma Access in highly competitive situations, expanding their network security footprint. This customer has now spent over $100 million over its lifetime across our [ chief ] platform*. A large global SaaS provider signed an $18 million Prisma Cloud transaction to consume modules across the portfolio. The customer is already a customer for our network security and Cortex platforms. A large educational organization expanded its relationship with us in the first quarter in a $15 million transaction, adding XSIAM, Prisma Cloud and an expansion of its network security footprint. And lastly, a nation state signed a $28 million deal. That is a first of its kind, standardizing on both SASE and XSIAM. *This is a long sales cycle and represents our systematic approach to platformization.*

31. Defendant Arora also represented the progress of new products in the Company's consolidation efforts, stating:

Let's turn on to updates from our 3 platforms that are the engine driving our success. First, in network security. *We continue to drive innovation across our portfolio and see momentum as customers drive towards Zero Trust architecture. This month, we*

*unveiled PAN-OS 11.1 or Cosmos and Strata Cloud Manager, unifying the management of all of our 3 form factors and all security services in a single pane of glass and also leveraging AI to analyze security policies, reduce risk configurations and predict and prevent disruptions.*

*Customers who invest in our platform by deploying all 3 form factors continue to grow rapidly, up 34%. Of our top 100 network security customers, 60% have purchased all 3 form factors, up from 53% a year ago. On average, these platform customers spend more than 15x of the rest of our network security customer spend.*

32. In response to an analyst's question about the XSIAM pipeline, Defendant Klarich stated:

*Yes, were -- look, we've obviously over the last few quarters talked about XSIAM, and the interest we're seeing from customers is very strong. And it's been the fastest sort of growth of a new product that we've ever seen.* I think it speaks to a couple of things. One is just the need in the market from customers to go through the SOC transformation. Nikesh talked about the speed of attacks increasing relative to disclosure requirements and things like that. And obviously, the number of attacks simply going up as well. *That's driving the technology need to have a different solution, a better solution, one driven by AI and automation. And that's exactly how XSIAM was built, and that is what's fueling the interest.*

*The second part of this is with XSIAM, we're able to replace several of the customers' legacy point solutions in the SOC. So we are consolidating multiple independent piece parts with a single XSIAM deployment. And third, with each deployment of XSIAM, this is a significant investment the customer is making in us. So it would vary with those [ investments ] for 3-year investments, in some cases, even longer, because they are standardizing their SOC on a new platform. They want that long-term runway with us. This is not a short-term decision they're making. So*

*all of those factors are what are fueling the strong pipeline that we shared and the early customer success we're having with XSIAM.*

33. Defendant Golechha addressed the use of discounts and deferred payment terms to entice new customers, but assured investors that there was strong demand in the market and that Palo Alto Networks had a strong financial position and flexibility:

> Before turning to guidance, I want to frame some of the impacts that we're seeing on our billings. As Nikesh noted, *we see strong demand in the market and continue to see customers make a technical selection of offerings across our portfolio. From here, we see more customers asking for deferred payment terms either with annual billings, financing through PANFS or pursuing external financing. Some customers are looking for additional discounts for upfront payments as they grapple with the cost of money. Our strong financial position, which includes $7 billion in cash, cash equivalents and investments, combined with our many options in dealing with this dynamic, gives us significant flexibility.* This can impact our billings trends quarter-to-quarter, and we're reducing our billings guidance to account for this through the fiscal year 2024.

