Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

*Counsel for Lead Plaintiffs Ron Nabhan and Michele Nabhan*
*And Lead Counsel for the Class*

[Additional Counsel Appear on Signature Page]

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN SCHLAEGEL, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>PALO ALTO NETWORKS INC., NIKESH ARORA, DIPAK GOLECHHA and LEE KLARICH,<br><br>        Defendants. | Lead Case No. 3:24-cv-01156-CRB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ............................................................4

JURISDICTION AND VENUE ...............................................................................10

PARTIES AND WITNESSES..................................................................................10

     A.     Parties.........................................................................................10

     B.     Former Employee Witnesses ...................................................12

SUBSTANTIVE ALLEGATIONS ...........................................................................12

     A.     The Company and Its Operations ............................................12

     B.     The Company's "Platformization" Strategy ...........................14

     C.     Platformization Did Not Address Difficulties in Palo Alto's Federal Government Business ........................................16

     D.     Palo Alto's New AI Products Had no Impact on Customer Consolidation or Platformization.....................................19

     E.     Palo Alto's Decision to Implement Free Giveaways was in Response to Industry Competition ....................................20

DEFENDANTS' MATERIALLY FALSE AND  MISLEADING STATEMENTS AND OMISSIONS ...........................................................................................22

PALO ALTO'S RISK WARNINGS WERE INADEQUATE ......................................38

THE TRUTH EMERGES.......................................................................................38

ADDITIONAL SCIENTER ALLEGATIONS ............................................................43

     A.     Defendant Arora Engaged in Substantial and Unusual Insider Trades During the Class Period...................................44

     B.     Defendant Arora Was A Hands-On Manager Who Was Personally Involved in Overseeing Sales...............................46

LOSS CAUSATION/ECONOMIC LOSS ................................................................48

APPLICABILITY OF PRESUMPTION OF RELIANCE:.............................................50

NO SAFE HARBOR ............................................................................................51

CLASS ACTION ALLEGATIONS .........................................................................52

COUNT I ...........................................................................................................53

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

COUNT II ........................................................................................................54

COUNT III .......................................................................................................54

PRAYER FOR RELIEF ...................................................................................55

DEMAND FOR JURY TRIAL ........................................................................56

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs Ron Nabhan and Michele Nabhan ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following upon personal knowledge as to Lead Plaintiffs, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, a review of documents filed by Defendants Palo Alto Networks, Inc. ("Palo Alto Networks" or "Palo Alto" or the "Company"), Nikesh Arora ("Arora"), Dipak Golechha ("Golechha"), and Lee Klarich ("Klarich") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, other publicly available information about Defendants and information provided by former Palo Alto employees ("FEs").  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, Palo Alto Networks common stock during the period from August 21, 2023 through February 20, 2024, inclusive (the "Class Period"), who were damaged thereby (the "Class").  This action is brought on behalf of the Class for violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      This is a case about a cybersecurity company, Palo Alto Networks, and its executives who were facing serious headwinds—increased competition for their cybersecurity products, with software and hardware being sold by competitors at lower prices, in an environment where demand was slowing due to a variety of factors including increased interest rates and what the Company called "spending fatigue in cyber security."  At the start of the Class Period, Palo Alto's executives began planning a scheme to combat these headwinds, which was to promote a "platformization" strategy in which Palo Alto would attempt to persuade customers to buy all their internet security products from Palo Alto in one package in the hopes that Palo Alto would gain larger market share and combat slowing sales. But the executives knew that for platformization to work, they would need to offer

their suite of products to customers for free for a period of time to initially get them onboard. Giving away products for free, even for a limited time, would cause the key metrics Palo Alto promoted to investors to decrease and have a negative short-term impact on the Company.

3.     After the close of trading on August 18, 2023, Defendant Arora offered investors very bullish revenue and billings growth for Palo Alto for its 2024 fiscal year (which ends July 31, 2024) and discussed platformization with investors, without revealing that the Company was considering a radical shift in its selling strategy – giving away product for free to entice customers to purchase Palo Alto products. Palo Alto's sales slowed during its 2024 First Quarter (which ended October 31, 2023) but Defendants still continued to guide to bullish increases in revenues and billings in its November 15, 2023 call with analysts and investors. Plus, Palo Alto was planning on a significant amount of revenue from a project ("Thunderdome") it was working on for the Department of Defense ("DoD") despite that Arora had been repeatedly told that revenue from this project would take a long time before it would arrive. Revenue from this project "didn't materialize at the pace and at the spending levels" expected in the First Quarter of 2024 and it became apparent that there would be no revenue for the Second Quarter of 2024.

4.     But despite slowing demand and the implementation of the new platformization strategy, which was already in the works, and despite the decrease in revenue from the DoD project, Defendants continued to offer bullish positive statements about Palo Alto's sales, revenue and billing growth and success in platformization. Despite these positive and upbeat statements, Defendant Arora dumped $160 million worth of his own shares in a four-week span from November to December 2023, just two months before Palo Alto would reveal to investors its platformization plan to combat slowing sales and reduction in revenue from the DoD project. When the market finally learned what Palo Alto and its executives knew—shocking analysts who followed the Company, the stock fell 28%, losing over $34 billion in market capitalization in a single day. By selling before the market learned of this give-it-away-for-free strategy, Arora saved himself millions of dollars at the expense of the unknowing investors, including Lead Plaintiffs. This action seeks to recover on those investors' behalf.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

5.      Throughout the Class Period, Defendants made false and misleading statements and failed to disclose material facts, including that: (1) the Company's consolidation and platformization initiatives were not driving increased market share; (2) customer demand for the Company's products was slowing due to increased competition and lower pricing from competitors, so the Company was planning to modify its strategy to offer free product as part of its platformization strategy in an effort to increase sales which would reduce short-term revenue and billings; (3) new AI offerings were not facilitating greater platformization and consolidation; (4) the Company's "Thunderdome" contract with the Department of Defense would not generate revenue in the short term; and (5) for these reasons, Defendants lacked a reasonable basis for their positive statements about customer demand, billings, and platformization, as well as related financial results, growth, and prospects.

6.      The Class Period begins on August 21, 2023, the first day of trading after Palo Alto provided guidance for its upcoming fiscal year 2024 ("FY 2024"), which began on August 1, 2023. On August 18, 2023, after the close of trading, the Company provided guidance for FY 2024, projecting total billings of $10.9 billion to $11.0 billion, for a year-over-year growth in billings of 19% to 20% up from Fiscal Year 2023 billings of $9.2 billion. Palo Alto Networks also projected revenue of $8.15 billion to $8.20 billion, for year-over-year growth of 18% to 19%, compared to its total revenue of $6.9 billion in 2023.

7.      The Company defines "billings" as "total revenue plus the change in total deferred revenue, net of acquired deferred revenue, during the period." In other words, billings represents both revenue actually received in a period and additions to the Company's deferred revenue balance.

8.      Billings, as Palo Alto explained in SEC filings, is a "key metric" which provides "investors with an important indicator of the health and visibility of our business because it includes subscription and support revenue, which is recognized ratably over the contractual service period, and product revenue, which is recognized at the time of hardware shipment or delivery of software license…"

9.      During a conference call with analysts and investors on August 18, 2023 to discuss Palo Alto's results and guidance for 2024, Defendant Arora said that "platformization is continuing

to drive large deal momentum." Platformization is the Company's strategy that was supposed to drive growth, which was being facilitated by new offerings imbued with artificial intelligence ("AI") technology. "Platformization" was effectively a means of bundling multiple Palo Alto security products into a single deal. Customers traditionally used multiple vendors for different security functions. Palo Alto's platformization approach allowed those customers to terminate other vendors and consolidate their security operations around Palo Alto's platform offerings. Defendants claimed this consolidation would "deliver superior security outcomes" for customers and that therefore the "strategy is resonating with a growing number of our customers."

10.     After announcing First Quarter 2024 financial results, during a call with analysts and investors on November 15, 2023, Arora said "on the product side, we've had one of the strongest starts to our fiscal year." He also claimed that Palo Alto "continue[d] to see strong interest across our next-generation security portfolio, and we're making progress on our platformization journey." Palo Alto did lower its 2024 year-over-year growth in billings to $10.7 billion to $10.8 billion, or 16% to 17% growth, but year-over-year growth in revenue was projected to continue to be between $8.15 billion and $8.2 billion, or 18% to 19% growth.

11.     As discussed, however, Palo Alto former employees said that customers were resistant to buying Palo Alto's suite of products via platformization. Palo Alto's competitors, Orca Security and Wiz, Inc., priced their products at much lower prices than Palo Alto, and some of their products were of higher quality. Additionally, many customers did not want all their software with one company and, as a result, Palo Alto had a difficult time competing with selling certain of its products to these customers. Also, customers were slowing their purchases of security software due to increased interest rates, which led to slowing sales growth for Palo Alto. As a result, Defendants began to implement a strategy of offering products for free as part of its platformization strategy in the hopes of winning more business from customers. Offering free products, however, would negatively impact Palo Alto's short-term revenue and would mean that Palo Alto would not achieve the guidance it informed investors about on August 18, 2024. Arora admitted that the Company "quietly" began to develop its free product offering strategy in or around August 2024.

12.     Additionally, for Fiscal 2024, Palo Alto was expecting significant revenue from a project it was working on for DoD, believed to be project Thunderdome, and Palo Alto included expected revenue in its 2024 guidance to investors. Arora subsequently admitted that revenue from a the "large [federal] program" did not "materialize" at the expected pace in the First Quarter of 2024 and "did not show up" in the Second Quarter of 2024, making Palo Alto's revenue and billings guidance false and misleading.

13.     In the four weeks between November 22, 2023, and December 12, 2023, during Palo Alto's Fiscal Second Quarter, Defendant Arora sold approximately $160 million of his Palo Alto common stock. These stock sales were out-of-line with his prior stock sales, as with one exception in June 2023, he had never sold more than 60,000 shares of stock in any given month since the Company went public in 2012. Whereas from November to December 2023, Arora sold over 555,000 shares. These stock sales came just two months before Palo Alto announced it was reducing revenue guidance for the second half of 2024, which it blamed on its "new" strategy of giving product to customers for free as part of its platformization strategy and that revenue from a large DoD project did not come in the Second Quarter.

14.     After the market closed on February 20, 2024, Palo Alto Networks announced its financial results for the second quarter of 2024 and lowered its third quarter and full-year billings and revenue guidance, with expected billings growth in Third Quarter 2024 of just 2-4% and Fiscal Year 2024 billings growth of 10% to 11%, dramatically below the 19% to 20% it guided in August 2023 and the 16% to 17% guided in November 2023. Palo Alto reduced its guidance for year-over-year total revenue growth from the 18% to 19% guided in August and November 2023 to between 15-16%. In an earnings call on the same day, Defendant Arora explained that "our guidance is a consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership."

15.     This announcement revealed what was essentially a complete overhaul of Palo Alto's growth strategy, which Defendants claimed was to respond to the realities customers face while trying to switch from several individual tools to a consolidated security platform. To circumvent this

roadblock to gaining new customers, Palo Alto's new strategy would instead allow customers to use its products free of charge until their contracts with other security vendors expired. Defendant Arora admitted the strategy overhaul had been "quietly" in the works for the past six months, *i.e.*, since the start of the Class Period.

16.    If Palo Alto's strategy was working, and if as Arora said on November 15, 2023, Palo Alto had, "on the product side," "one of the strongest starts to our fiscal year" there would have been no need to dramatically overhaul the platformization strategy to give away products for free. Contrary to their Class Period statements, however, Palo Alto's platforms did not have an advantage over competitors that would allow them to continue gaining market share.

17.    Analysts expressed surprise at the strategic pivot to discounts. Barclays called the decision to offer free product to customers while their legacy contracts with other vendors were still in effect "the part of the [earnings] call that was most unexpected" and questioned why Palo Alto would announce "this big of a change … unexpectedly in the middle of the year." Barclays estimated the move accounted for $600 million of the cut to FY 2024 billings. Guggenheim analysts wrote a note similarly questioning why Palo Alto would announce the "major change" on a quarterly earnings call rather than "at their Friday night call in August" 2023, six months earlier (*i.e.*, at the start of the Class Period).

18.    Defendant Arora also revealed on February 20, 2024 that U.S. federal government deals for several large projects did not close and resulted in "a significant shortfall in our U.S. federal government business" that the Company expected to continue into the third and fourth quarters of 2024. Defendant Arora further claimed, "[t]he situation started off towards the end of Q1 were worsened in Q2." This shortfall was largely caused by the Thunderdome project for the Department of Defense, to which Palo Alto was a sub-participant with Booz Allen Hamilton.

19.    On this news, the price of Palo Alto Networks common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024. This was the largest single-day drop Palo Alto Networks had suffered since going public in 2012.

20.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

<div align="center">

**JURISDICTION AND VENUE**

</div>

21.     The claims asserted herein arise under §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §78j(b), §78t(a), and §78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

22.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

24.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

<div align="center">

**PARTIES AND WITNESSES**

</div>

**A.  Parties**

25.     Lead Plaintiffs Ron Nabhan and Michele Nabhan are individual investors. As set forth in the certification previously filed with the Court (ECF No. 17-2), Lead Plaintiffs purchased shares of Palo Alto common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

26.     Defendant Palo Alto Networks, Inc. is a multinational cybersecurity company headquartered in Santa Clara, California. The Company's stock trades on the Nasdaq under the ticker symbol "PANW."

27.     Defendant Nikesh Arora ("Arora") has served as Chairman and Chief Executive Officer ("CEO") of Palo Alto at all relevant times.

28.     Defendant Dipak Golechha ("Golechha") has served as the Chief Financial Officer ("CFO") of Palo Alto at all relevant times.

29.     Defendant Lee Klarich ("Klarich") has served as the Chief Product Officer of Palo Alto at all relevant times.

30.     Collectively, Defendants Arora, Golechha, and Klarich are referred to throughout this complaint as the "Individual Defendants."

31.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.  Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

32.     Palo Alto and the Individual Defendants are referred to herein, collectively, as "Defendants."

**B. Former Employee Witnesses**

33.     FE 1 was employed by Palo Alto from mid-2021 through the end of the Class Period. From mid-2022 through the end of the Class Period, FE 1 oversaw sales of Prisma Cloud to enterprise customers as a district sales manager.

34.     FE 2 was employed by Palo Alto from mid-2021 through the end of the Class Period as a vice president of sales. FE 2 sold Prisma Access and Prisma SD-WAN. FE 2's business unit accounted for approximately 10% of Palo Alto's overall sales. FE 2's managers reported, in turn, to Defendant Arora. The sales goals for FE 2's business were arrived at by both FE 2 and Palo Alto's senior executives. Defendant Arora led quarterly business review meetings which FE 2 attended, and these meetings discussed growth numbers for FE 2's group. Growth numbers were quarterly business review meetings that FE 2 attended, and that Defendant Arora led. At the meetings, Arora would cite a sales number that FE 2's business was generating.

35.     FE 3 was employed as an Enterprise Account Manager by Palo Alto from mid-2022 to November 2023.

36.     FE 4 was employed by Palo Alto as a sales manager to enterprise customers from early 2022 through the end of the Class Period for Prisma and Cortex.

37.     FE 5 was employed by Palo Alto from mid-2022 through the end of the Class Period as a sales specialist in Cloud Security. FE 5 sold the Company's Prisma Cloud products to federal clients, specifically the Department of Defense and its contractors.

38.     FE 6 was a Regional Sales Manager at Palo Alto from mid-2019 through the end of the Class Period. FE 6 sold to enterprise and commercial customers.

**SUBSTANTIVE ALLEGATIONS**

**A. The Company and Its Operations**

39.     Palo Alto is a global cybersecurity company that purports to provide platforms and services to help secure enterprise users, networks, clouds, and endpoints. The Company focuses on four fundamental areas: network security, cloud security, security operations, and Unit 42 to provide threat intelligence and security consulting.

40.     In addition to stand-alone products, Palo Alto offers bundles of products in unified "Platforms." Palo Alto's platform offerings include: (1) Strata – its network security platform which purports to combine firewalls with AI models and other products, (2) Prisma Cloud – its cloud security platform which also uses AI-powered applications, and (3) Cortex – its Security Operations platform which combines XPANSE, XSOAR, XDR, and XSIAM to automate security operations functions.

41.     Palo Alto advertises a wide range of capabilities in its platforms:

a) **Network Security**: Palo Alto's network security platform includes hardware and software firewalls and cloud-delivered Secure Access Service Edge ("SASE"), which uses Prisma Access, the Company's Security Services Edge ("SSE") solution and Prisma SD-WAN. Palo Alto's network security platform also includes cloud-delivered security services as add-ons. Strata Cloud Manager is a "network security management solution," that "can centrally manage our network security platform irrespective of form factor, location, or scale."

b) **Cloud Security**: Prisma Cloud is marketed as a comprehensive Cloud Native Application Protection Platform ("CNAPP") that secures multi- and hybrid-cloud environments for applications, data, generative AI ("GenAI") ecosystem, and the entire cloud native technology stack across the development lifecycle. The Company also offers VM-Series and CN-Series virtual firewalls for inline network security on multi- and hybrid-cloud environments.

c) **Security Operations**: Cortex is marketed as combining security analytics, endpoint security, automation, and attack surface management ("ASM") solutions through its products delivered as software as a service ("SaaS") or software subscriptions. These products include Cortex XSIAM, which is advertised as the "AI security automation platform for the modern SOC [Security Operations Center], harnessing the power of AI to radically improve security outcomes and transform security operations."  The platform also includes Cortex XDR for the prevention, detection, and response to

complex cybersecurity attacks, Cortex XSOAR for security orchestration, automation, and response ("SOAR"), and Cortex Xpanse for ASM.

42.     The product for which Palo Alto is most known is its firewall – a product which helps filter traffic between devices to prevent users from accessing harmful websites and to keep malicious actors from accessing an organization's network.

43.     After the Company's initial success in its firewall business, it later expanded into cloud security (Prisma Cloud) and security operations (Cortex) to target a new generation of customers. To form its Prisma Cloud and Cortex businesses, Palo Alto spent over $4 billion on mergers and acquisitions of 17 companies since 2017. As the use of cloud-distributed applications and remote work increases, the cloud business is expected to continue to eclipse traditional firewall security. Palo Alto's firewall products, which once comprised over 90% of the Company's revenue, now comprise about 60%.

44.     In general, M&A activity is strong across the cybersecurity industry and allows incumbents with existing distribution channels to simply plug new products and features into their existing systems. Palo Alto has grown to significantly expand the number of products it offers over the past decade, including over 23 products across the three categories of network, security operations, and cloud, in addition to its Unit 42 threat management and administration across each of those areas. However, as a result of this expansion and lack of proper integration, Palo Alto's platforms became fragmented, featuring disjointed products, which can lead to poor security outcomes. This was a major concern for customers and placed the Company at a competitive disadvantage.

**B.  The Company's "Platformization" Strategy**

45.     Before and during the Class Period, Palo Alto represented that it was implementing a strategy called "platformization" which aimed to consolidate its various security solutions into a unified platform. Historically, Palo Alto's customers obtained different security products and services a la carte from different vendors. Palo Alto embarked on a platformization strategy to bring various security functions under one roof, thereby capturing more business from its competitors. As

1   Defendant Arora explained in September 2024, "[customers] need an integrated solution where all

2   the services are provided from one platform," rather than being "fragmented" across various vendors.

3       46.    To entice customers to consolidate, Palo Alto stated that "patching together"

4   technology from multiple vendors is no longer sufficient, and that their platform approach offers a

5   better solution that is simpler, more comprehensive and scalable, and more effective. On the other

6   hand, there is often no added value in consolidating network, endpoint, and cloud security with the

7   same vendor. Because they involve completely different technologies, simply combining them does

8   not necessarily add any improvement for the customer and can instead result in diminished versions

9   of one or all of the security products.

10      47.    Contrary to Defendants' claims, however, larger platforms can actually be less

11  efficient and create issues such as increased technical debt, poor support channels, difficulty with

12  implementation, and increased expenses for unused features. The more embedded large platforms

13  become in customers' workflows and covering larger areas, the more power the platform vendor, like

14  Palo Alto, has over the buyer as it becomes harder to switch to a different vendor. In addition, larger

15  platforms that cover a large scope of areas can also introduce more vulnerabilities. It can be easier for

16  bad actors to focus on poking holes in a single tool to unlock all doors, with catastrophic insecurities

17  resulting from a single failure point in a large platform.

18      48.    FE 2, a vice president in Palo Alto Networks' sales department at all times during the

19  Class Period, said that Palo Alto's sales were slowing in the last few months of 2023. FE 2 said, of

20  offering product for free, that "if you look at the timing of when that came up, in that quarter, our

21  numbers weren't very good. [Arora] could have said, 'more customers are buying more from us and

22  it's taking a longer time,' but that wouldn't have been very appealing to the Street for its stock price."

23  FE 2 confirmed that platformization was not truly a new sales strategy in the sense that Palo Alto had

24  previously "bundled" products together. Offering free products as part of the platformization

25  approach, however, was new.

26      49.    FE 2 explained that customers were taking a longer time to sign contracts, and before

27  signing were insisting that Palo Alto run its system within the customers' own environment so the

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1  customers could see its operations for themselves, using their own data. This slowed the sales process

2  down. Yet despite this slowing in sales, Defendants consistently represented that consolidation and

3  platformization efforts were continuing to drive growth, including Defendant Arora's statement on

4  November 29, 2023 that "our platformization continues to get us more and more share."

5       50.     FE 2 also stated that sales goals were arrived at in consultation with both FE 2 and the

6  executive team, including Arora. Arora, according to FE 2, was very aggressive with sales goals,

7  having high expectations and being hands-on.

8       51.     Defendants' decision to start offering products for free further demonstrates that

9  platformization was not resonating with customers. Implementing free giveaways was a risky and

10  aggressive strategy that would necessarily result in lower revenue and billings growth in at least the

11  following 12 months. There was also the chance that customers would engage in the free trials offered

12  by Palo Alto but later decide not to commit in the long-term, meaning the strategy would not have

13  the desired effect of accelerating the consumption of Palo Alto's products and helping the company

14  take lasting market share from competitors. These risks would not have been necessary if

15  platformization and consolidation had been progressing as Defendants represented to investors

16  throughout the Class Period.

17  **C. Platformization Did Not Address Difficulties in Palo Alto's Federal Government Business**

18  

19       52.     Throughout the Class Period, Defendants touted the impact of plaformization on large

20  deals, including Defendant Arora's statement on August 18, 2023, that "[o]ur platformization is

21  continuing to drive large deal momentum." Those large deals were mainly comprised of federal

22  government contracts, which made up the majority of Palo Alto's billing revenue.

23       53.     FE 5, who sold Palo Altos' Prisma Cloud products to federal government customers

24  including the DoD, recalled that although the Company pushed "platformization" during the Class

25  Period, in fact Palo Alto had always offered customers a way to add additional products onto their

26  platforms. "It's always been that way. It's no secret," FE 5 explained. Platformization was "just a

27  buzzword."

28

54.     FE 5 elaborated that once an existing customer chose to add a product to its plan, "then we restructure [the deal] and you get a bigger bang for your buck. It's already integrated." Platformization in practice meant that more products were offered for the same amount of money, or that one product was offered for a discount, as if the Company were selling "a $1.25 pencil for $1."

55.     FE 5 attended the Company's annual sales meeting in Las Vegas from August 20-24, 2023. There, Company sales executives announced to the gathered sales staff the new strategy to aggressively promote platformization to both commercial and federal customers. FE 5 and the other sales representatives were taken aback. According to FE 5, "we all knew about platformization, and we knew it wouldn't work [for federal customers]. But we wanted to feed our families and were told to sell the idea."

56.     One problem in particular FE 5 and FE 1 highlighted was the lack of security certifications Palo Alto's products had. Sales representatives selling cloud security products to federal customers had to show the products had adequate authorizations under the Federal Risk and Authorization Management Program ("FedRAMP"). Without FedRAMP authorization at the "High Impact Level," which is reserved for the federal government's most sensitive data, the DoD "couldn't touch certain [Palo Alto] products," according to FE 5. Unfortunately, many of Palo Alto's products did not have certification at the FedRAMP "High Impact Level," so they could not be sold or included in a platform sold to the DoD, including Cortex and Prisma Cloud.

57.     FE 5 recalled that, at the August 2023 annual sales meeting, one of FE 5's colleagues asked the executives leading the meetings how sales representatives could sell Prisma Cloud to federal customers without the FedRAMP "High" designation. The executives responded: "You make the sales happen; we'll make that happen faster."

58.     However, according to FE 1, the FedRAMP certification process can take 12 to 18 months. FE 1 agreed that Prisma Cloud was not completely FedRAMP certified and agreed that the DoD could only buy products which were either certified or whose certification was "in progress."

59.     Part of FE 5's responsibilities included creating projections for how many "credits" customers would use in the coming year "based on business secured" from a customer already. FE 5

and other sales representatives would share these projections with either the district sales manager or vice president of the public sector of Prisma Cloud, who would say he "would take it to the bosses." Because these projections were based on existing sales, which were drying up after the company's strategic shift to push platformization, FE 5 recalled "he got a clear understanding at those meetings that we weren't selling [much]."

60.     Exacerbating the problems, Congress repeatedly failed to pass a full spending package for fiscal year 2024 (which began on October 1, 2023) until March 2024. The federal agencies who were FE 5's customers told FE 5 that the lack of an approved federal budget left them without funds for cybersecurity projects, so they could not expand their contracts with Palo Alto. According to FE 5, who sold specifically to DoD and DoD contractors, the "U.S. government didn't have the budget for cybersecurity projects" until well after the Class Period, in the summer of 2024.

61.     One of the most significant federal government deals during the Class Period was the Thunderdome project, a large 5-year, $1.86 billion initiative (awarded to Booz Allen Hamilton with Palo Alto as a sub-participant) developed by the Defense Information Systems Agency ("DISA") to modernize the DoD's network security architecture by implementing zero trust. Zero trust is a strategic approach to cybersecurity that assumes networks are already compromised and continuously validates every stage of a digital interaction.

62.     One of the main components of the Thunderdome prototype was SASE, which included Palo Alto's Prisma service. Prior to the start of the Class Period, on March 7, 2023, Defendant Arora hyped Palo Alto's SASE business to investors, stating, "Our SASE pipeline is the largest... The U.S. government announced Zero Trust initiative last week. They said Thunder doom [dome] was approved by Department of Defense, the SASE project. There's going to be a lot of SASE."

63.     As Arora previously stated, Thunderdome was part of the SASE pipeline, yet he failed to disclose that this deal was facing major pitfalls,   was also not solidified beyond short-term milestones, and would not meaningfully contribute to billings or revenue in the first half of fiscal year

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

2024. Platformization and consolidation did nothing to address the key issues with Thunderdome and Palo Alto's other government deals.

### D. Palo Alto's New AI Products Had no Impact on Customer Consolidation or Platformization

64. In the face of rapid new developments in AI across the industry, Defendants also represented that new AI initiatives were contributing to both platformization and zero trust, with Defendant Arora stating in November 2023, that "[w]e launched an AI-enabled cloud manager in network security to continue our consolidation and platformization efforts towards Zero Trust." Earlier, in August 2023, he told investors that Palo Alto was "uniquely positioned in the industry" to be able to deliver AI-based outcomes to customers.

65. Defendant Arora advertised XSIAM, one of the Company's AI initiatives in security operations, as providing opportunities in platformization, stating, "[w]e continue to drive platformization and capitalize on the opportunity the changing landscape presents for products like XSIAM." In November 2023, Defendant Klarich further touted the progress of XSIAM and the greater potential in harnessing AI to benefit the Company, highlighting "very strong" interest from customers fueled by its AI technology and automation for the "fastest sort of growth of a new product that we've ever seen."

66. In reality, Palo Alto's AI initiatives were not driving platformization to a significant degree and would not meaningfully contribute to sustaining Palo Alto's revenue growth. FE 3 stated that when XSIAM was rolled out, approximately four months before FE 3 left in November 2023, it was "not ready for prime time." FE 3 made this comment because they had an opportunity to test it out with a number of customers, and the customers "couldn't get full functionality" on XSIAM.

67. According to FE 2, the process of selling XSAIM also took longer than other products. This is because Palo Alto's licensing contracts specified fees based on the volume of data that fed into Cortex XSIAM. As stated by FE 2, customers interested in XSIAM did not realize how much data they truly had. Prisma generated logs that fed into XSIAM, and FE 2's group charged on a per-user basis. The proposals given to customers before contracts were signed were therefore complex, since the Company was transparent about identifying each line-item charge. Customers typically had

questions about each charge, which made the process take longer than if the proposal simply presented a package number.

68.     FE 6 described similar difficulties. During the weekly sales meetings, FE 6 did not hear about anyone on their sales team, or any other team, having sold the XSIAM platform. For FE 6's market, although XSIAM was "extremely interesting," it was too expensive. "I didn't sell a single XSIAM product." For FE 6, this was frustrating; the product was "pushed for everyone" to sell in every territory and every market.

69.     FE 3 further explained that a product like XSIAM is "so complex, it takes a while to flesh it out. You have to connect log files, applications, provide the reporting and the integration of the environment." Nevertheless, FE 3 said that XSIAM was "rushed out" because "they were late" in introducing XSIAM. "A lot of it was customer demand: 'Why don't you have a SIEM like XSIAM?'" FE 3 said. "You gotta to compete with the IBMs."

**E. Palo Alto's Decision to Implement Free Giveaways was in Response to Industry Competition**

70.     While Palo Alto continued to tout its platformization progress, it was facing intense competitive pressure from cybersecurity-focused peers, including Orca Security ("Orca") and Wiz, Inc. ("Wiz"), both of which specialize in cloud security. Orca actively competes with Palo Alto's Prisma Cloud product, stating that Palo Alto's user interface puts together "different, standalone" products "stitched together" from seven different acquisitions to form Prisma Cloud, while Orca offers a "single, comprehensive" cloud security platform.

71.     Wiz also competes with Prisma Cloud, similarly stating that its "more unified platform" gives a "notable advantage" over Palo Alto. Wiz claims that Prisma Cloud is "offered to customers in a more modularized manner compared to Wiz, meaning they have fewer core modules as standard" which is "probably a result of the extensive M&A executed by Nikesh Arora and his leadership team." Both Orca and Wiz provide extensive public materials arguing that Palo Alto's products fall short of offering a worthwhile, unified platform.

1    72.    FE 4 confirmed that selling Prisma, in particular, was a challenge. This was because "competitors priced their product three times less." The competitors he was referring to were Orca and Wiz, which "were giving away their products."

73.    FE 1 confirmed that there was heavy competition and ultimately decided to leave Palo Alto in large part because trying to sell cloud services against rival Wiz was "brutal."

74.    Palo Alto also faced competition from companies such as CrowdStrike, Zscaler, Cloudflare, and Microsoft, which were boosting their cybersecurity businesses with expanded AI capabilities.

75.    In November 2023, Microsoft unveiled a new generative AI solution, Microsoft Security Copilot, also advertised as built on the principles of zero trust, to create a "flywheel of protection to change the asymmetry of the digital threat landscape[.]" Cloudfare partnered with Microsoft and other companies to improve its GPU-powered infrastructure, and it also augmented its Workers platform with AI capabilities by November 2023. CrowdStrike revealed a new generative AI cybersecurity tool called Charlotte AI in May 2023, followed by another AI and automation-based tool, Falcon for IT, in September 2023. In June 2023, Zscaler announced generative AI-powered tools, including Security Autopilot, Zscaler Navigator, and data loss prevention offerings. Later in November 2023, Zscaler announced that it hired an AI leadership team, including chief AI officer and executive vice president for data and AI platforms.

76.    These and other similar innovations were direct competitors for Palo Alto's own AI products during the Class Period, including Cortex XSIAM, which were aiming to address the challenge of leveraging massive data sets for security organizations and to maximize threat responses.

77.    Despite representing to investors that there was "strong demand in the market," "strong interest across our next-generation security portfolio," and that "platformization is continuing to drive large deal momentum," Palo Alto Networks was struggling to compete in a competitive environment.

**DEFENDANTS' MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS**

78.     On Friday, August 18, 2023, after trading in the stock market closed, Palo Alto announced its financial results for its fiscal 2023 fourth quarter ("Q4 2023"). In the lead-up to the earnings release, analysts questioned the unusual Friday night timing Palo Alto chose. Wedbush analysts called the decision to hold a Friday-night earnings call a "Disaster Timing Move For the Ages," and wrote: "We have seen many strange things in our 23 years covering the tech sector on the Street and thought we have seen it all until Palo Alto decided to host a 'head scratching' Friday August after the close conference call this Friday to discuss its earnings and medium term guidance." Wedbush further explained that Palo Alto "needs to grow Billings ~19% y/y in FY24E to ~$11b" to justify its current valuation because its stock was already "pricing in almost a 'best-case' scenario for FY24E numbers."

79.     On August 18, 2023, Palo Alto Networks issued a press release, filed as an exhibit to a Form 8-K with the SEC ("August 18, 2023 8-K"), quoting Defendants Arora and Golechha:

> "***We finished off the year with strong execution and the changing environment drove more customers towards platformization***," said Nikesh Arora, chairman and CEO of Palo Alto Networks. "***Our strategy is resonating with a growing number of our customers, driving continued consolidation, to deliver superior security outcomes***. We were delighted with the reception in the market for our AI based security automation platform, XSIAM."

> "Our top-line strength showed through in our remaining performance obligation and next-generation security ARR. ***Our billings this quarter didn't fully capture that strength***. We continue to make great progress in our financial transformation," said Dipak Golechha, chief financial officer of Palo Alto Networks. "Our operating margins increased by more than 500 basis points for the year as we continued to focus on profitability."

80.     The italicized statements referenced above in ¶79 were materially misleading and omitted to disclose material facts when made. By August 2023, Palo Alto's platformization "strategy" was not working and not resonating with customers. In fact, customers were hesitant to adopt platformization and Palo Alto Networks' competitors were offering lower prices. In response to slowing sales, the Company started to "quietly" develop platformization sales programs that would

offer customers substantial up-front discounts, amounting to, on average, approximately six-months of free products while their contracts with Palo Alto Networks' competitors expired, to entice them to purchase Palo Alto products. The Company's projected 2024 billings and revenue growth was not achievable. Offering lengthy periods of free product would negatively impact the Company's billings and revenue. Despite Defendants' assurances that platformization was being well received by customers, the Company was about to drastically change its strategy which required it to take a billings hit that would take an estimated 12-18 months to recover from. Moreover, many of the Company's products could not be combined and sold to federal agencies because they did not have the requisite FedRAMP certifications.

81.     The August 18, 2023 8-K also provided guidance for the upcoming quarter and fiscal year:

For the fiscal year 2024, we expect:

*• Total billings in the range of $10.9 billion to $11.0 billion, representing year-over-year growth of between 19% and 20%.*

*• Total revenue in the range of $8.15 billion to $8.20 billion, representing year-over-year growth of 18% and 19%.*

*• Diluted non-GAAP net income per share in the range of $5.27 to $5.40, representing year-over-year growth of 19% and 22%.*

 *• Adjusted free cash flow margin in the range of 37% to 38%.*

82.     The italicized statements identified above in ¶81 were materially misleading and omitted material facts when made. First, for the reasons explained in ¶80, Palo Alto's billings growth was unsustainable. The Company had already begun to develop for a new sales strategy for platformization in response to slowing sales which involved offering approximately 6-months of free product to customers. This strategy would necessarily cause a hit to billings in FY 2024 lasting approximately 12-18 months and would therefore require Palo Alto Networks to cut approximately $600 million from its billings outlook. Second, another approximately $600 million of Palo Alto Networks' billings guidance for Fiscal Year 2024 was attributable to the federal Thunderdome project, which was not materializing. As FE 5 affirmed, DoD did not have the funds to spend on cybersecurity until months after the Class Period.

83.     Also on August 18, 2023, Palo Alto Networks held an earnings call about its reported Q4 2023 financial results ("Q4 2023 Earnings Call"). On the Q4 2023 Earnings Call, Defendant Arora discussed the Company's platformization initiative, stating:

> This quarter, we added more new ARR than any other pure-play cybersecurity company. ***Our platformization is continuing to drive large deal momentum***. One way to illustrate the traction of our next-generation security capability across network security, cloud security and SOC automation, so look at the makeup of some of our largest deals.
>
> *  *  *
>
> ***We continue to drive platformization and capitalize on the opportunity the changing landscape presents for products like XSIAM***. We continued with our go-to-market transformation. For example, we consolidated our SASE sales team into our core a year ago, and we had a strong outcome, as you saw, with some large transactions and opportunities across the pipeline.

84.     The italicized statements referenced above in ¶83 were materially misleading and omitted material facts when made for the reasons explained in ¶80. Palo Alto Networks' platformization strategy was not resonating with customers and the Company had already begun to plan for a new sales strategy for platformization which would require it to take a hit to its billings that would negatively impact the Company for 12-18 months. Arora's statement that "platformization is continuing to drive large momentum deals" was materially misleading as it was not driving "large momentum deals," which would include deals with the federal government, and it omitted to reveal that the Company's platformization strategy began to change. Palo Alto had begun to plan a strategic shift to offering products to customers for free, which, while it could result in more deals, would result in less short-term revenue for Palo Alto and make achieving its projected billings and revenue growth unattainable.

85.     Palo Alto also acknowledged during the August 18, 2023 Q4 2023 Earnings Call that the Company was increasingly offering "deferred payment terms" to customers. Arora explained that the "rising cost of money," *i.e.* rising interest rates, had "caused customers to hold on to their cash" and seek to pay more often on deferred payment terms, such as annual billing plans. Arora later explained that the Company had an option between offering steep discounts to customers and simply allowing them to pay at later points in time, so deferred payments were Palo Alto's preferred choice:

[I]nterest rates are higher. CFOs are scrutinizing deals, which means you have to be better prepared to answer their question and show the business value that you bring to them with your cybersecurity products. We are lucky that we have been focusing on our platform strategy.

So we can usually walk in and say, here, you can consolidate the following 5, it doesn't cost you anymore, but you get a better outcome and you get a modernized security infrastructure. So from that perspective, that strategy of ours is resonating. But there is more scrutiny. There are deals that go through multiple levels.

There are some that get pushed. There are some that get canceled. And again, you just have to get more on the top of the funnel. And as Dipak very clearly highlighted that eventually end up and there's a conversation about saying, wait, I used to pay you upfront. And I need to understand the cost of money. ***And is there a way, either my cost has to be lower from you, so I can sort of account for the cost of money or you've going to allow me to pay you later. From a deferred plan perspective, those are really the 2 effects***.

86.     The italicized statements referenced above in ¶85 were materially misleading and omitted material facts because by August 2023, Palo Alto's approach to selling customers platformization packages was not working. The Company began "quietly" adjusting its platformization strategy to offer customers substantial up-front discounts rather than just deferred payment terms and Arora omitted to reveal this material fact. As Arora admitted on February 20, 2024, the cost of money was not the only sticking point for prospective platformization customers. Palo Alto Networks' competitors were lowering prices in an effort to retain customers and platformization was not the attractive alternative Palo Alto Networks described it as being. The Company found it would be necessary to offer lengthy periods of free product to customers while their legacy contracts with other vendors for various point products expired to get customers to leave their current security vendors and adopt Palo Alto's platform approach. These "discount[s]" or "free offer[s]," as Arora put it in February 2024, would mean "about 6 months' worth of free product capabilities to our customers" and would impact the Company's billings for 12-18 months. Accordingly, while Defendants were assuring investors that Palo Alto could avoid offering discounts by allowing customers to pay substantially in full on a deferred basis, the Company was already planning to offer significant discounts to induce customers to adopt platformization.

87.     On September 1, 2023, Palo Alto Networks filed its annual report for fiscal year 2023, ended July 31, 2023, with the SEC on Form 10-K ("2023 10-K"). Defendants Arora and Golechha

signed the 2023 10-K. The 2023 10-K warned that a portion of Palo Alto's revenue "is generated by sales to government entities, which are subject to a number of challenges and risks."

> Sales to government entities are subject to a number of risks. ***Selling to government entities can be highly competitive, expensive, and time-consuming, often requiring significant upfront time and expense without any assurance that these efforts will generate a sale***. The substantial majority of our sales to date to government entities have been made indirectly through our channel partners. ***Government certification requirements for products and subscriptions like ours may change, thereby restricting our ability to sell into the federal government sector until we have attained the revised certification. If our products and subscriptions are late in achieving or fail to achieve compliance with these certifications and standards, or our competitors achieve compliance with these certifications and standards, we may be disqualified from selling our products, subscriptions, and support offerings to such governmental entity, or be at a competitive disadvantage, which would harm our business, operating results, and financial condition.*** Government demand and payment for our products, subscriptions, and support offerings may be impacted by government shutdowns, public sector budgetary cycles, contracting requirements, and funding authorizations, with funding reductions or delays adversely affecting public sector demand for our products, subscriptions, and support offerings. Government entities may have statutory, contractual, or other legal rights to terminate contracts with our distributors and resellers for convenience or due to a default, and any such termination may adversely impact our future operating results. Governments routinely investigate and audit government contractors' administrative processes, and any unfavorable audit could result in the government refusing to continue buying our products, subscriptions, and support offerings, a reduction of revenue, or fines or civil or criminal liability if the audit uncovers improper or illegal activities, which could adversely impact our operating results in a material way. Additionally, the U.S. government may require certain of the products that it purchases to be manufactured in the United States and other relatively high-cost manufacturing locations, and we may not manufacture all products in locations that meet such requirements, affecting our ability to sell these products, subscriptions, and support offerings to the U.S. government.

88.     The italicized statements referenced above in ¶87 were materially misleading and omitted material facts when made for the reasons identified in ¶¶80, 86. Additionally, as FE 5 and FE 1 attested, Palo Alto's products lacked adequate FedRAMP certifications already. It was misleading to warn that it was only if certification requirements "change" that the Company would need to "attain[] the revised certification" when the Company largely lacked the certifications already and it could take 12-18 months to obtain them. The Company was already at the competitive disadvantage it warned about. Moreover, while the 2023 10-K presented in hypothetical terms the risk that sales to the government could take time without generating revenue, in fact Palo Alto's Thunderdome deal had failed to close and was already failing to generate revenue. At the close of the Class Period, Palo

Alto would revise its 2024 billings guidance downwards by approximately $600 million because of the failure of the federal Thunderdome deal to close.

89.     During a September 7, 2023 conference call, Arora fielded a question from Goldman Sachs analyst Gabriela Borges regarding Palo Alto Networks' FY 2024 fiscal planning and how customer purchases were being impacted by the cost of money:

Gabriella Borges Goldman Sachs Group, Inc.:

[M]y question to you is, how did the fiscal '24 process planning compare to fiscal year '23? Are there are 1 or 2 things that stood out to you? I know you've talked about how cost of capital is impacting customer purchases. What was different this year?

Defendant Arora:

I think customers and companies are still absorbing the change in behavior. I think the idea that money was free for 10 years, you walk up to a customer and saying, here's a 3-year deal. And the guy said, oh, what do you want me to pay you for 3 years, $10 million? Yes, I need $10 million now. Well, give me a discount, here's 5%. No problem, $10 million here, like I'm making 25 basis points in my treasury.

Now the guy is making 500 basis points on treasury. He wants a 15% to 20% discount to pay your cash upfront. Suddenly, people understand the cost of money. ***So suddenly, you have a choice. You can take the 20% discount, take a hit on bookings and revenue or you can take payments every year.*** That changes all the math that all the wonderful analysts are used to tracking. And they're all like trying to figure out, is demand going away. ***Well, demand is there. Cybersecurity demand is growing. It's a secular demand. It's not cyclical.*** People are getting more petrified. The attackers are moving faster. The plant of cybersecurity has been chronically underinvested in.

***We're just absorbing that change in customer behavior. Demand is not changing. It's execution is shifting***.

90.     Defendant Arora's italicized statements referenced above in ¶89 were materially misleading for the reasons identified in ¶¶80, 86. As FE 2 recounted, Palo Alto Networks was experiencing slowing sales in the final months of 2023 and the "numbers weren't very good" that quarter. FE 5 agreed that Palo Alto Networks' sales representatives knew platformization "wouldn't work" and were reporting in monthly meetings that they were not selling much product. Palo Alto's competitors, meanwhile, were offering customers lower prices; three times lower in the case of Prisma according to FE 4. Despite Arora's assurances that Palo Alto was offering deferred payment plans instead of discounts and "demand is there," the Company was actively planning a shift in strategy to

1    use steep discounts, amounting to approximately 6-months-worth of free product, to entice customers

2    to replace their legacy patchworks of security vendors with Palo Alto's platforms.

3            91.     Later in the September 7, 2023 conference call, in response to an analyst's question

4    about key takeaways from the sales kickoff, Defendant Arora responded:

> We're now pivoting to demonstrate the value of integration. For 5 years, people didn't believe that integrated products need to exist in security. ***Now they're beginning to -- sort of beginning -- many of our customers, they'd much rather have integration because not having the integration hasn't made their breaches stop or hasn't made bad actors go away. So they're beginning to understand the value of integration.***

8            92.     Defendant Arora's italicized statements referenced above in ¶91 were materially

9    misleading for the reasons identified in ¶¶80, 86, 90. As recounted by FE 1 and FE 4, Palo Alto was

10   facing difficulties selling against competitors such as Orca and Wiz, which offered more unified and

11   integrated platforms. Defendant Arora's assurances that customers would "rather have integration"

12   and were "beginning to understand the value of integration" was misleading because customers were

13   not in fact responding to Palo Alto's "integration" or platformization. The Company was actively

14   planning a shift in strategy to offer approximately 6-months-worth of free product, to entice customers

15   to replace their legacy patchworks of security vendors with Palo Altos' platforms.

16           93.     Defendant Arora further stated, in response to an analyst's question about "selling the

17   Palo Alto platform versus the point products" and "how do you go about converting or bringing over

18   more SIs over to the platform approach?":

> Now the moment they get in the build and operate mode, they actually don't want to deploy 17 products. They don't deploy one because it's more sort of efficient it is for them to deploy one product, the more profitable possibly it is for them, the less error prone it is, the less amount of skills they need to learn 17 different products and deploy them.
>
> ***So it actually is a good thing for them to partner with a single vendor on multiple certain lanes as opposed to multiple vendors as long as the products are good and they will meet the requirements of the customer***. So that is a prerequisite. You can't go with bad products and security because they work together. You have to have a good product. ***So I think it's a proposition, they're -- they continue to warm up to.*** There are some of them like Deloitte just launched an SSDL called secure software double life cycle. The whole thing is on Prisma Cloud and train their entire sales force on how do we go do better software development and make it secure. And the way

28

you do it is by using Prisma Cloud as part of the underlying sort of the product solution because eventually, the customer is looking how do I deploy this in my environment.

**So we deploy Prisma Cloud, and that's how you get a secure software at the life cycle**...

94.     Defendant Arora's italicized statements referenced above in ¶93 were materially misleading for the reasons identified in ¶¶80, 86, 90. In touting the benefits of partnering with a single vendor and representing that customers were continuing to "warm up to" Palo Alto's platform consolidation approach, Defendant Arora mislead investors about the true strength of platformization. Platformization was failing to drive growth and the Company was experiencing slowing sales. The Company had already begun to plan to shift from its failed strategy of selling customers on the benefits of platformization to offering them free product.

95.     On November 15, 2023, Palo Alto Networks issued a press release announcing its financial results for the first quarter of fiscal 2024, filed with the SEC on Form 8-K ("November 15, 2023 8-K"). The press release quoted Defendants Arora and Golechha:

"An unprecedented level of attacks is fueling strong demand in the cybersecurity market," said Nikesh Arora, chairman and CEO of Palo Alto Networks. "***We continue to execute on platformization as customers recognize the benefits we can provide in simplifying security architectures and driving better security outcomes***."

"Our revenue, next-generation security ARR, and cRPO metrics best represent our top-line performance in Q1, while ***our billings were impacted by the cost of money***," said Dipak Golechha, chief financial officer of Palo Alto Networks. "Our record cash flow generation and strong Q1 non-GAAP operating margin, illustrate our commitment to driving profitable growth.

96.     The italicized statements identified above in ¶95 were materially misleading and omitted to state material information for the reasons identified in ¶¶80, 86, 90. It was misleading to suggest that platformization was resonating with customers and attribute the billings reduction to the "cost of money." In fact, platformization was not selling itself organically on the strength of its supposed benefits. The promises of "simplifying security architectures and driving better security outcomes" were not enticing customers to leave their legacy vendors. The cost of money was not the only culprit for customers' hesitance to adopt platformization, and offering deferred payment terms or financing was not enough. The Company was experiencing slowing sales and had already begun

to plan to shift from its failed strategy of selling customers on the benefits of platformization to offering them free product.

97.     The November 15, 2023 8-K also provided guidance for the second quarter of 2024 ("Q2 2024") and full fiscal year 2024. The Company revealed that it anticipated lower billings growth (15-18%) in Q2 2024 as compared to Q1 2024 (17-19%). The Company also lowered its fiscal year 2024 guidance for billings ($10.7 billion to $10.8 billion) and billings growth (16-17%) from the figures projected in Q1 2024 ($10.9 billion to $11.0 billion and 19-20%):

> For the fiscal year 2024, we expect:
>
> • *Total billings in the range of $10.7 billion to $10.8 billion, representing year-over-year growth of between 16% and 17%.*
>
> • *Total revenue in the range of $8.15 billion to $8.20 billion, representing year-over-year growth of between 18% and 19%.*

98.     The italicized statements referenced above in ¶97 were materially misleading and omitted material facts for the reasons identified in ¶¶80, 86, 88, 90. By November 2023, Palo Alto was months into planning a strategic shift in its platformization sales strategy that would include offering customers free products. This strategy would make the revenue figures Palo Alto guided to in the November 15, 2023 8-K overstated by approximately $600 million. Second, another $600 million worth of the projected billings were comprised of the Thunderdome project, which was failing to materialize, making the projected billings and revenue projections false and misleading.

99.     Defendant Arora further stated on the Q1 2024 Earnings Call:

> *I am not concerned about the demand for cybersecurity for this quarter and upcoming quarters nor am I concerned about our ability to execute.* The billings variability is a pure consequence of the payment conversations that we're having with our customers, and this is validated by the fact that we continue to see strong RPO and low churn, suggesting this is a cosmetic impact to our business.
>
> *We continue to see strong interest across our next-generation security portfolio, and we're making progress on our platformization journey.* I'll highlight a few deals to talk about the diversity of opportunity, cross-platform buys as well as the geographical distribution of our deals.

100.    The italicized statements referenced above in ¶99 were materially misleading and omitted material facts for the reasons identified in ¶¶80, 86, 90. Platformization was not resonating

with customers, and the Company was months into planning a pivot in strategy to offer large discounts because platformization's supposed benefits were not enticing customers on their own. Contrary to Arora's representations that he was "not concerned about the demand for cybersecurity" and "we continue to see strong interest," the Company was in fact experiencing issues with customer demand for its products. As stated by FE 1 and FE 4, Palo Alto was struggling to sell against competitors. Additionally, the Company was struggling to make sales to federal agencies, whose resources were constrained during the Class Period.

101.   Later on the Q1 2023 Earnings Call, Defendant Arora stated: "***Customers who invest in our platform by deploying all 3 form factors continue to grow rapidly, up 34%.*** Of our top 100 network security customers, 60% have purchased all 3 form factors, up from 53% a year ago. On average, these platform customers spend more than 15x of the rest of our network security customer spend."

102.   The statements referenced above in ¶101 were materially misleading and omitted material facts for the reasons identified in ¶¶80, 86, 90. Contrary to Arora's representations that consolidation across platforms continued to "grow rapidly," platformization was not a sustainable source of growth and was not resonating with customers. Sales were slowing to the point that Palo Alto was already planning a major pivot in strategy which would have a large negative impact on its business.

103.   Defendant Arora further touted Palo Alto's platformization efforts related to Prisma Cloud on the Q1 2024 Earnings Call, stating:

> Moving on to Prisma Cloud. ***We continue to see a strong endorsement of our integrated platform strategy. This traction is evident in the strong growth of our multi-module customers. We have seen particular success here with modules released over the last 2.5 years***. There has been a consistent pattern of seeing 100-plus customers for new modules in the first full quarter of launch and rapid growth after that as the benefits of these new modules are broadly understood. ***This enthusiastic adoption has driven our strong conviction in adding key new modules, including some through acquisitions.***

104.   The italicized statements referenced above in ¶103 were materially misleading and omitted material facts for the reasons identified in ¶¶80, 86, 90. The Company's platform strategy was not seeing a "strong endorsement" and "traction" as Arora represented. Rather, "adding key new

modules" through acquisitions put Prisma Cloud at a disadvantage compared to competitors that were offering a more unified product. The Company's platformization was not resonating with customers and the Company was months into planning a pivot in strategy to offer large discounts.

105.     In response to an analyst's question about the XSIAM pipeline, Defendant Klarich stated:

> *Yes, were -- look, we've obviously over the last few quarters talked about XSIAM, and the interest we're seeing from customers is very strong. And it's been the fastest sort of growth of a new product that we've ever seen*. I think it speaks to a couple of things. One is just the need in the market from customers to go through the SOC transformation. Nikesh talked about the speed of attacks increasing relative to disclosure requirements and things like that. And obviously, the number of attacks simply going up as well. *That's driving the technology need to have a different solution, a better solution, one driven by AI and automation. And that's exactly how XSIAM was built, and that is what's fueling the interest*.
>
> *The second part of this is with XSIAM, we're able to replace several of the customers' legacy point solutions in the SOC. So we are consolidating multiple independent piece parts with a single XSIAM deployment. And third, with each deployment of XSIAM, this is a significant investment the customer is making in us. So it would vary with those [ investments ] for 3-year investments, in some cases, even longer, because they are standardizing their SOC on a new platform. They want that long-term runway with us. This is not a short-term decision they're making. So all of those factors are what are fueling the strong pipeline that we shared and the early customer success we're having with XSIAM.*

106.     The italicized statements referenced above in ¶105 were materially misleading and omitted material facts for the reasons identified in ¶¶80, 86, 90. Contrary to Klarich's statements, customers were not seeing platformization's benefits as natural selling points. Sales were slowing to the point that the Company was already planning a major pivot in strategy which would have a large negative impact on its business. Additionally, customers were underwhelmed with Palo Alto Networks' AI products.

107.     During the Q1 2024 Earnings Call, Defendant Arora also addressed deferred billing:

> In Q1, the cost of money remained a constant discussion and customers' significant focus on this topic is becoming the new normal. *The way it manifests itself in our business is that there's always a payment and duration discussion in final renegotiations. Given our strong balance sheet, we can use a mix of strategies to navigate the environment. This includes annual billing plans, financing through PANFS [Palo Alto Networks Financial Services] and partner financing.* Whilst *this does not impact our business demand or impact to annual revenue or annual metrics, it does create variability on total billings more than before, depending on financing use or the duration of contracts*.

I am not concerned about the demand for cybersecurity for this quarter and upcoming quarters nor am I concerned about our ability to execute. ***The billings variability is a pure consequence of the payment conversations that we're having with our customers, and this is validated by the fact that we continue to see strong RPO and low churn, suggesting this is a cosmetic impact to our business***.

108.    The italicized statements identified above in ¶107 were materially misleading for the reasons identified in ¶¶80, 86, 90. Defendant Arora's assurances that the "cost of money" was the primary friction for customers considering platformization and could be addressed through a "mix of strategies" including "annul billing plans, financing through PANFS and partner financing," which would only have a "cosmetic impact" on Palo Alto's business and no real "impact" on "annual revenue," was materially misleading and failed to disclose information known to Defendants. In fact, Palo Alto by this point had been planning for months to make a strategic shift in its platformization efforts to offer steep discounts to customers, including approximately 6-months of free products, to induce them to switch from their legacy vendors to Palo Alto's platforms. Giving products away for free, unlike deferred payment terms and financing, would have more than a "cosmetic impact" on Palo Alto's finances.

109.    Later during the Q1 2024 Earnings Call, an analyst revisited the issue of the "higher cost of money" and asked how Palo Alto management had "thought about factors like pipeline, like close rates and very importantly, billings duration for the rest of the year, as we just try to get comfortable with how much that billings guide has maybe been de-risked." Arora replied:

I think repetition doesn't spoil the prayer, so I will repeat. The billings difference is not a change in demand for us or not a function of our pipeline. The billings change is a consequence of negotiations with customers. ***When the customer says, you want me to pay you for 3 years upfront? You got to give me a bigger discount. Do you want to pay me -- do you want me to do a 3-year deal? You got to go finance it with PANFS. Now I could do that.***

***But I could say, just pay me on an annual basis. I'm okay. I'll collect my money every year. If I go in that direction, my billings changes. It does not change anything in my pipeline, in my close rates or in my demand function. Do you see my point?***

So we're just keeping -- giving ourselves flexibility because this quarter, we saw a lot more negotiations around those topics. ***We just don't want to be held hostage to those kind of negotiations***, where we have to go finance deals to get TCV in that because billings is a TCV metric. TCV is important if I'm concerned about churn. I have very low churn across my product category.

***I'm very happy to collect my money on an annualized basis if that's what's needed to make sure that I don't get pressure on financing, I don't get pressure on having***

*to give larger discounts.* I retain flexibility. I do a lot of TCV teams. I do a lot of financing. But this allows me the flexibility. So I want to make sure is there is no change in demand function in the market. ***There is no change in our revenue forecast***.

110.     Later, during the same call in response to another analyst question, Arora reiterated: "As I said, the demand function is not going down for cybersecurity across the board. ***The only thing that's changing is people say, I'll do a 2-year, 1-year deal or a 3-year deal or a 5-year deal. I'll pay you later. You finance it around year-over-year. That's the only confusion you're seeing.***"

111.     The italicized statements identified above in ¶¶109, 110 were materially misleading and omitted material facts when made for the reasons identified in ¶¶80, 86, 90. Despite Defendant Arora claiming Palo Alto Networks was using deferred payment terms as an alternative to discounts and did not want to be "held hostage" to those types of customer negotiations, in fact the Company had found its platformization strategy was not working and had been planning for months to offer prospective customers large discounts to make it more palatable to switch to Palo Alto Networks' platforms.

112.     During the same Q1 2024 Earnings Call, Defendant Arora touted the SASE business, stating in response to an analyst question: "In terms of SASE, as I said, we're -- we compete with a different set of people, not with the hardware people. ***We saw 60% growth this quarter. And we have visibility on the pipeline for the rest of the year, which gives us comfort that there is business to be had there***."

113.     The italicized statements referenced above in ¶112 were materially misleading and omitted material facts when made for the reasons identified in ¶¶80, 86, 88, 90. In touting 60% growth and stating that "we have visibility on the pipeline for the rest of the year," Defendant Arora omitted the uncertainties about Thunderdome, the key government SASE deal.

114.     Defendant Golechha also addressed the use of discounts and deferred payment terms to entice new customers, but assured investors that there was strong demand in the market and that Palo Alto Networks had a strong financial position and flexibility:

> Before turning to guidance, I want to frame some of the impacts that we're seeing on our billings. As Nikesh noted, ***we see strong demand in the market and continue to see customers make a technical selection of offerings across our portfolio. From here, we see more customers asking for deferred payment terms either with annual***

*billings, financing through PANFS or pursuing external financing. Some customers are looking for additional discounts for upfront payments as they grapple with the cost of money. Our strong financial position, which includes $7 billion in cash, cash equivalents and investments, combined with our many options in dealing with this dynamic, gives us significant flexibility. This can impact our billings trends quarter-to-quarter, and we're reducing our billings guidance to account for this through the fiscal year 2024.*

115.     Defendant Golechha's italicized statements referenced above in ¶114 were materially misleading and omitted material facts when made for the reasons identified in ¶¶80, 86, 90. Although Golechha emphasized Palo Alto Networks' ability to use deferred payment terms and PANFS as the Company's primary means of reducing friction in sales, in fact the company was experiencing slowing sales and was months into planning a strategic shift to using discounts and free products to facilitate deals.

116.     On November 17, 2023, Palo Alto filed its quarterly report for the period ended October 31, 2023 with the SEC on Form 10-Q ("1Q 2024 10-Q"). The 1Q 2024 10-Q also warned, in hypothetical terms, that "[a] portion of" Palo Alto's "revenue is generated by sales to government entities, which are subject to a number of challenges and risks."

Sales to government entities are subject to a number of risks. ***Selling to government entities can be highly competitive, expensive, and time-consuming, often requiring significant upfront time and expense without any assurance that these efforts will generate a sale***. The substantial majority of our sales to date to government entities have been made indirectly through our channel partners. ***Government certification requirements for products and subscriptions like ours may change, thereby restricting our ability to sell into the federal government sector until we have attained the revised certification. If our products and subscriptions are late in achieving or fail to achieve compliance with these certifications and standards, or our competitors achieve compliance with these certifications and standards, we may be disqualified from selling our products, subscriptions, and support offerings to such governmental entity, or be at a competitive disadvantage, which would harm our business, operating results, and financial condition***. ***Government demand and payment for our products, subscriptions, and support offerings may be impacted by government shutdowns, public sector budgetary cycles, contracting requirements, and funding authorizations, with funding reductions or delays adversely affecting public sector demand for our products, subscriptions, and support offerings***. Government entities may have statutory, contractual, or other legal rights to terminate contracts with our distributors and resellers for convenience or due to a default, and any such termination may adversely impact our future operating results. Governments routinely investigate and audit government contractors' administrative processes, and any unfavorable audit could result in the government refusing to continue buying our products, subscriptions, and support offerings, a reduction of revenue, or fines or civil or criminal liability if the audit uncovers improper or illegal activities, which could adversely impact our operating results in a material way. Additionally, the U.S. government may require certain of the products that it purchases to be manufactured

in the United States and other relatively high-cost manufacturing locations, and we may not manufacture all products in locations that meet such requirements, affecting our ability to sell these products, subscriptions, and support offerings to the U.S. government.

117.    The italicized statements referenced above in ¶116 were materially misleading and omitted material facts when made for the reasons identified in ¶¶80, 86, 88, 90. As FE 5 and FE 1 attested, Palo Alto products lacked adequate FedRAMP certifications already. It was misleading to warn that it was only if certification requirements "change" that the Company would need to "attain[] the revised certification" when the Company largely lacked the certifications already and it could take 12-18 months to obtain them. FE 5 also confirmed that Palo Alto was struggling to make sales to federal customers because the delay in the "budgetary cycles" and "funding authorizations" had already deprived federal agencies of the funds to engage in broader deals with Palo Alto. Moreover, while the 1Q 2024 10-Q presented in hypothetical terms the risk that sales to the government could take time without generating revenue, in fact Palo Alto's Thunderdome deal was already failing to generate revenue. Palo Alto would revise its 2024 billings guidance downwards by approximately $600 million because of the failure of the federal Thunderdome deal to close.

118.    During a conference call on November 29, 2023, in response to an analyst's question about the competitive environment, Defendant Arora stated:

The way I think about competition, remember, 5 years ago, we had 1.5% market share of $180 billion market. We're probably at 3.5% now, which means 96% of the time, somebody else has got the business. This -- I live happily with competition. It's great. It's wonderful, drives more innovation. ***Our platformization continues to get us more and more share.*** The more people that are in the market, the more innovation there is, the more they could tell customers and saying, listen, you should move to SASE.

119.    The italicized statements referenced above in ¶118 were materially misleading and omitted material facts when made for the reasons identified in ¶¶80, 86, 90. Platformization was not allowing the Company to gain "more and more share." Palo Alto's sales were slowing, and in order to secure the "business" Arora referred to, the Company was planning to offer significant discounts which would negatively impact billings.

120.    On the same call, in response to an analyst's question about AI, Defendant Arora stated: "I think 12 to 18 months we will see copilots in most products. I think the question will become, ***how do I deal with so many copilots because you have 40 security vendors, you have 40***

1  *security copilots now. I'd deal with them. So then that goes back and reinforces the theme of*

2  *consolidation, platformization*. And then the question is, can every small start-up afford to build a

3  security product and a copilot next to it."

4       121.   The italicized statements referenced above in ¶120 were materially misleading and

5  omitted material facts when made for the reasons identified in ¶¶80, 86, 90. Additionally, Palo Alto's

6  AI initiatives were not meaningfully contributing to Palo Alto's revenue growth. FE 2 stated that

7  selling XSAIM took longer than selling other products, and FE 6 did not hear about anyone on their

8  sales team, or any other team, having sold the XSIAM platform. FE 3 recalled that when Palo Alto's

9  XSIAM AI product was rolled out in mid-2023, customers who had the opportunity to test it reported

10  that they "couldn't get full functionality" from XSIAM. FE 3 further explained that XSIAM was

11  "rushed out" because Palo Alto was "late" in bringing AI initiatives to market and felt it had to put

12  out an AI product to "compete" with other companies.  Platformization was failing to drive growth

13  in the face of heavy competition and the Company was experiencing slowing sales. Palo Alto was not

14  in a position to "deal with" competitors on consolidation but had instead already begun to plan to

15  shift from its failed strategy and start offering customers free product.

16       122.   Later on the November 29, 2023 conference call, in response to an analyst's question

17  related to market share and AI, Defendant Arora stated:

18       ***So we're trying to make sure that we can sell more things to the same customer,***

19  ***which is good for them, by the way, because it gives them consolidation from a***
     ***platform perspective. We'll give them a better security outcome***. It's a better business

20       for us. So from that perspective, I don't look at these things as individual streams that

21       I got to go sell individually, a lot of them. I look at collectively how can I give a
     platform to a customer, which gets them to a better security outcome, and they make

22       Palo Alto a big trusted partner. ***I think there's tons of room out there in the market***
     ***to do that.***

23       123.   The italicized statements referenced above in ¶122 were materially misleading and

24  omitted material facts when made for the reasons identified in ¶¶80, 86, 90. Contrary to Arora's

25  representations, Palo Alto's platformization efforts did not resonate with customers. There was not

26  "tons of room" in the market to consolidate customers. Rather, sales were slowing to the point that

27

28

Palo Alto was already planning a major pivot in strategy which would have a large negative impact on its business.

### PALO ALTO'S RISK WARNINGS WERE INADEQUATE

124.    The 2023 10-K and 1Q 2024 10-Q described, in hypothetical terms, the risk facing the Company if it failed to "accurately predict, prepare for, and respond promptly to rapidly evolving technological and market developments and ***successfully manage product and subscription introductions and transitions*** to meet changing end-customer needs in the enterprise security industry, our competitive position and prospects will be harmed."

> The enterprise security industry has grown quickly and continues to evolve rapidly. Moreover, many of our end-customers operate in markets characterized by rapidly changing technologies and business plans, which require them to add numerous network access points and adapt increasingly complex enterprise networks, incorporating a variety of hardware, software applications, operating systems, and networking protocols. ***If*** we fail to effectively anticipate, identify, and respond to rapidly evolving technological and market developments in a timely manner, our business will be harmed.

> …Our investments in research and development, including investments in AI, may not result in design or performance improvements, marketable products, subscriptions, or features, or may not achieve the cost savings or additional revenue that we expect.

> … While we have historically been successful in developing, acquiring, and marketing new products and product enhancements that respond to technological change and evolving industry standards, we ***may*** not be able to ***continue*** to do so, and there can be no assurance that our new or ***future offerings*** will be successful or will achieve widespread market acceptance. If we fail to accurately predict and address end-customers' changing needs and emerging technological trends in the enterprise security industry, including in the areas of AI, mobility, virtualization, cloud computing, and software-defined networks, our business could be harmed.

125.    These risk disclosures failed to alert the market that Palo Alto's sales had already slowed and that the Company's new offerings were not achieving market acceptance. Sales were slowing by this point and the Company was developing an overhaul of its platformization strategy, which would harm the business to the tune of an estimated $600 million hit to billings.

### THE TRUTH EMERGES

126.    On February 20, 2024, Palo Alto Networks issued a press release, filed on Form 8-K with the SEC, which announced that the Company had drastically reduced its billings guidance for the third quarter of 2024 and full FY 2024, reporting expected total billings growth of 2-4% and

revenue growth of between 13-15% for the third quarter, and billings growth of just 10-11% and revenue growth of 15-16% for FY 2024 .

127.    During a conference call with analysts held the same day, Defendant Arora revealed the Company's lowered guidance was a result of accelerated platformization and consolidation and "activating our AI leadership," as well as deals with the federal government failing. As he told an analyst: "just to be clear . . . from a billings perspective, part of the billings guidance is related to the Fed . . . part of it is also because of the platform initiatives -- platformization initiatives per se, but also part of it is we just expect there to be more deferred payments like annual billings, things like that as we roll out these programs. That's what makes it up."

128.    During the call, Arora stated in his opening remarks, "Our guidance is a consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership."

129.    Defendant Arora explained "we're beginning to notice customers are facing spending fatigue in cybersecurity." Defendant Arora continued, explaining that Palo Alto's competitors had begun to lower prices, often "resorting to uneconomic pricing" to retain customers, therefore thwarting platformization efforts.

130.    Defendant Arora revealed that selling customers on the idea of platformization therefore required not just allowing them to defer payments, but to have discounts and lengthy periods of time in which they would be using multiple Palo Alto products for free before billing even started, and that "[o]ver the last 6 months," Palo Alto had been "quietly developing programs" to overhaul its platformization strategy:

> We believe we can build customer confidence in our platforms by approaching them well before their point product contracts expire. After we gain their contractual commitment, we have offered an extended rollout period where we can demonstrate our ability to deliver these platform benefits. Customers can then start paying us after the obligation of legacy vendors ends.
>
> *       *       *
>
> We expect a typical customer entering into a platformization transaction will not pay us for our technology for a period of time.

131.    Defendant Golechha expanded on the discounts Palo Alto was being forced to give to induce customers to embrace platformization:

> For the customer, they are able to execute on the platform deployment with lower risk and consolidate vendors while benefiting from a lower cost -- total cost of ownership and the better security posture. As Nikesh [Arora] gave you the high-level trajectory in our pipeline, I want to help you understand how we think about the medium term. Our platformization offers to drive consolidation effectively provide customers a period of the contract for free as part of their commitment. We expect we may see a period of 12 to 18 months of pressure on our top line growth rate, notably billings.

132.    Analysts homed in on the surprising news that Palo Alto was finding it necessary to offer discounts to sell customers on platformization, which it had advertised as a win-win. JP Morgan Chase analyst Brian Lee Essex asked: "one thing that caught my ear was the comment about discounting or offering a free period upfront for a certain period of time. Wanted to get a sense of what kind of headwind within that billings guidance is attributable to some of that discounting?" Arora replied:

> I think let me clarify in terms of the discounting notion. What's happening today is when I go to a customer and say, listen, I'd like to replace your estate with the entire platform. The customer says, 'Wait, wait a minute, I got this vendor for IPS, this for SD-WAN, this for SSC. And I got half of my firewalls from another vendor, and they all expire at different points in time. I'd love to deploy Zero Trust but it's going to take me 2, 3 years as the end of life, so these vendors happen. And I'm scared that if I rip and replace this at this point in time, is going to create execution risk, not just that, it's going to hit economic risk.'
>
> So the propositions we're going to customers is, listen, let's lay out a 2-year, 3-year cybersecurity consolidation and platformization plan. We'll go start implementing today, you pay us when they're done. So what it is, is more of a sort of like you can use our services until you have to keep paying the other vendor, we'll take it from there. But that's taking away a lot of the economic exposure and the execution risk for our customers. **Now you can call that discount or you can call that a free offer. Our estimate is approximately it works out at about 6 months' worth of free product capabilities to our customers on a rolling basis.** I think in about 12 months, as our offers start lapping each other, we should go back to our growth rate we've been talking about. And I think the right metric is the time frame is to look at RPO.
>
> (emphasis added)

133.     A slide accompanying the February 20, 2024 conference call demonstrated how Palo Alto was offering free products to customers for a period of time while their legacy contracts with other vendors ran out. Palo Alto Networks would complete "Platform Implementation & operationalization" before "Economic considerations begin" following the expiration of incumbent vendors' remaining contract durations:



134.     Defendant Arora also attributed a portion of the billing weakness to federal government projects. Arora revealed that Palo Alto "did see softness in the U.S. Federal Government market" and therefore experienced "billing weakness in Fed." U.S. federal government deals for several large projects "did not close" and resulted in "a significant shortfall in our U.S. federal government business" that is expected to continue into the third and fourth quarters of 2024. Defendant Arora further claimed that this "situation started off towards the end of Q1" and "worsened in Q2." Defendant Golechha further explained:

> We had some puts and takes during the quarter related to billings. As Nikesh [Arora] mentioned, we saw weakness in the U.S. federal vertical related to some specific programs. This U.S. federal weakness was a meaningful headwind to our billings in

Q2 after we saw a slow start in the year to Fed. The impact of the federal deals on our revenue is significant as they are relatively shorter than our average contract term.

135.    When an analyst expressed surprise about the softness in federal spending and asked for more information on the causes, Arora explained:

As you are aware, there was a large program. We were part of down selected to be the only vendor. We'd expected and we staffed it to make sure we could implement it and we could get the orders. That program didn't materialize at the pace and at the spending levels we had expected. We saw an early glimpse in Q1 towards the end, we saw it not show up in Q2, and we have it staffed for Q3 and Q4. Remember, Fed is a lower duration number. So it has a much more significant impact to revenue because Fed pays on an annualized basis as opposed to a TCV [total contract value] basis.

So you're seeing the impact of that to our revenue for Q3 and Q4 and some of the billings miss in Q2, which we had to make up with shipping from non-product backlog.

136.    Many analysts – including Barclays, KeyBanc, William Blair, and Wells Fargo – understood the "large program" to refer to Thunderdome.

137.    On this news, the price of Palo Alto common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024. This was the worst trading day in Palo Alto Networks' 12-year history as a public company.

138.    As one observer summarized Palo Alto's "horrendous" new guidance and outlook in an article posted on *Seeking Alpha* on February 21, 2024: "The company apparently feels the need to help customers transition from point products to the platformization concept with financial incentives of sharing the costs to end legacy contracts, including not charging customers for a period of time. . . . Palo Alto has to provide customers incentives in what was supposed to be overflowing AI demand."

139.    In a research note issued on February 20, 2024, Barclays analysts called the billings cut "unexpected" and estimated that "about half [of the $600M billings cut] is from the US Federal 'Thunderdome' project." Barclays wrote: "[W]e think PANW was assuming some contribution from the US Defense Information Systems Agency (DISA), for a project around zero-trust network architecture referred to as 'Thunderdome.' We estimate the contribution from this project in FY24 was in the few hundred million range, which means that potentially half of this guidance revision was from this large project that has been pushed out."

140.    Wells Fargo analysts also released a research note on February 20, 2024 explaining that the "$1.86B Thunderdome contract … did not materialize as expected," leading to the lowered billings.

141.    Another fundamental contributor, according to the February 20, 2024 Barclays note: "PANW's explanation around free trials to reduce friction in platform deals and prevent customers from double-paying makes sense on paper … but until we see examples of this, the debate will be 'is this giving it away for free?' or 'is this short-term pain for long-term gain?' and the issue is this big of a change is being done unexpectedly in the middle of the year." Barclays called Arora's and Golechha's announcement that Palo Alto was offering discounts to customers while their legacy contracts with other vendors were still in effect "the part of the call that was most unexpected" and estimated it contributed to $600 million of the cut to Fiscal Year 2024 billings.

142.    Several other analysts reacted with surprise and disappointment to the news that Palo Alto was finding it necessary to offer discounts to support its platformization strategy. Piper Sandler lowered its rating of Palo Alto from overweight to neutral, explaining that the need to offer customers free products while their legacy contracts expired would "negatively impact the business for 12-18 months - eliminating $600M from billings estimates in the back half of this year."

143.    Guggenheim wrote the same day, February 20, 2024, that Palo Alto attributed the guidance cut to "a strategic shift to a new word called 'platformization,' which when described sounds like what they've been doing all along." Guggenheim further noted: "this raises questions: (1) Why does PANW have to do this when other companies embark on similar paths of consolidation without having to give away product for a time, but they instead increase revenue from the start – CRWD comes to mind. (2) Why drop this major change on a quarterly conference call when results are weak? Why didn't they do it at their Friday night call in August?"

### ADDITIONAL SCIENTER ALLEGATIONS

144.    As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Palo Alto's common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Palo Alto, their control over, and/or receipt or modification of, the Company's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Palo Alto, participated in the fraudulent scheme alleged herein. The adverse events at issue also involved the Company's key billings metric and core platformization strategy.

145.    As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

**A. Defendant Arora Engaged in Substantial and Unusual Insider Trades During the Class Period.**

146.    Defendant Arora engaged in suspicious insider stock sales during the Class Period timed to maximize gains from the Company's false and misleading statements.

147.    According to filings made on Form 4 with the SEC, Defendant Arora sold 555,240 shares of Palo Alto Networks stock during the Class Period for a total of approximately $160,250,210. Arora's sales took place on five dates spread out over less than a month between November 22, 2023, and December 12, 2023.

148.    During this time period, according to FE 2, Palo Alto Networks' sales were slowing. And as Arora admitted, in the 6 months preceding February 20, 2024, Palo Alto had "been quietly working to develop programs that enable us to help minimize and even share in the risk of our customer space." This strategic shift in its platformization sales strategy, which Arora would have known about for months by November 2023, would require an approximately $600 million downward projection in its FY 2024 billings guidance. Although the Company revised its guidance downwards slightly on November 15, 2023, it curiously did not incorporate the full impact of the strategic shift into its guidance until February 20, 2024, after Arora had been able to execute on his recently-adopted trading plan while the market price for Palo Alto's shares was still reaching all-time highs.

149.     In each transaction during the Class Period, Arora exercised an option to acquire Palo Alto shares at a price of $66.17 per share, and immediately sold the entire allotment in a single day. **In SEC filings dating back to June 2018, Arora had never exercised and sold options in this manner, with the exception of one day, June 7, 2023, just two months before the start of the Class Period. In fact, until June 2023, Arora had never sold more than 60,000 shares in a two-month period (excluding sales denoted as made to satisfy tax obligations), let alone less than four weeks.** Arora's class period trades were as follows:

| Date | # of Shares Acquired at $66.17 | Total Cost of Acquired Shares (Rounded) | # of Shares Sold | Average Prices of Shares Sold (Range) | Total Revenue from Shares Sold (Approx.) | Net Profit (Approx.) |
|---|---|---|---|---|---|---|
| **Nov. 22, 2023** | 40,848 | $2,702,777 | 40,848 | $266.55 to $268.07 | $10,909,267 | $8,206,491 |
| **Nov. 24, 2023** | 30,678 | $2,029,862 | 30,678 | $266.15 | $8,164,827 | $6,134,965 |
| **Nov. 27, 2023** | 178,474 | $11,809,036 | 178,474 | $267.06 to $269.62 | $47,865,346 | $36,056,310 |
| **Dec. 11, 2023** | 5,240 | $346,714 | 5,240 | $300.01 | $1,572,060 | $1,225,347 |
| **Dec. 12, 2023** | 300,000 | $19,850,010 | 300,000 | $300.44 to $307.32 | $91,738,710 | $71,888,700 |
| **TOTAL:** | 555,240 | $36,738,399 | 555,240 | $266.55 to $307.32 | $160,250,210 | $123,511,812 |

150.     The 555,240 shares Arora sold in less than a month during the Class Period is also 53% greater than the number of shares he has sold in the nearly eight months since the Class Period ended (363,174).

151.     When Defendant Arora sold his shares on December 12, 2023, Palo Alto stock had, to that point, never been priced higher.[1] Defendant Arora sold his shares that day in eight tranches. The shares in the first tranche sold on December 12, 2023 were sold for an average price of $300.11, the lowest price Arora fetched for any of the eight tranches sold that day but still higher than Palo Alto's peak share price at any point in time since its Initial Public Offering ("IPO") in July 2012. Defendant

---

[1] When prices are adjusted to account for the effects of Palo Alto Networks' 3-to-1 reverse stock split effected September 13, 2022.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Arora sold his last tranche of shares at an average price of $307.32 per share, just 56 cents below the then-historic high of $307.88 Palo Alto's stock hit on December 12, 2023, and higher than its close of $305.58/share.[2]

152.   Before November 22, 2023, Arora held 866,395 shares of Palo Alto stock. Although his holdings did not substantially change given the in-and-out nature of his transactions, the 555,240 shares he sold were the equivalent of 64% as many shares as Arora held before and after the Class Period sales.

153.   Defendant Arora's Form 4 disclosures filed with the SEC during the Class Period represent that his Class Period sales were made pursuant to a 10b5-1 trading plan which he adopted just two months before the start of the class period and which he terminated on December 13, 2023, immediately following his final sales. The timing of Arora's adoption and implementation of the 10b5-1 trading plan strongly suggest it was a discretionary choice to exercise and sell options on the dates described above. No other sales were made according to this short-lived, conspicuously timed 10b5-1 trading plan.

154.   As "personal financial gain may weigh heavily in favor of a scienter inference,"[3] Defendant Arora's unusual trades, timed to maximize Arora's personal benefit as they coincided with Palo Alto Networks' highest share prices since its 2012 Initial Public Offering, strongly suggest his scienter.

**B. Defendant Arora Was A Hands-On Manager Who Was Personally Involved in Overseeing Sales.**

155.   When Defendant Arora made the misleading statements described above in ¶¶78-123 and sold over $160 million worth of Palo Alto shares, he would have known Palo Alto's billing was unsustainable, that the Company's sales had slowed, and that the Company was planning a strategic pivot to offer discounts to customers, thereby taking a substantial hit in the near and medium term.

---

[2] *See* YAHOO!FINANCE, *Palo Alto Networks, Inc. (PANW)*, (last visited Sept. 24, 2024), https://tinyurl.com/3betnkfj.

[3] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007).

156.    On February 20, 2024, Arora admitted that the Company's decision to offer free products to customers until customers' contracts with legacy vendors ran out was far from a new or sudden decision. Palo Alto Networks, he admitted, had been "quietly working" on the strategy "*[o]ver the last 6 months*," *i.e.* during the entirety of the Class Period. Accordingly, Defendants knew, or recklessly disregarded, that Palo Alto's platformization strategy was not working throughout the Class Period, and indeed were planning all the while to begin offering large discounts in a manner that would cannibalize the Company's billings. Yet Defendants told investors that platformization was driving growth and the headwinds (which they attributed primarily to rising interest rates) were being successfully managed through deferred payment plans and financing.

157.    Arora knew or was reckless in not knowing that Palo Alto's platformization sales strategy was underperforming because he exercised close oversight of Palo Alto's sales teams and figures. FE 2 described Arora as a "command-and-control" manager who had "his pulse on the business." Arora led quarterly business review meetings, which FE 2 attended, in which Arora led discussions of Palo Altos' sales figures and projections. FE 2 described Arora as having high expectations and being a hands-on manager. If FE 2 provided sales figures which were below Arora's target, for example if FE 2 provided $450 million when the target was $500 million, Arora would respond: "What do we have to do to close that to $500 million?" Arora would also require FE 2 to prepare six slides to present for each large account. Accordingly, the strongest inference is that Arora either knew or recklessly disregarded that Palo Altos' sales were slowing by the last quarter of 2023. Given Arora's hands-on control and involvement in sales, it is fair to infer that he knew about the 6-month planning process to change Palo Alto's platformization sales strategy.

158.    FE 1 also confirmed that there was a formal internal process at Palo Alto to approve its platformization agreements that included giving products away for free. These deals had to be reviewed by the Deal Desk, the CFO and the Sales Operations and Revenue Desk. Additionally, on a quarterly basis, all sales staff had to sign a letter stating that they would follow only ethical sales practices. FE 1 also stated that Defendant Arora knew about the impact of platformization and considered related strategy.

159.    There is a strong inference that Defendant Golechha also knew, or was reckless in disregarding, Palo Alto's slowing sales and shift in strategy, as FE 1 confirmed that the formal, internal process described above to approve platformization agreements that included giving products away for free required these deals to be reviewed by the Company's CFO, Defendant Golechha.

160.    Additionally, Defendant Arora either knew or recklessly disregarded that Palo Alto's expectations for meaningful revenue from the Thunderdome project in early 2024 were misguided. Because Arora was deeply involved in the strategic sales process, the is a strong inference he would have been aware that revenue was not coming in for the monumental Thunderdome project, which would have accounted for at least $600 million in billings in 2024.

## LOSS CAUSATION/ECONOMIC LOSS

161.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the Class.

162.    As described more fully in ¶¶126-143, on February 20, 2024, Palo Alto drastically reduced its billings guidance for the third quarter, reporting expected total billings growth of 2-4% and revenue growth of between 13% and 15%. The facts revealed on February 20, 2024 exposed omitted facts and demonstrated the falsity of Defendants' statements regarding: (1) the Company's ability to sustain billings growth; (2) the success of the Company's platformization initiatives to drive sales demand; (3) the Company's ability to reduce sales friction, which the Company primarily attributed to the cost of money rather than competition or platformization itself, by offering deferred payment terms and financing rather than large discounts; (4) the ability of the Company's new AI offerings to facilitate greater platformization and consolidation; (5) the Company's expectations for billings from federal government projects in FY 2024.

163.    For example, during a conference call with analysts held after market close on February 20, 2024, Defendant Arora revealed Palo Alto's reduced guidance was "a consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership." Defendant Arora also revealed that U.S. federal government deals for several large projects did not close and resulted in "a significant shortfall in our U.S. federal

government business." These disclosures in part corrected, or were a materialization of a known risk concealed by, Defendants' misstatements about billings growth and guidance, customer demand for platformization, the Company's AI offerings, and the Company's expectations for billings from federal government projects to materialize in FY 2024.

164.    Moreover, Defendant Arora explained during the call that competitors were lowering prices to prevent Palo Alto from dislodging them as security vendors. Selling customers on the idea of platformization therefore required offering "a free offer" of products for extended periods of time ("about 6 months' worth of free product capabilities") before billing even started. Defendant Arora stated that Palo Alto had been developing the new platformization strategy "[o]ver the last 6 months." Defendant Golechha further elaborated that the new strategy "to drive consolidation effectively provide[s] customers a period of the contract for free as part of their commitment" which the Company expected to cause "a period of 12 to 18 months of pressure on our top line growth rate, notably billings." These disclosures in part corrected, or were a materialization of a known risk concealed by, Defendants' misstatements about demand for platformization, billings growth and guidance, and the Company's ability to reduce sales friction without resorting to significant discounts.

165.    Market observers were surprised by Palo Alto's announcement. One observer summarized: "Palo Alto has to provide customers incentives in what was supposed to be overflowing AI demand." Analysts called the billings cut "unexpected." Barclays noted that the announcement of significant discounts was "the part of the call that was most unexpected" and questioned why "this big of a change" was "being done unexpectedly in the middle of the year." Guggenheim questioned why Palo Alto had not announced the new strategy six months earlier "at their Friday night call [o]n August [18, 2023]?"

166.    Barclays attributed about $600 million worth of the cut to FY 2024 billings to the strategic shift in platformization, and another $600 million worth of the cut to the federal Thunderdome contract failing to materialize.

167.    On this news, the price of Palo Alto common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024. This was the worst trading day in Palo Alto Networks' 12-year history as a public company.

168.    The decline in Palo Alto's stock price is directly attributable to the announcements about the strategic shift in platformization and reduced guidance.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

169.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)  The omissions and misrepresentations were material;

c)  The Company's common stock traded in efficient markets;

d)  The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e)  Lead Plaintiffs and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

170.    At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news ire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Lead Plaintiffs and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

# NO SAFE HARBOR

171.    The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. First, the statutory safe harbor does not apply to any statements alleged to be false and misleading which relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

172.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

173.    In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement."  15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

174.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.  To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.

175.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had

1  actual knowledge that the forward-looking statement was materially false or misleading, or the

2  forward-looking statement was authorized or approved by an executive officer who knew that the

3  statement was false when made. As detailed herein, Defendants were not only aware of factors

4  undermining their forward-looking projections but were actively planning a strategic shift which

5  would render them false.

6  <center>**CLASS ACTION ALLEGATIONS**</center>

7  176.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

8  Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise

9  acquired Palo Alto Networks common stock between August 21, 2023 through February 20, 2024,

10  inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the

11  Company, at all relevant times, members of their immediate families, and their legal representatives,

12  heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

13  177.    The members of the Class are so numerous that joinder of all members is

14  impracticable. The disposition of their claims in a class action will provide substantial benefits to the

15  parties and the Court.

16  178.    There is a well-defined community of interest in the questions of law and fact involved

17  in this case. Questions of law and fact common to the members of the Class which predominate over

18  questions which may affect individual Class members include:

19      a) Whether Defendants violated the Exchange Act;

20      b) Whether Defendants omitted and/or misrepresented material facts;

21      c) Whether Defendants' statements omitted material facts necessary in order to make the

22          statements made, in light of the circumstances under which they were made, not

23          misleading;

24      d) Whether Defendants knew or recklessly disregarded that their statements were false

25          and misleading;

26      e) Whether the price of the Company's stock was artificially inflated; and

27

28

f)   The extent of damage sustained by Class members and the appropriate measure of damages.

179.   Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

180.   Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

181.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

182.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

183.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

184.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

185.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiffs and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

186.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

187.    The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Lead Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. By reason of their senior management positions, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Palo Alto to engage in the unlawful acts and conduct complained of herein. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public filings, and other public statements which Palo Alto disseminated. Each of the Individual Defendants exercised control over the general operations of Palo Alto and possessed the power to control the specific activities, including statements made over telephone and through SEC filings, which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**COUNT III**
**For Violation of §20A of the Exchange Act**
**(Against Defendant Arora)**

188.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

189.    As detailed herein, Defendant Arora was in possession of material non-public information regarding Palo Alto. Defendant Arora took advantage of his possession of this material non-public information to obtain significant insider trading profits during the Class Period.

190.    Defendant Arora's sales of Palo Alto common stock (as set forth below) were made contemporaneously with Lead Plaintiffs' purchases of Palo Alto common stock (as set forth in Lead Plaintiffs' certifications, ECF No 17-2) during the Class Period.

191.    Defendant Arora made the following sales of Palo Alto common stock contemporaneously with purchases of Palo Alto common stock by Lead Plaintiffs. On December 11, 2023, Defendant Arora sold 5,240 shares for the price of $300.01 and on December 12, 2023, Defendant Arora sold 300,000 shares in the price range of $300.44 to $307.32. Within 3 days of those sales, on December 12, 2023, Lead Plaintiffs bought 1,250 shares for $307.20, 875 shares for $307.45, and 40 shares for $306.97.

192.    Defendant Arora's sales of Palo Alto common stock during the Class Period were also contemporaneous with purchases of Class members during the Class Period. *See* ¶¶147-151 (listing Defendant Arora's Class Period sales).

193.    Lead Plaintiffs and other Class members who purchased Palo Alto common stock contemporaneously with sales by Defendant Arora suffered damages because: (1) in reliance on the integrity of the market, Lead Plaintiffs and members of the Class paid artificially inflated prices as a result of the violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, as alleged herein; and (2) Lead Plaintiffs and members of the Class would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendant Arora's false and misleading statements and concealment alleged herein.

194.    By reason of the above conduct, Defendant Arora is liable pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiffs' counsel as Lead Counsel;

B.      Awarding compensatory and punitive damages in favor of Lead Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.      Awarding Lead Plaintiffs and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D.      Awarding Lead Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury.

October 11, 2024

Respectfully submitted,

*/s/ Jacob A. Walker*
Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

Jeffrey C. Block (*pro hac vice*)
Sarah E. Delaney (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
sarah@blockleviton.com

*Counsel for Lead Plaintiffs and Lead Counsel
for the Class*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS