1
2
3
4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

5
6
7

| | |
|---|---|
| IN RE PALO ALTO NETWORKS, INC. SECURITIES LITIGATION | Lead Case No.: 3:24-cv-01156-CRB |
| This Document relates to: | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| ALL ACTIONS | |

8
9
10
11
12

United States District Court
Northern District of California

13

     Plaintiffs bring this securities class action on behalf of all persons who purchased or otherwise acquired Palo Alto Networks, Inc. (abbreviated as PANW) common stock, or who sold put options of PANW stock, between August 21, 2023 and February 20, 2024. Plaintiffs allege that PANW and its executive officers violated the Securities Exchange Act by making misleading statements about the company's financials. Defendants now move to dismiss for failure to state a claim. The Court finds this matter suitable for resolution without oral argument pursuant to Civil Local Rule 7-1(b), vacates the hearing, and **GRANTS** Defendants' motion to dismiss without prejudice.

## I.    BACKGROUND

### A.    Parties

     Lead Plaintiffs Ron and Michele Nabhan are individual investors who purchased shares of PANW common stock between August 21, 2023 and February 20, 2024. Am. Compl. (AC) (dkt. 65) ¶ 25. The purported class of plaintiffs also purchased PANW common stock or exercised put options of PANW in the same time period. Id. ¶ 1.

     Defendant PANW is a multinational cybersecurity company headquartered in Santa Clara, California. Id. ¶ 26. The three individual defendants are Nikesh Arora, PANW's

1   CEO; Dipak Golechha, PANW's CFO; and Lee Klarich, PANW's chief product officer.

2   Id. ¶¶ 27–29.

3       **B.    Factual Background**

4       PANW sells network security products, AI-enhanced cloud security platforms, and

5   security operations products, among others.  Id. ¶¶ 39–40.  In 2023 PANW began an

6   ongoing "platformization strategy"—a targeted sales tactic whereby PANW consolidated

7   various standalone products into a unified "platform" product with the goal of bringing

8   "various security functions under one roof" and "capturing more business from its

9   competitors."  Id. ¶¶ 45, 52.  PANW also incorporated platformization in dealings with its

10  federal clients; this made up a large portion of PANW's billings revenue.  Id. ¶¶ 52, 61–62.

11      On August 18, 2023, PANW announced its revenue and billings guidance for the

12  upcoming FY2024.  Id. ¶ 78.  Then, on November 15, PANW announced its Q1 2024

13  results and provided updated guidance.  Id. ¶¶ 95, 97.  PANW (1) reported that it met its

14  revenue guidance but fell short of its billings guidance during Q1 2024, (2) announced

15  lower billings guidance for Q2 2024, and (3) lowered the FY2024 billings guidance.  Id.;

16  Nov. 15 Earnings Call Slides (dkt. 66-6) at 17.  Golechha publicly attributed the impacts

17  on billings to "more customers asking for deferred payment terms" and "some customers

18  … looking for additional discounts for upfront payments."  AC ¶ 114.

19      On February 20, 2024, PANW reported that it met its Q2 2024 billings and revenue

20  guidance, announced its Q3 2024 guidance, and again updated its FY2024 guidance.  Id.

21  ¶ 126; Feb. 20 Earnings Call Slides (dkt. 66-7) at 20.  Once again, PANW lowered its

22  guidance.  AC ¶ 126.  On the same day, Arora explained in an earnings call that the change

23  in projections was "a consequence of us driving a shift in our strategy in wanting to

24  accelerate both our platformization and consolidation and activating our AI leadership."

25  Id. ¶ 128.  He also told investors that several deals with the federal government for "large

26  projects" did not close, resulting in "a significant shortfall in [] U.S. federal government

27  business" that he expected to last through the end of 2024.  Id. ¶ 134.  He said that this

28  shortfall "started off towards the end of Q1" and "worsened in Q2."  Id.

2

United States District Court
Northern District of California

That same day, Arora also announced that PANW would begin offering customers transitional periods of free platform products to "build customer confidence" and lower risk for customers as they transitioned out of their contracts with other security vendors. Id. ¶¶ 130–131, 133.  Golechha explained that this free product strategy would put immediate pressure on their billings revenue, but Arora estimated that PANW would return to its growth rate within twelve months.  Id. ¶¶ 131–132.

The next day, PANW's common stock price declined by over 28% per share—from $366.09 per share on February 20 to $261.97 per share on February 21.  Id. ¶ 167.

### C.    Procedural History

Plaintiffs filed this securities class action on February 26, 2024.  Compl. (dkt. 1).  In Plaintiffs' amended complaint, they allege that PANW, Arora, Golechha, and Klarich made false or misleading statements and material omissions about PANW's business, operations, and prospects during that period, and that these statements and omissions resulted in significant losses to class members.  AC ¶ 20.  To support these allegations, Plaintiffs offer statements from six confidential witnesses.  Id. ¶¶ 33–38.  Plaintiffs also allege that Arora engaged in insider trading.

**Failures to disclose.**  Plaintiffs allege that Defendants failed in August 2023 to disclose that they planned to lower their year-over-year revenue and billings guidance, which they did in February 2024.  Id. ¶ 82.  Plaintiffs also allege that Defendants failed to disclose (1) that platformization was "not driving increased market share"; (2) that demand was slowing due to increased competition, so PANW was planning to start offering free trial periods of its platform products; (3) that PANW's new artificial intelligence products were "not driving platformization"; and (4) that one of PANW's federal government contracts (Thunderdome) would not generate short-term revenue.  Id. ¶ 5.

**Misstatements.**  Plaintiffs challenge 24 statements contained in various press releases, earnings call transcripts, SEC filings, and conference call transcripts.  The statements fall into three general categories:

- Category I, statements about platformization, product demand, and billings;

3

- <u>Category II</u>, PANW's FY2024 revenue and billings guidance announced on August 18, 2023 and revised on November 15, 2023; and

- <u>Category III</u>, risk factor disclosures regarding sales to government entities.

**Insider trading.**  Plaintiffs allege that Arora "dumped $160 million worth of his own shares" in a four-week span from November to December 2023—two months before PANW launched its free platform product strategy.  <u>Id.</u> ¶ 4.  According to Plaintiffs, these sales were inconsistent with his prior stock sales.  <u>Id.</u> ¶ 149.

Plaintiffs bring three counts under the Exchange Act: a Section 10(b) fraud claim against all Defendants; a Section 20(a) control person liability claim against Arora, Golechha, and Klarich; and a Section 20A insider trading claim against Arora.  <u>Id.</u> ¶¶ 182–194.  Defendants now move to dismiss the amended complaint.

## II.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim that is facially plausible.  Fed. R. Civ. P. 12(b)(6); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft</u>, 556 U.S. at 678.  The Court "must take all of the factual allegations in the complaint as true," but it is "not bound to accept as true a legal conclusion couched as a factual allegation."  <u>Id.</u>[1]

A complaint alleging fraud must also "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1125

---

[1] In addition to the allegations in the AC, the Court can consider documents subject to judicial notice or incorporation by reference.  <u>United States v. Ritchie</u>, 342 F.3d 903, 908 (9th Cir. 2003).  Defendants request judicial notice of publicly available communications and financial documents, including an SEC filing.  Request for Consideration (dkt. 67) at 4.  Judicial notice of these documents is proper.  <u>Metzler Inv. GMBH v. Corinthian Colls., Inc.</u>, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (publicly available financial documents); <u>Wochos v. Tesla, Inc.</u>, No. 17-cv-05828-CRB, 2019 WL 1332395, at *2 (N.D. Cal. Mar. 25, 2019) (earnings call transcripts).  Defendants further request that various statements and forms filed by Defendants be incorporated by reference because Plaintiffs refer to them throughout the amended complaint and rely on them as the basis for their claims.  Request for Consideration at 2.  This too is proper.  <u>Khoja v. Orexigen Therapeutics</u>, 899 F.3d 988, 1002 (9th Cir. 2018).

United States District Court
Northern District of California

(9th Cir. 2009). Rule 9(b) requires a plaintiff to set forth the "who, what, when, where, and how" of the alleged fraud. <u>Vess v. Ciba Geigy Corp. USA</u>, 317 F.3d 1097, 1106 (9th Cir. 2003). One purpose of Rule 9(b)'s heightened pleading requirement is to provide notice to defendants of the specific fraudulent conduct against which they must defend. <u>Bly-Magee v. California</u>, 236 F.3d 1014, 1018 (9th Cir. 2001).

Securities fraud claims must further meet the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA): "[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 321 (2007).

## III.    DISCUSSION

The Court concludes that Plaintiffs fail to state a claim under Section 10(b); thus, their claims as to control-person liability under Section 20(a) and Section 20A fail as well.

### A.    Section 10(b) and Rule 10b-5

To state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff must adequately allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>ESG Cap. Partners, LP v. Stratos</u>, 828 F.3d 1023, 1032 (9th Cir. 2016) (citations omitted). "SEC Rule 10b-5 implements [section] 10(b) by declaring it unlawful: '(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements … not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'" <u>Tellabs</u>, 551 U.S. at 318 (quoting 17 C.F.R. § 240.10b-5).

1    Plaintiffs' Section 10(b) claim rests on 24 allegedly false and misleading statements

2    made by Defendants.  See AC ¶¶ 78–123.  Defendants challenge the sufficiency of

3    Plaintiffs' allegations with respect to two elements: (1) the falsity of their statements and

4    (2) whether they were made with scienter.  Ultimately, Plaintiffs fail to plead facts with

5    sufficient particularity to allege that any statements were false or materially misleading

6    when made.  Plaintiffs also fail to plead particularized facts alleging scienter.

### 1.    Materially false or misleading statements

7

8    To prevail on a Section 10(b) claim, Plaintiffs must show either that Defendants'

9    statements contained material falsehoods, see Dura Pharmaceuticals., Inc. v. Broudo, 544

10   U.S. 336, 341 (2005), or that Defendants' statements omitted material information in a

11   manner that made the statements misleading, see Basic Inc. v. Levinson, 485 U.S. 224,

12   231–32 (1988).  Materiality depends on whether "there is a substantial likelihood that a

13   reasonable shareholder would consider" the information to be "important."  Id. at 231

14   (citation omitted).  Certain types of statements are non-actionable, including puffery and

15   "vague statements of optimism," because most investors "know how to devalue the

16   optimism of corporate executives."  Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,

17   759 F.3d 1051, 1060 (9th Cir. 2014).

18   For an omission to be misleading and therefore actionable, "there must be a

19   substantial likelihood that the disclosure of the omitted fact would have been viewed by

20   the reasonable investor as having significantly altered the 'total mix' of information made

21   available."  Basic, 485 U.S. at 231–32 (citation omitted).  But "[section] 10(b) and Rule

22   10b-5(b) do not create an affirmative duty to disclose any and all material information."

23   Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011).  These rules "prohibit only

24   misleading and untrue statements, not statements that are incomplete."  In re Rigel

25   Pharms., Inc. Sec. Litig., 697 F.3d 869, 880 n.8 (9th Cir. 2012).  Disclosure is therefore

26   required only if necessary to make statements not misleading "in the light of the

27   circumstances under which they were made."  Id. (citing 17 C.F.R. § 240.10b-5(b)).

28   Moreover, a plaintiff "cannot rely on hindsight; rather, it must explain 'why the

United States District Court
Northern District of California

6

statements were false or misleading at the time they were made.'" In re Cloudera, Inc., 121 F.4th 1180, 1187 (quoting Rigel, 697 F.3d at 876); see also City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp., 47 F. Supp. 3d 1205, 1221–22 (E.D. Wash. 2014) ("[A] plaintiff may not plead 'fraud by hindsight,' i.e. a complaint may not simply contrast a defendant's past optimism with less favorable actual results."); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084–85 (9th Cir. 2002) ("The purpose of [the PSLRA's] heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading fraud by hindsight."), abrogated on other grounds by Tellabs, 551 U.S. 308.

Plaintiffs challenge 24 statements that fall into three general categories. Category I includes statements about platformization, product demand, and billings. Category II includes statements drawn from PANW's revenue and billings guidance. Category III includes PANW's risk disclosures regarding sales to government entities.

### a. Category I (platformization, demand, and billings statements)

Plaintiffs challenge 20 statements Defendants made about platformization, product demand, and billings on the grounds that they omitted material information. These statements range from general comments on the strength and popularity of particular products (see, e.g., AC ¶¶ 79, 101, 118) to statements about past sales and anticipated future sales (see, e.g., id. ¶ 112) to statements about billings strategies (see, e.g., id. ¶¶ 107, 109–10). Plaintiffs fail to allege that any of these statements were materially misleading.

Many of the challenged statements are non-actionable puffery or statements of corporate optimism that include optimistic, upbeat, and otherwise non-verifiable opinion-based expressions. For instance, Plaintiffs challenge PANW's statement that "[w]e continue to see strong interest across our next-generation security portfolio, and we're making progress on our platformization journey." Id. ¶ 99; see also id. ¶¶ 79, 83, 89, 91, 93, 95, 103, 105, 120, 122. Courts regularly find that similar statements are non-actionable. See, e.g., In re Splash Tech. Holdings., Inc. Sec. Litig., 160 F. Supp. 2d 1059,

1077 (N.D. Cal. 2001) (words like "strong," "robust," "well-positioned," and "solid," when used to describe results, demand, strategy, and products, were not actionable); Intuitive, 759 F.3d at 1060 (statement that "there is potential for growth in the [] market" was not actionable); In re Pivotal Sec. Litig., No. 19-cv-03589-CRB, 2020 WL 4193384, at *7 (N.D. Cal. Jul. 21, 2020) (statements about the "viral adoption" of a "leading" product that addressed a "rapidly growing market" were not actionable).

Plaintiffs note that "even general statements of optimism, when considered in context, may form a basis for a securities fraud claim if they address specific aspects of a company's operation that the speaker knows to be performing poorly." Opp. at 8–9 (citing In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1143 (9th Cir. 2017)). But Plaintiffs have not adequately alleged that relevant aspects of PANW's business operations were performing poorly, much less that any speaker knew that to be the case. Plaintiffs also argue that some of the challenged statements were material to investors and therefore are not mere puffery. Opp. at 9. To the extent any statements discussed material information (and few did), Plaintiffs fail to adequately allege that they were materially misleading.

For instance, eleven of the challenged statements discuss PANW's platformization strategy. AC ¶¶ 79, 83, 91, 93, 95, 99, 101, 103, 118, 120, 122. Plaintiffs contend that platformization was not as well-received in the market as promised and that Defendants failed to disclose those failures. Id. ¶ 80. Plaintiffs allege that the challenged statements about platformization were misleading because Defendants failed to disclose material information about platformization's weak reception in the market. Id. ¶¶ 45–51, 66, 80. Additionally, Plaintiffs appear to contend that federal contracts were integral to the success of platformization but that many of the platform products could not actually be sold to the government because they lacked requisite federal certifications. Id. ¶¶ 56–58, 80. Accordingly, Plaintiffs allege, these challenged statements were misleading because the company could not generate any revenue from platform sales to the government. Id.

For the challenged statements about platformization to have been misleading, platformization would have had to be failing at the time those statements were made, with

8

Defendants withholding that information from their investors. Rather than allege specific facts that would demonstrate this, Plaintiffs rely on vague statements from confidential witnesses that "numbers weren't very good," customer requests "slowed the sales process down," and the idea of offering free product "came up" at the end of the quarter. Id. ¶¶ 48–49. Plaintiffs also allege that platformization could not have been succeeding to the extent Defendants claimed because the platformization strategy was nothing new. See, e.g., id. ¶ 53 (PANW "had always offered customers a way to add additional products onto their platforms" and "[p]latformization was 'just a buzzword'"). Similarly, Plaintiffs rely on confidential witness statements to allege that PANW's new AI offering, XSIAM, was not driving increased platformization. See, e.g., id. ¶ 66 (XSIAM was "not ready for prime time" and customers "couldn't get full functionality"); id. ¶ 67 ("the process of selling XSIAM took longer than other products"); id. ¶ 68 ("I didn't sell a single XSIAM product"); id. ("[Confidential Witness] 6 did not hear about anyone … having sold the XSIAM platform."). To show that PANW could not sell platform products to federal customers, Plaintiffs rely on confidential witness statements that "the [Department of Defense] couldn't touch certain [PANW] products" because those products did not have the highest level of federal certifications. Id. ¶¶ 56–58.

None of these vague accounts sufficiently allege that the challenged statements were misleading when made.[2] See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009) (rejecting as insufficient confidential witness accounts that "allege conclusory assertions"), as amended (Feb. 10, 2009). Some of these accounts, like one confidential witness "not hear[ing]" about any XSIAM sales or another's report that

---

[2] Plaintiffs argue that disagreements over the reliability of confidential witnesses are improper at this stage, but that is not the reason the confidential witnesses' statements are insufficient. Rather, their accounts are vague, speculative, and conclusory. See Cloudera, 121 F.4th at 1189 (conclusory assertions about the reasons for a company's poor sales performance and a conclusory assertion that a company's "products could not provide performance comparable to its competitors'" were "unsupported by details" and thus could not "satisfy the particularity requirement of Rule 9(b)"); cf. City of Sunrise Firefighters' Pension Fund v. Oracle Corp., 527 F. Supp. 3d 1151, 1179 (N.D. Cal. 2021) (confidential witness accounts sufficiently particularized when they reported concrete internal metrics with specific data points).

United States District Court
Northern District of California

"customers couldn't get full functionality," are unreliable hearsay.  AC ¶¶ 66, 68.  Others are plainly conclusory, such as one statement that platformization's "numbers weren't very good" and another's that "we all knew about platformization, and we knew it wouldn't work."  Id. ¶¶ 48, 55.  When confidential witnesses report only unreliable hearsay or make conclusory assertions, their reports are insufficient to show that any statements by defendants were misleading.  See Zucco, 552 F.3d at 996.  Some of the confidential witness assertions are even inconsistent with reality, which further indicates unreliability.  For instance, Plaintiffs cite confidential witness as saying he "never heard of a single sale" of XSIAM, but PANW announced $200 million in XSIAM sales in FY2023.  AC ¶ 68; Nov. 15 Earnings Call Transcript (dkt. 66-16) at 7.

Plaintiffs' allegations also fail because Plaintiffs do not allege with particularity how any statements omitted material information and thereby "significantly altered the 'total mix' of information made available" to investors.  See Basic, 485 U.S. at 231–32 (citations omitted).  Nowhere do Plaintiffs allege particularized facts that would show that general demand was declining, that demand for platform products was declining, or that demand for platform products was low relative to demand for other products.[3]  Nowhere do Plaintiffs provide data about actual sales of the platform products, actual AI product sales, the size of PANW's market share, or how market share changed.  Without these or similar allegations, Plaintiffs do not adequately allege falsity.

Similarly, nowhere do Plaintiffs allege any facts that would show that PANW had already decided to implement the free product strategy when the challenged statements were made.  Plaintiffs allege that increased competition from other companies slowed demand, so PANW's "decision to implement free giveaways was in response to industry competition."  AC at 20.  This, Plaintiffs allege, indicates that Defendants knew all along

---

[3] Plaintiffs point to lowered February 2024 guidance as an indication that platformization had been failing all along.  At best this is fraud by hindsight, which is not a valid theory of fraud.  See Cloudera, 121 F.4th at 1187.  That PANW lowered its guidance in February 2024 does not suffice to allege that platformization was failing months earlier, nor that statements made months earlier were misleading.

United States District Court
Northern District of California

1    they would start offering free products to stem the flow of customers over to lower-priced

2    competitors.[4]  See, e.g., id. ¶ 80.  The Ninth Circuit rejected similar speculation in

3    Cloudera.  121 F.4th at 1189 (unsupported assertions about the cause of a company's "poor

4    performance" did not "satisfy the particularity requirement of Rule 9(b)").

5         Plaintiffs also rely on a statement Arora made on an earnings call on February 20,

6    2024—the day that PANW announced its free product strategy—that PANW had "been

7    quietly working" for six months to "develop programs" to "accelerate [its]

8    [platformization] strategy further."  AC ¶¶ 80, 86, 148.  According to Plaintiffs, this was

9    tantamount to an admission that platformization had been failing all along and that

10   Defendants had been lying about it for months.  But Plaintiffs take Arora's statement out

11   of context: Arora said nothing about platformization not driving increased market share,

12   platform product sales slowing, or the platformization strategy not succeeding.  In fact, on

13   the same earnings call, Arora noted that the percentage of customers who purchased

14   platform products had increased in the last two years, announced several large sales of

15   platform products, noted that PANW "continued to drive large deals" involving platform

16   products, noted that PANW was seeing market "share shift happening in our favor because

17   we see customers consolidating," and remarked that "the demand story is no different from

18   previous quarters."  Feb. 20 Earnings Call Transcript (dkt. 66-17) at 4–7.  Plaintiffs do not

19   allege, let alone with factual support, that these statements were false.  So it is wrong to

20   allege that Arora was concealing the failures of platformization; to the contrary, the full

21   transcript shows him explaining how platformization was succeeding.

22        Nor did anything else Arora said in the February 20 earnings call indicate that any

23   challenged statements about billings (AC ¶¶ 85, 89, 95, 99, 107, 109–10, 114) were

24   misleading.  All he said was that PANW "was beginning to notice customers [were] facing

25   _____

26   [4] Plaintiff cites In re Apple Inc. Sec. Litig., 2020 WL 6482014, at *6–7 (N.D. Cal. Nov. 4,
     2020), in which a defendant "cut production lines" due to low demand after representing to
27   its investors only four days prior that the company was not "experiencing [demand]
     pressure" and the court found plausible the plaintiff's allegation that the challenged
28   statement was misleading.  Id.  The six-month timeline in this case is significantly longer
     than the four days in Apple.  See id.

                                          11

spending fatigue" and "beginning to see rogue behavior" from competitors, and that the free product strategy was one way to "accelerate platformization and consolidation." Feb. 20 Earnings Call Transcript at 6–7 (emphasis added). But Plaintiffs offer no factual allegations to show that Defendants had decided to offer free products at the time that the statements were made.[5] And "later, sobering revelations do not by themselves make [an] earlier, cheerier statement a falsehood." Cloudera, 121 F.4th at 1189 (citation omitted). Ultimately, Arora's statements do not provide a basis for Plaintiffs' overarching allegations that PANW was keeping secrets from its investors or engaging in fraud to artificially inflate PANW's billings and revenue guidance.

Even if Defendants had been planning on launching their free product strategy for several months, Plaintiffs have not alleged that Defendants had a duty to disclose that information. Despite Plaintiffs' allegation that "Defendants were assuring investors that [PANW] could avoid offering discounts by allowing customers to pay substantially in full on a deferred basis," AC ¶ 86, Plaintiffs never identify any statement that created the impression that PANW was not discounting (or would not discount) its products. The closest that Plaintiffs come is identifying statements that some customers wanted discounts that PANW did not want to give, and that PANW offered those customers deferred payment plans instead of discounts. Id. ¶¶ 85, 89, 109, 114. Such statements do not impose a duty on Defendants to disclose whether they were—or were not—planning to offer discounts.[6]

Not only do Plaintiffs fail to show that Defendants hid material information about demand or competition from investors, they also fail to show that demand was declining or

---

[5] One confidential witness states that the topic of offering free products "came up" at the end of 2023. AC ¶ 48. But this does not demonstrate that PANW "was already planning to offer significant discounts to induce customers to adopt platformization" six months earlier, as Plaintiffs contend. Id. ¶¶ 48, 86.

[6] Plaintiffs also argue that "insiders in possession of material nonpublic information must disclose that information to shareholders or refrain from trading with them," so Arora's stock sales triggered a duty to disclose information to shareholders. Opp. at 8 (citing McCormick v. Fund Am. Cos., 26 F.3d 869, 876 (9th Cir. 1994)). The Court does not need to reach the holdings of Plaintiffs' cited cases because Plaintiffs do not allege with particularity that Arora was in possession of any material nonpublic information.

United States District Court
Northern District of California

United States District Court
Northern District of California

that PANW was struggling to compete.  Statements from confidential witnesses that they "got a clear understanding at those meetings that we weren't selling [much]," id. ¶ 59, are not specific enough.  And one of Plaintiffs confidential witnesses even admits the existence of high demand.  Id. ¶ 69 (increased pace of XSIAM's development and rollout was because of "customer demand").  Plaintiffs allege the existence of competitors, but they offer no factual allegations to support their conclusory allegation that PANW "was struggling to compete in a competitive environment."  Id. ¶¶ 70–77.  Plus, PANW's investors had contemporaneous access to material details about platformization and competition that could have corroborated (or undermined) the challenged statements.  See, e.g., Aug. 18 Earnings Call Slides (dkt. 66-13) at 6–8, 11, 100, 108 (disclosing the proportion of PANW's largest deals that were "platformization" transactions, the growth of multi-module customers, and the ratio of total customers who had purchased products "across all 3 platforms"); Nov. 15 Earnings Call Slides at 6, 9, 12 (disclosing the growth of multi-module customers and the value of XSIAM bookings in 2023); FY2023 Annual Report (dkt. 66-14) at 14, 19–20 (disclosing risks); Q1 2024 Quarterly Report (dkt. 66-15) at 36, 41–42 (same).  Plaintiffs have not alleged any omission that would have significantly altered the total mix of information available to investors.

Finally, Plaintiffs fail to allege that Defendants' representations about future federal contracts made any of the challenged statements misleading.  Plaintiffs allege that platform product sales to government entities "made up the majority of [PANW's] billing revenue," but that those sales were faltering, so Defendants' statements about platformization "driving large deal momentum" were misleading.  Id. ¶¶ 52, 63.  But Plaintiffs do not provide any factual allegations that would demonstrate that the lack of certifications for these "certain products" had a material effect on overall sales of those platform products.  Nor do they identify which products required which certifications, which government entities could still buy products without specific certifications, or how any lack of certifications affected platformization as a whole.  Standing alone, the confidential witness statements that the Department of Defense could not purchase "certain [PANW] products"

are not enough to allege the misleading nature of the challenged statements.  Id. ¶ 56.
Plaintiffs do not even allege any representation from PANW that the products did have
such certifications.  Because Plaintiffs did not allege facts sufficient to show that a lack of
certifications materially affected PANW's sales to government entities, they fail to
adequately allege that Defendants' statements about platformization driving government
sales were misleading.

### b.   Category II (guidance statements)

Plaintiffs challenge two revenue and billings guidance statements: the August 18,
2023 guidance statement, AC ¶ 81, and the November 15, 2023 guidance statement, id.
¶ 97.  These guidance statements are protected by the PSLRA's safe harbor rule.

The PSLRA carves out a safe harbor from liability for statements that are identified
as "forward-looking" and are "accompanied by meaningful cautionary statements."  15
U.S.C. § 78u-5(c)(1)(A)(i).  A forward-looking statement is "any statement regarding
(1) financial projections, (2) plans and objectives of management for future operations,
(3) future economic performance, or (4) the assumptions 'underlying or related to' any of
these issues."  No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.
Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003).  "[I]f a forward-looking statement is
identified as such and accompanied by meaningful cautionary statements … the statement
is not actionable."  In re Cutera Sec. Litig., 610 F.3d 1103, 1112 (9th Cir. 2010).  A
forward-looking statement is also non-actionable when the plaintiff fails to allege that it
was made with "actual knowledge that the statement was false or misleading."  Id. at 1111
(citing 15 U.S.C. § 78u–5(c)(1)(B)).  Guidance statements, like earnings projections, are
forward-looking statements "by definition."  See id.

Plaintiffs erroneously claim that Defendants' guidance statements were not
identified as forward-looking.  AC ¶ 171.  But see Aug. 18 Form 8-K (dkt. 66-5) at 6
("This press release contains forward-looking statements"); Nov. 15 Form 8-K (dkt. 66-10)
at 5 (same).  They contend that the "boilerplate" cautionary statements accompanying the
guidance statements were not "meaningful," so the safe harbor rule does not apply.  Opp.

United States District Court
Northern District of California

at 10–11.  But PANW's guidance statements specifically incorporated risk factor disclosures that referenced the exact kinds of risks that PANW faced.  See, e.g., May 24 Form 10-Q (dkt. 66-3) at 43, 50; FY2023 Annual Report at 18, 20; Q1 2024 Quarterly Report at 40, 42.  Plaintiffs also argue that the risk factor disclosures failed to reference known developments that made the identified risks more likely to come to fruition—that platformization was already failing, and that a key federal contract called Thunderdome was already not materializing.  Opp. at 11; AC ¶¶ 61, 63.  But this argument fails because Plaintiffs fail to allege facts that would establish that platformization was already failing or that Thunderdome was not materializing when the statements were made, let alone that Defendants knew of those developments.

### c.    Category III (risk disclosure statements)

Finally, Plaintiffs challenge two of PANW's risk disclosure statements as misleading: the September 1, 2023 risk disclosure statement, AC ¶ 87, and the November 17, 2023 risk disclosure statement, id. ¶ 116.  Plaintiffs fail to plead with sufficient particularity that these statements were misleading.

As Plaintiffs correctly note, allegations are "sufficient to survive a motion to dismiss when the complaint plausibly allege[s] that a company's SEC filings warn[] that risks 'could' occur when, in fact, those risks had already materialized."  In re Facebook, Inc. Sec. Litig., 87 F.4th 934, 948–49 (9th Cir. 2023).  The challenged statements warn of the risks inherent to sales to government entities: such sales can be "highly competitive," certification requirements may "restrict[] our ability to sell into the federal government sector," and funding restrictions may "adversely affect[] public sector demand."  AC ¶¶ 87, 116.  Plaintiffs allege that these risks had already come to fruition at the time the challenged statements were made because many products lacked federal certifications, the Thunderdome deal was not generating revenue, and there were federal budgetary limitations that prevented deals from going through.  Id. ¶¶ 88, 117.

But Plaintiffs fail to substantiate their allegations with specific factual allegations.  For instance, they make only vague, unsupported allegations that "many" products lacked

1   necessary federal certifications and that the Department of Defense would not buy

2   "certain" products.  Id. ¶ 56.  As discussed earlier, plaintiffs do not specify which products

3   had or needed which certifications, whether the lack of such certifications had a material

4   effect on sales to government entities, or how the Department of Defense's inability to buy

5   "certain" products affected overall sales.

6        Plaintiffs' focus on the Thunderdome deal fares no better.  They allege that the

7   challenged risk disclosure statements—which warned of the risk that the company may

8   expend "significant upfront time and expense" trying to secure government sales "without

9   any assurance that these efforts will generate a sale"—were misleading because

10  Thunderdome was already "failing to generate revenue."  AC ¶¶ 87, 116.  But Plaintiffs do

11  not offer any factual allegations about when the issues with the Thunderdome deal

12  materialized or when Defendants knew of those issues.  They only offer a statement from

13  Arora that "softness in the U.S. federal government market … started off towards the end

14  of Q1 [of 2024]" and "worsened in Q2 [of 2024]," id. ¶ 134, and one from Golechha that

15  "a large program" (which Plaintiffs assume to be Thunderdome) "didn't materialize at the

16  pace and at the spending levels we had expected.  We saw an early glimpse in Q1 towards

17  the end."  Id. ¶ 135.  Other than those vague references, Plaintiffs do not allege any facts

18  about the timing of the Thunderdome deal.

19       The challenged risk disclosure statements were published on September 1 and

20  November 17, 2023.  Id. ¶¶ 87, 116.  Plaintiffs do not adequately allege that Thunderdome

21  was already failing, or that Defendants were aware of Thunderdome's failures, on those

22  dates.  At best, they make the conclusory allegation that Thunderdome "was already failing

23  to generate revenue" because Defendants announced on February 20, 2024 that the

24  Thunderdome deal did not close and accordingly lowered their guidance.  Id. ¶¶ 117, 135;

25  see also id. ¶¶ 136, 139, 140 (analysts' statements after PANW lowered its guidance).

26  This is, again, a barred "fraud by hindsight" theory.  See Cloudera, 121 F.4th at 1187.

27       Finally, Plaintiffs do not adequately allege that federal budgetary constraints

28  affected sales to government entities at the time the challenged statements were made.

16

United States District Court
Northern District of California

Plaintiffs offer only a single statement from a confidential witness that "the U.S. government didn't have the budget for cybersecurity products" until "summer of 2024." Id. ¶ 60. Plaintiffs do not identify when the U.S. government supposedly informed the confidential witness of this budgetary issue, who at PANW knew about this budgetary issue, or whether this budgetary issue actually affected PANW's sales to government entities. Thus, this bare assertion is insufficient to make the challenged statements from September 1 and November 17, 2023 misleading.

### 2.      Scienter

Defendants also challenge Plaintiffs' Section 10(b) claim on the grounds that Plaintiffs failed to plead particularized facts giving rise to a "strong inference" of scienter. Tellabs, 551 U.S. at 323. A Section 10(b) claim must "state with particularity facts giving rise to a strong inference that the defendant acted" with "a mental state embracing intent to deceive, manipulate, or defraud." Id. at 319, 321. To do so, a complaint must allege that the defendants made "false or misleading statements either intentionally or with deliberate recklessness." Zucco, 552 F.3d at 991 (citation omitted). Deliberate recklessness is not "mere recklessness," but is instead "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 705 (9th Cir. 2016) (citations omitted).

The Court must "engage in a comparative evaluation [and] … consider, not only inferences urged by the plaintiff … but also competing inferences rationally drawn from the facts alleged." Tellabs, 551 U.S. at 314. Courts in the Ninth Circuit sometimes conduct a dual inquiry, which considers both "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter" and, if not, whether the individually inadequate allegations "combine" to allege scienter when considered as a whole. In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 702–03 (9th Cir. 2012).

Plaintiffs' theory of scienter relies on four allegations: (1) that Defendants "artificially inflated" PANW's guidance; (2) that Arora engaged in suspiciously timed bulk

17

United States District Court
Northern District of California

1  sales of shares; (3) that Arora's statements on the February 20 earnings call indicated that

2  his previous statements were false or misleading; and (4) that Arora and Golechha

3  occupied such integral positions at PANW that they "were reckless in not knowing" that

4  platformization was "underperforming."  Opp. at 1, 5, 12; AC ¶¶ 78, 81, 148–160.  But

5  Plaintiffs have not sufficiently pleaded scienter, even considering their allegations both

6  individually and collectively.

7      First, Plaintiffs offer no support for their allegation that Defendants "artificially

8  inflated" PANW's guidance to maintain its then-current valuation.  Opp. at 1, 5, 12.

9  Plaintiffs have not alleged any facts, let alone with particularity, from which the Court

10  could infer that Defendants acted intentionally or with deliberate recklessness when setting

11  PANW's guidance.  See Tellabs, 551 U.S. at 323.  Rather, the Court can rationally infer

12  that PANW's valuation was simply accurate.

13      Second, Plaintiffs fail to allege with particularity that Arora's stock sales were

14  "dramatically out of line with prior trading practices" and thus indicative of deliberate

15  recklessness.  See Zucco, 552 F.3d at 1005 (citations omitted).  Though "trading at

16  suspicious times or in suspicious amounts by corporate insiders has long been recognized

17  as probative of scienter," trading must also "be unusual, well beyond the normal patterns

18  of trading by those defendants."  In re Daou Sys., Inc., 411 F.3d 1006, 1022–23 (9th Cir.

19  2005) (citation omitted).  To be sure, Arora's net profit from his sales in November and

20  December 2023 was over $120 million, his sales were made on five days over a four-week

21  span, his largest sale corresponded to PANW's then-highest-ever stock price, and his sales

22  rapidly increased in the summer of 2023 and have rapidly tapered since February 2024.

23  AC ¶¶ 149–51.  But the Court must consider competing inferences, and facts drawn from

24  incorporated documents counteract any apparent suspiciousness of Plaintiffs' allegations.[7]

---

26  [7] Though "it is improper to assume the truth of an incorporated document if such
   assumptions only serve to dispute facts stated in a well-pleaded complaint," Khoja, 899

27  F.3d at 1003, the facts drawn from these incorporated documents do not dispute any of
   Plaintiffs' factual allegations.  Rather, they relate to Plaintiffs' conclusory allegation that

28  Arora's stock sales were unusual.  See In re Eventbrite, Inc. Sec. Litig., No. 18-cv-2019-
   EJD, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020) ("Khoja does not prevent a

United States District Court
Northern District of California

Arora sold more shares in the three months before August 21, 2023 than he did between that date and February 20, 2024.  May 26 Form 4 (dkt. 66-19), June 8 Form 4 (dkt. 66-20); see also In re Apple Comput. Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989) ("Large sales of stock before the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock during the class period.").  Plaintiffs do not allege that the other individual Defendants similarly traded.  See Metzler, 540 F.3d at 1067 ("We typically require larger sales amounts [than 37%]—and corroborative sales by other defendants—to allow insider trading to support scienter.").  And Arora's sales were made pursuant to a 10b5-1 plan he created two months before Defendants allegedly came up with the free product strategy.  AC ¶ 153.[8]

Third, as discussed above, Plaintiffs fail to adequately allege that Arora's February 20 statement directly contradicted or was inconsistent with earlier statements such that Arora must have had contemporaneous knowledge of the falsity of those earlier statements.  See In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 846 (9th Cir. 2003).  Plaintiffs' assertion to the contrary does not allege a strong inference of scienter.

Fourth, Plaintiffs fail to allege with particularity that Arora and Golechha were deliberately reckless in not knowing about the strength or weakness of the platformization strategy.  Plaintiffs rely on confidential witnesses to argue that Arora and Golechha, by virtue of their roles and responsibilities to the company, should have known about any alleged failures with platformization.  That argument fails.  For one, Plaintiffs do not allege facts from which the Court could conclude that any risks of platformization were so obvious that Arora and Golechha must have been aware of them.  See Intuitive, 759 F.3d

---

defendant from using the doctrines of judicial notice or incorporation by reference to create factual disputes with a plaintiff's conclusory allegations." (emphasis in original)).
[8] Plaintiffs cite Lamartina v. VMWare, Inc., No. 5:20-cv-02182-EJD, 2021 WL 4133851, at *12 (N.D. Cal. Sept. 10, 2021), as support for their position that Arora's 10b5-1 plan does not automatically negate scienter.  Opp. at 14.  But in Lamartina, it was unclear when the defendants adopted their 10b5-1 plans, so "the Court [could not] say that those plans preceded [the defendants'] awareness of the alleged plan to manipulate."  2021 WL 4133851, at *12.  Here, Plaintiffs allege that the 10b5-1 plans preceded the "alleged plan" to manipulate stock prices by two months.  AC ¶ 153.

at 1062 (allegations of scienter based on defendant's role in the company may be sufficient "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter") (citation omitted).  For another, Plaintiffs do not explain how these confidential witnesses know what Arora and Golechha would have known about specific operations at PANW.  See Mulligan v. Impax Labs., Inc., 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014) (confidential witnesses must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" (citations omitted)); Intuitive, 759 F.3d at 1062 (plaintiff's allegations insufficient where the complaint lacked "allegations of specific admissions by the individual defendants regarding their involvement with [the company's] operations" and instead relied on "impressions of witnesses who lacked direct access to the executives but claim[ed] that the executives were involved with [the company's] day-to-day operations").

Even taking Plaintiffs' individual allegations holistically, they still fail to allege sufficient facts to demonstrate scienter.  The Ninth Circuit has found scienter on a holistic review, as one example, where a company's founders repeatedly sold their shares without informing an investor in violation of the investor's right to notice because the investor was highly regarded and would cause the company to go under if it jumped ship, all while the founders were engaged in a scheme to profit from the company's business while it lost enormous amounts of money.  WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1052–53 (9th Cir. 2011), abrogated on other grounds by Lorenzo v. SEC, 587 U.S. 71 (2019).  Plaintiffs have not alleged anything nearly as compelling.  Their allegations do not tell a cohesive story like those in WPP Luxembourg, they do not become more "cogent" together than they are individually, and they do not combine to become "at least as compelling as any opposing inference of nonfraudulent intent."  See Tellabs, 551 U.S. at 314.  Accordingly, Plaintiffs have not sufficiently alleged scienter.

**B.      Section 20(a) Control Person Liability and Section 20A Insider Trading**

Because the Section 10(b) claim is dismissed, the Section 20(a) claim based on

control person liability and the Section 20A insider trading claim must also be dismissed. See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their claims for violations of [Section] 20(a) and [Section] 20A, plaintiffs must first allege a violation of [Section] 10(b) or Rule 10b-5.").

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss and dismisses Plaintiffs' amended complaint without prejudice.  Plaintiffs have 28 days from the issuance of this order to file a further amended complaint, if any.

**IT IS SO ORDERED.**

Dated: April 11, 2025



CHARLES R. BREYER
United States District Judge