34. Defendant Arora also addressed the Company's billing metric and financial flexibility, stating:

> In Q1, the cost of money remained a constant discussion and customers' significant focus on this topic is becoming the new normal. The way it manifests itself in our business is that there's always a payment and duration discussion in final renegotiations. *Given our strong balance sheet, we can use a mix of strategies to navigate the environment. This includes annual billing plans, financing through PANFS and partner financing. Whilst this does not impact our business demand or impact to annual revenue or annual metrics, it does create variability on total billings more than before, depending on financing use or the duration of contracts.*

> *I am not concerned about the demand for cybersecurity for this quarter and upcoming quarters nor am I concerned about our ability to execute. The billings variability is a pure consequence of the payment conversations that we're having with our customers, and this is validated by the fact that we continue to see strong RPO and low churn, suggesting this is a cosmetic impact to our business.*

35. During a conference call on November 29, 2023, in response to an analyst's question about the competitive environment, Defendant Arora stated:

> The way I think about competition, remember, 5 years ago, we had 1.5% market share of $180 billion market. We're probably at 3.5% now, which means 96% of the time, somebody else has got the business. This -- I live happily with competition. It's great. It's wonderful, drives more innovation. **Our platformization continues to get us more and more share.** The more people that are in the market, the more innovation there is, the more they could tell customers and saying, listen, you should move to SASE.

36. The statements referenced above in ¶¶25-35 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, which were known to Defendants or recklessly disregarded by them as follows:

    a) Palo Alto Networks' consolidation and platformization initiatives were not driving increased market share to a significant degree;

    b) Palo Alto Networks would need to ramp up platformization and free product offerings to entice customers to adopt more of their platforms;

    c) Palo Alto Networks' high growth in billings was not sustainable;

    d) Palo Alto Networks' new AI offerings were not facilitating greater platformization and consolidation;

    e) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's business, operations, and prospects related to customer demand, billings, and platformization.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

37. On February 20, 2024, Palo Alto Networks drastically reduced its billings guidance for the third quarter, reporting expected total billings growth of 2-4% and revenue growth of between 13-15%, which Defendant Arora revealed was a result of accelerated platformization and consolidation and "activating our AI leadership." Defendant Arora also revealed that U.S. federal government deals for several large projects did not close and resulted in "a significant shortfall in our U.S. federal government business" that is expected to continue into the third and fourth quarters of 2024. Defendant Arora further claimed, "[t]he situation started off towards the end of Q1 were worsened in Q2."

38. On this news, the price of Palo Alto Networks common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024.

## ADDITIONAL SCIENTER ALLEGATIONS

39. As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Palo Alto Networks' common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Palo Alto Networks, their control over, and/or receipt or modification of, the Company's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Palo Alto Networks, participated in the fraudulent scheme alleged herein. The adverse events at issue also involved the Company's key billings metric and core platformization strategy.

40. As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION/ECONOMIC LOSS

41. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

42. On February 20, 2024, Palo Alto Networks drastically reduced its billings guidance for the third quarter, reporting expected total billings growth of 2-4% and revenue growth of between 13% and 15%, which Defendant Arora revealed was a result of accelerated platformization and consolidation and "activating our AI leadership." Defendant Arora also revealed that U.S. federal government deals for several large projects did not close and resulted in "a significant shortfall in our U.S. federal government business." On this news, the price of Palo Alto Networks common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024.

43. The decline in Palo Alto Networks' stock price is directly attributable to the announcements about the accelerated platformization and reduced guidance.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

44. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b) The omissions and misrepresentations were material;

   c) The Company's common stock traded in efficient markets;

   d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

   e) Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

45. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news ire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

46. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

47. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CLASS ACTION ALLEGATIONS

48. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Palo Alto Networks common stock between August 18, 2023 through February 20, 2024, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

49. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

50. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a) Whether Defendants violated the Exchange Act;

    b) Whether Defendants omitted and/or misrepresented material facts;

    c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e) Whether the price of the Company's stock was artificially inflated; and

    f) The extent of damage sustained by Class members and the appropriate measure of damages.

51. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

52. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

53. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

54. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

57. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### (Against All Defendants)

58. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59. Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. The Company controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C. Awarding Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D. Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

February 26, 2024

Respectfully submitted,

*/s/ Jacob A. Walker*
Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

Jeffrey C. Block (*pro hac vice* forthcoming)
Sarah E. Delaney (*pro hac vice* forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
sarah@blockleviton.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS