1  Jacob A. Walker (SBN 271217)
2  **BLOCK & LEVITON LLP**
   400 Concar Drive
3  San Mateo CA 94402
   (650) 781-0025
4  jake@blockleviton.com

5  *Counsel for Lead Plaintiffs Ron Nabhan and Michele Nabhan*
   *And Lead Counsel for the Class*

6  [Additional Counsel Appear on Signature Page]

7            **UNITED STATES DISTRICT COURT**
8           **NORTHERN DISTRICT OF CALIFORNIA**

9  MARTIN SCHLAEGEL, individually and on
   behalf of all others similarly situated,
10
                                                    Lead Case No. 3:24-cv-01156-CRB
        Plaintiff,
11
   v.                                               **SECOND AMENDED CLASS ACTION**
12                                                  **COMPLAINT FOR VIOLATION OF**
                                                    **THE FEDERAL SECURITIES LAWS**
   PALO ALTO NETWORKS INC. and
13 NIKESH ARORA,
                                                    **DEMAND FOR JURY TRIAL**
14
        Defendants.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -
SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

**TABLE OF CONTENTS**

2   NATURE AND SUMMARY OF THE ACTION ............................................................4

3   JURISDICTION AND VENUE ...........................................................................10

4   PARTIES AND WITNESSES............................................................................10

5        A.     Parties...........................................................................10

6        B.     Former Employee Witnesses ................................................11

7   SUBSTANTIVE ALLEGATIONS .......................................................................12

8        A.     The Company and Its Operations ..........................................12

9        B.     The Company's "Platformization" Strategy ...........................14

10       C.     Pressure from Industry Competition Posed an Obstacle to Platformization..........16

11       D.     The Company's Positive Representations in the Lead-up to the Class Period ......18

12   DEFENDANTS' MATERIALLY FALSE AND
13   MISLEADING STATEMENTS AND OMISSIONS ......................................21

14   THE TRUTH EMERGES................................................................................24

15   ADDITIONAL SCIENTER ALLEGATIONS............................................................30

16       A.     Defendant Arora's Pre-Planned Trades Provided a Strong Motive to
17              Conceal Material Information from the Market During the Class Period. ..........31

18       B.     Defendant Arora Was A Hands-On Manager
                Who Was Personally Involved in Overseeing Sales...............................41

19   DEFENDANTS EMPLOYED DEVICES, SCHEMES, AND ARTIFICES
20   TO DEFRAUD INVESTORS IN VIOLATION OF RULE 10B-5(a) AND (c)..............42

21   LOSS CAUSATION/ECONOMIC LOSS ...............................................................48

22   APPLICABILITY OF PRESUMPTION OF RELIANCE:.............................................50

23   NO SAFE HARBOR ....................................................................................50

24   CLASS ACTION ALLEGATIONS ......................................................................52

25   COUNT I ................................................................................................53

26   COUNT II ...............................................................................................53

27   COUNT III ..............................................................................................55

28   PRAYER FOR RELIEF ................................................................................55

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL ...........................................................................................56

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs Ron Nabhan and Michele Nabhan ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following upon personal knowledge as to Lead Plaintiffs, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, a review of documents filed by Defendants Palo Alto Networks, Inc. ("Palo Alto Networks" or "Palo Alto" or the "Company"), and Nikesh Arora ("Arora") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, other publicly available information about Defendants and information provided by former Palo Alto employees ("FEs"). Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, Palo Alto Networks common stock during the period from November 16, 2023 through February 20, 2024, inclusive (the "Class Period"), who were damaged thereby (the "Class"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      Palo Alto Networks is a cybersecurity company headquartered in Santa Clara, California. Palo Alto's common stock has traded publicly on the Nasdaq since 2012.

3.      On June 7, 2023, Palo Alto Networks' Chief Executive Officer, Defendant Nikesh Arora, engaged in his largest single-day sale of Palo Alto stock. After exercising 474,300 options, Arora then sold 530,169 Palo Alto shares, more than 20 times larger than his previous largest single-day sale. This trade was not made pursuant to a Rule 10b5-1 trading plan. However, Arora established a 10b5-1 trading plan the very next day, June 8, 2023, under which he would ultimately execute even more profitable trades in a three-week period from November 22, 2023 to December 12, 2023.

4.     The 10b5-1 trading plan Arora established on June 8, 2023 was originally scheduled to end on August 30, 2024. Alternatively, the 10b5-1 plan would end if Arora sold 2 million shares before August 30, 2024.

5.     After Defendant Arora established his 10b5-1 trading plan, Palo Alto Networks embarked on an aggressive sales strategy to promote what it called "platformization." Business customers had traditionally purchased cybersecurity products and services a la carte from various vendors. Palo Alto's strategy was to bundle its products into consolidated "platforms" in an effort to convince businesses to bring multiple security functions under one roof. Palo Alto touted platformization to its investors as a key driver of the Company's growth.

6.     "Platformization," however, was not an "easy" sell "for many of [Palo Alto's] customers" as Defendant Arora would later concede. The "[k]ey friction points" came from the inherent difficulty of replacing "multiple products simultaneously." Customers who had contracts of different durations with different vendors would end up paying "double" if they replaced everything all at once with Palo Alto's platforms. Meanwhile, competitors seeking to retain customers offered their individual products at lower prices, challenging Palo Alto in an environment where demand was slowing due to a variety of factors including increased interest rates and what the Company called "spending fatigue in cyber security."

7.     Palo Alto began "quietly working to develop programs" to mitigate precisely these "friction points," as Arora later conceded, in August 2023. The solution the Company adopted was to offer their suite of products to customers for free for a period of approximately 6 months.

8.     There was a problem, however. Giving away products for free, even for a limited time, would cause the key metrics Palo Alto promoted to investors to decrease—in particular its billings—and have a negative short-term impact on the Company lasting an estimated 12–18 months. Palo Alto's share price, by extension, would also take a significant hit. Even if the hit were temporary, Defendant Arora stood to lose tens of millions of dollars in profit from his upcoming, pre-planned sales pursuant to the 10b5-1 plan he had adopted in June 2023.

9.      In the lead-up to the Company's 2024 Fiscal Year ("FY 2024"), Palo Alto's share price already reflected favorable assumptions about the Company's ability to grow its billings. Just before Palo Alto disclosed its FY 2024 guidance, Wedbush analysts explained that Palo Alto "needs to grow Billings ~19% y/y in FY24E to ~$11b" to justify its then-current valuation because its stock was already "pricing in almost a 'best-case' scenario for FY24E numbers."

10.      After the close of trading on Friday, August 18, 2023, Palo Alto held an earnings call to discuss its financial results for Q4 2023 and its guidance for the upcoming fiscal year (the "August 18, 2023 Q4 Earnings Call"). Defendants projected FY 2024 billings growth of 19–20%—precisely in line with what Wedbush had calculated as being necessary to maintain Palo Alto's stock price— and revenue of $8.15 billion to $8.2 billion, for year-over-year growth of 18% to 19%.

11.      The Company defines "billings" as "total revenue plus the change in total deferred revenue, net of acquired deferred revenue, during the period." In other words, billings represents both revenue actually received in a period and additions to the Company's deferred revenue balance.

12.      Billings, as Palo Alto explained in SEC filings, is a "key metric" which provides "investors with an important indicator of the health and visibility of our business because it includes subscription and support revenue, which is recognized ratably over the contractual service period, and product revenue, which is recognized at the time of hardware shipment or delivery of software license…"

13.      Defendant Arora discussed platformization during the August 18, 2023 Q4 Earnings Call. Arora singled out rising interest rates as the source of customers' hesitancy to consolidate their security functions under Palo Alto's platforms. If Palo Alto's customers wanted to hold onto cash longer in order to benefit from higher interest rates, Arora told investors, Palo Alto could overcome this challenge by offering "deferred payment terms" and financing.

14.      During the August 18, 2023 Q4 Earnings Call, one analyst asked if there was "discounting when you're doing these multiyear [deferred payment] deals?" Arora responded that Palo Alto had effectively "navigated" its business into "deferred payment plans," and explained that deferred payment plans and discounts were an either-or proposition whereby Palo Alto could avoid

1  giving discounts by offering deferred payments instead: "I can take the money up front and let the

2  customers get a discount . . . or I can let them pay when they're ready to pay and I can extract a better

3  economic outcome in that context."

4      15.    The Class Period begins on the first trading day after Palo Alto announced its first

5  quarter 2024 results on November 15, 2023. The Company revised its billings growth downwards

6  slightly from its August 18, 2023 projections to a range of 16–17%, explaining that "billings were

7  impacted by the cost of money," *i.e.*, high interest rates, but maintained its projection for year-over-

8  year growth in revenue to be between $8.15 billion and $8.2 billion, for 18% to 19% growth.

9      16.    During an earnings call held after market close on November 15, 2023, Defendant

10  Arora reiterated that the billings adjustment was a pure consequence of Palo Alto's increased reliance

11  on deferred payment plans to account for high interest rates. Defendant Arora did not acknowledge

12  the other headwinds to selling Palo Alto's platformization approach, even though the Company by

13  this point had been secretly working to address those "[k]ey" friction sources for three months. Arora

14  instead told investors: "The ***only thing that's changing*** is people say, I'll do a 2-year, 1-year deal or

15  a 3-year deal or a 5-year deal. ***I'll pay you later***." Arora assured investors that, because only the timing

16  of payment would change, the impact to Palo Alto's metrics was purely "cosmetic."

17      17.    Defendants therefore insisted Palo Alto could overcome the strawman challenge of

18  rising interest rates without resorting to the sorts of customer discounts and incentives which the

19  Company was already developing to address the more challenging "[k]ey friction points." Deferred

20  payment plans might work if the cost of money truly was the most significant source of customer

21  hesitancy, but they could not solve the problem of customers double-paying for security products

22  before their legacy contracts expired. Deferred payment plans would still mean customers would

23  ultimately pay twice for the same product. This was why Palo Alto was "develop[ing] programs" to

24  address customer friction above and beyond deferred payment plans.

25      18.    A week after assuring investors that the "only thing that's changing" was deferred

26  payments, Defendant Arora began to capitalize on his 10b5-1 plan. Between November 22, 2023 and

27  December 12, 2023, as Palo Alto's stock price reached historic highs, Arora exercised options and

28

immediately liquidated a total of 555,240 shares of Palo Alto stock for $160 million in total revenue in less than three weeks. Arora purchased each share for a set price of $66.17, meaning Palo Alto's price inflation allowed him to reap $123.5 million in net profit.

19.    This was by far Arora's most profitable month of trading in Palo Alto securities. In fact, Arora made far more in net profit in just three weeks during the Class Period than he made in any *three-month* period beforehand, and brought in more total revenue in this 20-day period during the Class Period than he made in any *year* prior to the Class Period. Arora made nearly as much revenue off of his Class Period sales ($160.25 million) as he did off of all of his prior sales combined ($173 million).

20.    And yet, on December 13, 2023, the day after his final Class Period sales, Arora abruptly filed a Form 4 with the SEC stating that he had "terminated [his] Rule 10b5-1 trading plan." The cancellation came 8 months prior to the plan's scheduled end date of August 30, 2024, and before the alternative condition of 2 million shares sold had been satisfied.

21.    At Palo Alto's very next earnings announcement, after markets closed on February 20, 2024, Palo Alto announced its financial results for the second quarter of 2024. The Company surprised the market by significantly lowering its third quarter and full-year billings and revenue guidance, with expected billings growth in Third Quarter 2024 of just 2-4% and Fiscal Year 2024 billings growth of 10% to 11%, dramatically below the 19% to 20% it guided in August 2023 and the 16% to 17% guided in November 2023. Palo Alto reduced its guidance for year-over-year total revenue growth from the 18% to 19% guided in August and November 2023 to between 15-16%.

22.    The explanation for why Palo Alto was making this disappointing adjustment was even more surprising. In an earnings call on the same day, Defendant Arora explained that "our guidance is a consequence of us driving a shift in our strategy" to respond to the realities customers face while trying to switch from several individual tools to a consolidated security platform. Arora explained that, "[o]ver the last 6 months, we have been quietly working to develop programs" to overcome the "[k]ey friction points we've noticed" which made it difficult for customers to adopt platformization:

1  "the challenge of replacing multiple products simultaneously as well as the issues around double
2  [paying] while working through complex contract terms."

3        23.    To overcome this roadblock to gaining new customers, Palo Alto's new strategy would
4  allow customers to use its products free of charge until their contracts with other security vendors
5  expired. The plan amounted to offering "about 6 months' worth of free product" to customers as a
6  sales incentive for platformization. Palo Alto's CFO, Dipak Golechha, clarified that deferred
7  payments would continue alongside the new "platformization programs." In other words, discounting
8  and deferred payments were not an either-or proposition after all. The Company would have to use
9  both to overcome different sources of sales friction.

10       24.    The announcement shocked analysts who followed the Company. A Barclays analyst
11  report called Palo Alto's announcement that it was offering lengthy discounts to customers "the part
12  of the call that was most unexpected." Analysts were particularly confounded by the timing of the
13  announcement, coming in the middle of Palo Alto's fiscal year and well after it embarked on its
14  consolidation efforts. A Citigroup analyst stated during the February 20, 2024 earnings call that the
15  "middle of the year" timing was "admittedly atypical." Barclays also commented on the unusually
16  delayed timing, writing in a research note that "the issue" was that "this big of a change is being done
17  unexpectedly in the middle of the year." And Guggenheim published a note bluntly asking: "Why
18  drop this major change on a quarterly conference call when results are weak? Why didn't they do it
19  at their Friday night call [o]n August [18, 2023]?"

20       25.    Palo Alto's stock price declined by $104.12 per share, or approximately 28%, from
21  $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024. This was the largest
22  single-day drop Palo Alto Networks had suffered since going public in 2012. Palo Alto lost over $34
23  billion in market capitalization in a single day. By selling before the market learned of this give-it-
24  away-for-free strategy, Arora made tens of millions of dollars at the expense of the unwitting investors
25  the Company had kept in the dark, including Lead Plaintiffs. This action seeks to recover on those
26  investors' behalf.

27

28

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

28.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

29.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

30.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES AND WITNESSES

**A.  Parties**

31.     Lead Plaintiffs Ron Nabhan and Michele Nabhan are individual investors. As set forth in the certification previously filed with the Court (ECF No. 17-2), Lead Plaintiffs purchased shares of Palo Alto common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

32.     Defendant Palo Alto Networks, Inc. is a multinational cybersecurity company headquartered in Santa Clara, California. The Company's stock trades on the Nasdaq under the ticker symbol "PANW."

33.     Defendant Nikesh Arora ("Arora") has served as Chairman and Chief Executive Officer ("CEO") of Palo Alto at all relevant times.

34.     Defendant Arora, because of his position at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. Defendant Arora authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of his position with the Company and access to material non-public information available to him but not to the public, Defendant Arora knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. Defendant Arora is liable for the false statements pleaded herein.

35.     Palo Alto and Defendant Arora are referred to herein, collectively, as "Defendants."

**B. Former Employee Witnesses**

36.     FE 1 was employed by Palo Alto from mid-2021 through the end of the Class Period. From mid-2022 through the end of the Class Period, FE 1 oversaw sales of Prisma Cloud to enterprise customers as a district sales manager.

37.     FE 2 was employed by Palo Alto from mid-2021 through the end of the Class Period as a vice president of sales. FE 2 sold Prisma Access and Prisma SD-WAN. FE 2's business unit accounted for approximately 10% of Palo Alto's overall sales. FE 2's managers reported, in turn, to Defendant Arora. The sales goals for FE 2's business were arrived at by both FE 2 and Palo Alto's senior executives. Defendant Arora led quarterly business review meetings which FE 2 attended, and these meetings discussed growth numbers for FE 2's group. Growth numbers were quarterly business

review meetings that FE 2 attended, and that Defendant Arora led. At the meetings, Arora would cite a sales number that FE 2's business was generating.

38.     FE 4 was employed by Palo Alto as a sales manager to enterprise customers from early 2022 through the end of the Class Period for Prisma and Cortex.

39.     FE 5 was employed by Palo Alto from mid-2022 through the end of the Class Period as a sales specialist in Cloud Security. FE 5 sold the Company's Prisma Cloud products to federal clients, specifically the Department of Defense and its contractors.

## SUBSTANTIVE ALLEGATIONS

### A.  The Company and Its Operations

40.     Palo Alto is a global cybersecurity company that purports to provide platforms and services to help secure enterprise users, networks, clouds, and endpoints. The Company focuses on four fundamental areas: network security, cloud security, security operations, and Unit 42 to provide threat intelligence and security consulting.

41.     In addition to stand-alone products, Palo Alto offers bundles of products in unified "Platforms." Palo Alto's platform offerings include: (1) Strata – its network security platform which purports to combine firewalls with AI models and other products, (2) Prisma Cloud – its cloud security platform which also uses AI-powered applications, and (3) Cortex – its Security Operations platform which combines XPANSE, XSOAR, XDR, and XSIAM to automate security operations functions.

42.     Palo Alto advertises a wide range of capabilities in its platforms:

a)  **Network Security**: Palo Alto's network security platform includes hardware and software firewalls and cloud-delivered Secure Access Service Edge ("SASE"), which uses Prisma Access, the Company's Security Services Edge ("SSE") solution and Prisma SD-WAN. Palo Alto's network security platform also includes cloud-delivered security services as add-ons. Strata Cloud Manager is a "network security management solution," that "can centrally manage our network security platform irrespective of form factor, location, or scale."

b) **Cloud Security**: Prisma Cloud is marketed as a comprehensive Cloud Native Application Protection Platform ("CNAPP") that secures multi- and hybrid-cloud environments for applications, data, generative AI ("GenAI") ecosystem, and the entire cloud native technology stack across the development lifecycle. The Company also offers VM-Series and CN-Series virtual firewalls for inline network security on multi- and hybrid-cloud environments.

c) **Security Operations**: Cortex is marketed as combining security analytics, endpoint security, automation, and attack surface management ("ASM") solutions through its products delivered as software as a service ("SaaS") or software subscriptions. These products include Cortex XSIAM, which is advertised as the "AI security automation platform for the modern SOC [Security Operations Center], harnessing the power of AI to radically improve security outcomes and transform security operations." The platform also includes Cortex XDR for the prevention, detection, and response to complex cybersecurity attacks, Cortex XSOAR for security orchestration, automation, and response ("SOAR"), and Cortex Xpanse for ASM.

43. The product for which Palo Alto is most known is its firewall – a product which helps filter traffic between devices to prevent users from accessing harmful websites and to keep malicious actors from accessing an organization's network.

44. After the Company's initial success in its firewall business, it later expanded into cloud security (Prisma Cloud) and security operations (Cortex) to target a new generation of customers. To form its Prisma Cloud and Cortex businesses, Palo Alto spent over $4 billion on mergers and acquisitions of 17 companies since 2017. As the use of cloud-distributed applications and remote work increases, the cloud business is expected to continue to eclipse traditional firewall security. Palo Alto's firewall products, which once comprised over 90% of the Company's revenue, now comprise about 60%.

45. In general, M&A activity is strong across the cybersecurity industry and allows incumbents with existing distribution channels to simply plug new products and features into their

existing systems. Palo Alto has grown to significantly expand the number of products it offers over the past decade, including over 23 products across the three categories of network, security operations, and cloud, in addition to its Unit 42 threat management and administration across each of those areas. However, as a result of this expansion and lack of proper integration, Palo Alto's platforms became fragmented, featuring disjointed products, which can lead to poor security outcomes. This was a major concern for customers and placed the Company at a competitive disadvantage.

**B. The Company's "Platformization" Strategy**

46.    Before and during the Class Period, Palo Alto represented that it was implementing a strategy called "platformization" which aimed to consolidate its various security solutions into a unified platform. Historically, Palo Alto's customers obtained different security products and services a la carte from different vendors. Palo Alto embarked on a platformization strategy to bring various security functions under one roof, thereby capturing more business from its competitors. As Defendant Arora explained in September 2024, "[customers] need an integrated solution where all the services are provided from one platform," rather than being "fragmented" across various vendors.

47.    To entice customers to consolidate, Palo Alto stated that "patching together" technology from multiple vendors is no longer sufficient, and that their platform approach offers a better solution that is simpler, more comprehensive and scalable, and more effective. On the other hand, there is often no added value in consolidating network, endpoint, and cloud security with the same vendor. Because they involve completely different technologies, simply combining them does not necessarily add any improvement for the customer and can instead result in diminished versions of one or all of the security products.

48.    Larger platforms can actually be less efficient and create issues such as increased technical debt, poor support channels, difficulty with implementation, and increased expenses for unused features. The more embedded large platforms become in customers' workflows and covering larger areas, the more power the platform vendor, like Palo Alto, has over the buyer as it becomes harder to switch to a different vendor. In addition, larger platforms that cover a large scope of areas can also introduce more vulnerabilities. It can be easier for bad actors to focus on poking holes in a

single tool to unlock all doors, with catastrophic insecurities resulting from a single failure point in a large platform.

49.     FE 5, who sold Palo Alto's Prisma Cloud products to federal government customers including the Department of Defense, recalled that although the Company pushed "platformization" during the Class Period, in fact Palo Alto had always offered customers a way to add additional products onto their platforms. "It's always been that way. It's no secret," FE 5 explained. Platformization was "just a buzzword."

50.     FE 5 elaborated that once an existing customer chose to add a product to its plan, "then we restructure [the deal] and you get a bigger bang for your buck. It's already integrated." Platformization in practice meant that more products were offered for the same amount of money, or that one product was offered for a discount, as if the Company were selling "a $1.25 pencil for $1."

51.     FE 5 attended the Company's annual sales meeting in Las Vegas from August 20-24, 2023. There, Company sales executives announced to the gathered sales staff the new strategy to aggressively promote platformization to both commercial and federal customers. FE 5 and the other sales representatives were taken aback. According to FE 5, "we all knew about platformization, and we knew it wouldn't work. But we wanted to feed our families and were told to sell the idea."

52.     FE 2, a vice president in Palo Alto Networks' sales department at all times during the Class Period, said that Palo Alto's sales were slowing in the last few months of 2023. FE 2 said, of offering product for free, that "if you look at the timing of when that came up, in that quarter, our numbers weren't very good. [Arora] could have said, 'more customers are buying more from us and it's taking a longer time,' but that wouldn't have been very appealing to the Street for its stock price." FE 2 confirmed that platformization was not truly a new sales strategy in the sense that Palo Alto had previously "bundled" products together. Offering free products as part of the platformization approach, however, was new.

53.     FE 2 explained that customers were taking a longer time to sign contracts, and before signing were insisting that Palo Alto run its system within the customers' own environment so the

customers could see its operations for themselves, using their own data. This slowed the sales process down. Yet Defendants consistently represented that platformization was driving Palo Alto's growth.

54. FE 2 also stated that sales goals were arrived at in consultation with both FE 2 and the executive team, including Arora. Arora, according to FE 2, was very aggressive with sales goals, having high expectations and being hands-on.

55. FE 5's responsibilities included creating projections for how many "credits" customers would use in the coming year "based on business secured" from a customer already. FE 5 and other sales representatives would share these projections with either the district sales manager or vice president of the public sector of Prisma Cloud, who would say he "would take it to the bosses." Because these projections were based on existing sales, which were drying up after the Company's strategic shift to push platformization, FE 5 recalled "he got a clear understanding at those meetings that we weren't selling [much]."

56. Defendants' decision to start offering products for free further demonstrates that platformization sales faced challenges above and beyond rising interest rates. Implementing free giveaways was a risky and aggressive strategy that would necessarily result in lower revenue and billings growth in at least the following 12 months. There was also the chance that customers would engage in the free trials offered by Palo Alto but later decide not to commit in the long-term, meaning the strategy would not have the desired effect of accelerating the consumption of Palo Alto's products and helping the Company take lasting market share from competitors. These risks would not have been necessary if platformization and consolidation had been progressing as Defendants represented to investors throughout the Class Period, and if rising interest rates were the only notable headwind.

**C. Pressure from Industry Competition Posed an Obstacle to Platformization**

57. While Palo Alto continued to tout its platformization progress, it was facing intense competitive pressure from cybersecurity-focused peers, including Orca Security ("Orca") and Wiz, Inc. ("Wiz"), both of which specialize in cloud security. Orca actively competes with Palo Alto's Prisma Cloud product, stating that Palo Alto's user interface puts together "different, standalone"

products "stitched together" from seven different acquisitions to form Prisma Cloud, while Orca offers a "single, comprehensive" cloud security platform.

58.     Wiz also competes with Prisma Cloud, similarly stating that its "more unified platform" gives a "notable advantage" over Palo Alto. A market researcher has explained that Prisma Cloud is "offered to customers in a more modularized manner compared to Wiz, meaning they have fewer core modules as standard" which is "probably a result of the extensive M&A executed by Nikesh Arora and his leadership team." Both Orca and Wiz provide extensive public materials arguing that Palo Alto's products fall short of offering a worthwhile, unified platform.

59.     FE 4 confirmed that selling Prisma, in particular, was a challenge. This was because "competitors priced their product three times less." The competitors he was referring to were Orca and Wiz, which "were giving away their products."

60.     FE 1 confirmed that there was heavy competition and ultimately decided to leave Palo Alto in large part because trying to sell cloud services against rival Wiz was "brutal."

61.      Palo Alto also faced competition from companies such as CrowdStrike, Zscaler, Cloudflare, and Microsoft, which were boosting their cybersecurity businesses with expanded AI capabilities.

62.     In November 2023, Microsoft unveiled a new generative AI solution, Microsoft Security Copilot, also advertised as built on the principles of zero trust, to create a "flywheel of protection to change the asymmetry of the digital threat landscape[.]" Cloudfare partnered with Microsoft and other companies to improve its GPU-powered infrastructure, and it also augmented its Workers platform with AI capabilities by November 2023. CrowdStrike revealed a new generative AI cybersecurity tool called Charlotte AI in May 2023, followed by another AI and automation-based tool, Falcon for IT, in September 2023. In June 2023, Zscaler announced generative AI-powered tools, including Security Autopilot, Zscaler Navigator, and data loss prevention offerings. Later in November 2023, Zscaler announced that it hired an AI leadership team, including chief AI officer and executive vice president for data and AI platforms.

63.     These and other similar innovations were direct competitors for Palo Alto's own AI products during the Class Period, including Cortex XSIAM, which were aiming to address the challenge of leveraging massive data sets for security organizations and to maximize threat responses.

64.     Despite representing to investors that there was "strong demand in the market," "strong interest across our next-generation security portfolio," and that "platformization is continuing to drive large deal momentum," Palo Alto Networks was struggling to compete in a competitive environment.

**D.  The Company's Positive Representations in the Lead-up to the Class Period**

65.     On Friday, August 18, 2023, after trading in the stock market closed, Palo Alto announced its financial results for its fiscal 2023 fourth quarter ("Q4 2023"). In the lead-up to the earnings release, analysts questioned the unusual Friday night timing Palo Alto chose. Wedbush analysts called the decision to hold a Friday-night earnings call a "Disaster Timing Move For the Ages," and wrote: "We have seen many strange things in our 23 years covering the tech sector on the Street and thought we have seen it all until Palo Alto decided to host a 'head scratching' Friday August after the close conference call this Friday to discuss its earnings and medium term guidance." Wedbush further explained that Palo Alto "needs to grow Billings ~19% y/y in FY24E to ~$11b" to justify its current valuation because its stock was already "pricing in almost a 'best-case' scenario for FY24E numbers."

66.     On August 18, 2023, Palo Alto Networks issued a press release, filed as an exhibit to a Form 8-K with the SEC ("August 18, 2023 8-K"). The August 18, 2023 8-K provided guidance for the upcoming quarter and fiscal year precisely in line with the analyst's "best-case" scenario projection to justify its already-high valuation:

> For the fiscal year 2024, we expect:
>
> • Total billings in the range of $10.9 billion to $11.0 billion, representing year-over-year growth of between 19% and 20%.
>
> • Total revenue in the range of $8.15 billion to $8.20 billion, representing year-over-year growth of 18% and 19%.

67.     Also on August 18, 2023, Palo Alto held its Fourth Quarter 2023 Earnings Call ("August 18, 2023 Q4 Earnings Call"). The Company represented during the August 18, 2023 Q4

2023 Earnings Call that the company was increasingly offering "deferred payment terms" and financing to customers. The change in how and when companies were paying for Palo Alto's products, the Company assured investors, was not a reflection of customer trepidation for those products or about adopting platformization. Instead, according to Palo Alto, macroeconomic trends were to blame. The culprit was reportedly rising interest rates, which were incentivizing Palo Alto's business customers to hold onto their cash longer and prefer paying on a deferred basis. As Golecha explained in his opening remarks, although Palo Alto was "not see[ing] a significant impact in [the quarter] from unexpected deal delays," it was finding that "the rising cost of money has caused customers to hold on to their cash and more frequently seek deferred payment terms. These deferred payment terms are delivered in the form of annual billing plans and through our PANFS [Palo Alto Networks Financial Services] financing capability."

68.    The first question Palo Alto's executives fielded during the August 18, 2023 Q4 Earnings Call came from an RBC analyst who asked Arora to "talk a bit more broadly about some of the broader trends that you're seeing" and provide more detail on "high-level demand trends." Arora repeated the claim that the Company was using more deferred payment plans, and claimed that it was either that or offer steep discounts:

> I think as I said, and as Dipak elaborated, look, it's – interest rates are higher. CFOs are scrutinizing deals, which means you have to be better prepared to answer their question and show the business value that you bring to them with your cybersecurity products. We are lucky that we have been focusing on our platform strategy.
>
> So we can usually walk in and say, here, you can consolidate the following 5, **it doesn't cost you anymore,** but you get a better outcome and you get a modernized security infrastructure. So from that perspective, that strategy of ours is resonating. But there is more scrutiny. There are deals that go through multiple levels.
>
> There are some that get pushed. There are some that get canceled. And again, you just have to get more on the top of the funnel. And as Dipak very clearly highlighted that eventually end up and there's a conversation about saying, wait, I used to pay you upfront. And I need to understand the cost of money. **And is there a way, either my cost has to be lower from you, so I can sort of account for the cost of money or you'[re] going to allow me to pay you later. From a deferred plan perspective, those are really the 2 effects.**

69.    During the August 18, 2023 Q4 Earnings Call, analyst Robbie David Owens of Piper Sandler sought to "build" on the question of "deferred payments" and asked if there was "discounting

when you're doing these multiyear deals?" Arora again claimed that Palo Alto was using deferred

payments to avoid discounts:

> Look, on the macro front, the part I'm really excited about that Dipak [Golechha] and
> his team have basically navigated a significant part of our business into annual billings
> effectively through these deferred payment plans, right?
>
> And we were able to hold our free cash flow in spite of those downward sort of
> pressure. And we think we're going to keep absorbing some of that as it goes. In the
> end, it's an economic argument. It's like there's a cost of money. **I can take the money
> up front and let the customers get a discount, and I can go try and get a return
> on that cash or I can let them pay when they're ready to pay and I can extract a
> better economic outcome in that context.**
>
> ***
>
> So if you put it all together, as Dipak said, we're very comfortable with the way we've
> modeled it. There's definitely levers that go in different directions. And our sort of
> aspiration and desire and hope is that we keep transitioning seamlessly into more and
> more annual billings over time while being able to hold these metrics and these
> outcomes for ourselves.

70.     During a September 7, 2023 conference call, Arora reiterated that Palo Alto was not

facing changing demand, only offering deferred payment plans to adjust for higher interest rates,

when he fielded a question from Goldman Sachs analyst Gabriela Borges regarding Palo Alto

Networks' FY 2024 fiscal planning and how customer purchases were being impacted by the cost of

money:

> <u>Gabriella Borges Goldman Sachs Group, Inc.</u>:
>
> [M]y question to you is, how did the fiscal '24 process planning compare to fiscal year
> '23? Are there are 1 or 2 things that stood out to you? I know you've talked about how
> cost of capital is impacting customer purchases. What was different this year?
>
> <u>Defendant Arora</u>:
>
> I think customers and companies are still absorbing the change in behavior. I think the
> idea that money was free for 10 years, you walk up to a customer and saying, here's a
> 3-year deal. And the guy said, oh, what do you want me to pay you for 3 years, $10
> million? Yes, I need $10 million now. Well, give me a discount, here's 5%. No
> problem, $10 million here, like I'm making 25 basis points in my treasury.
>
> Now the guy is making 500 basis points on treasury. He wants a 15% to 20% discount
> to pay your cash upfront. Suddenly, people understand the cost of money. **So
> suddenly, you have a choice. You can take the 20% discount, take a hit on
> bookings and revenue or you can take payments every year.** That changes all the
> math that all the wonderful analysts are used to tracking. And they're all like trying to
> figure out, is demand going away. Well, demand is there. Cybersecurity demand is
> growing. It's a secular demand. It's not cyclical. People are getting more petrified. The

attackers are moving faster. The plant of cybersecurity has been chronically underinvested in.

**We're just absorbing that change in customer behavior. Demand is not changing. It's execution is shifting**.

71.     Entering the Class Period, investors had been told multiple times that interest rates were the primary hurdle to sales. This hurdle, Defendants had represented, could be managed effectively with deferred payment plans which would mitigate the need to offer discounts.

**DEFENDANTS' MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS**

72.     On November 15, 2023, Palo Alto Networks issued a press release announcing its financial results for the first quarter of FY 2024, filed with the SEC on Form 8-K ("November 15, 2023 8-K"). The November 15, 2023 8-K explained that Palo Alto's "billings were impacted by the cost of money" in the quarter and provided guidance for the second quarter of 2024 ("Q2 2024") and full fiscal year 2024. The Company revealed that it anticipated lower billings growth (15-18%) in Q2 2024 as compared to Q1 2024 (17-19%). The Company also lowered its fiscal year 2024 guidance for billings ($10.7 billion to $10.8 billion) and billings growth (16-17%) from the figures projected in Q1 2024 ($10.9 billion to $11.0 billion and 19-20%). Palo Alto maintained its revenue guidance as issued on August 18, 2023:

> For the fiscal year 2024, we expect:
>
> • Total billings in the range of $10.7 billion to $10.8 billion, representing year-over-year growth of between 16% and 17%.
>
> • Total revenue in the range of $8.15 billion to $8.20 billion, representing year-over-year growth of between 18% and 19%.

73.     Also on November 15, 2023, Palo Alto held its Q1 2024 Earnings Call ("November 15, 2023 Earnings Call"). In his opening remarks, Defendant Arora acknowledged that there were "payment and duration discussion[s]" during contract negotiations with customers, but said the Company could manage the challenge by offering deferred billing plans and financing. Arora stated that these strategies did not have an "impact" on "annual metrics" and constituted only a "cosmetic impact" to Palo Alto's business:

In Q1, the cost of money remained a constant discussion and customers' significant focus on this topic is becoming the new normal. ***The way it manifests itself in our business is that there's always a payment and duration discussion in final renegotiations. Given our strong balance sheet, we can use a mix of strategies to navigate the environment. This includes annual billing plans, financing through PANFS [Palo Alto Networks Financial Services] and partner financing.*** Whilst ***this does not impact our business demand or impact to annual revenue or annual metrics, it does create variability on total billings more than before, depending on financing use or the duration of contracts***.

I am not concerned about the demand for cybersecurity for this quarter and upcoming quarters nor am I concerned about our ability to execute. ***The billings variability is a pure consequence of the payment conversations that we're having with our customers, and this is validated by the fact that we continue to see strong RPO and low churn, suggesting this is a cosmetic impact to our business***.

74.    The italicized statements referenced above in ¶ 73 were materially misleading and omitted material facts because sales in the first quarter of 2024 had slowed and Palo Alto was considering offering customers product discounts to address the slowing sales as Defendants understood Palo Alto's approach to selling customers security platforms packages was in need of a fix. Defendant Arora's assurances that the "cost of money" was the primary friction for customers considering platformization and could be addressed through a "mix of strategies" including "annual billing plans, financing through PANFS and partner financing," which would only have a "cosmetic impact" on Palo Alto's business and no real "impact" on "annual revenue," was materially misleading and failed to disclose that Platformization was not an "easy" sell "for many of [Palo Alto's] customers" as Defendant Arora would later concede, and the causes of friction went well beyond interest rates. The "[k]ey friction points" Palo Alto identified came from the inherent difficulty of replacing "multiple products simultaneously," which would require customers to pay twice for numerous security products while their legacy contracts ran out. Palo Alto Networks' competitors were also lowering prices in an effort to retain customers. The Company therefore had began "quietly" adjusting its platformization strategy at least three months before Arora made this statement. As Arora admitted on February 20, 2024, the cost of money was not the only sticking point for prospective platformization customers. The Company found it would be necessary to offer lengthy periods of free product to customers while their legacy contracts with other vendors for various point products expired to get customers to leave their current security vendors and adopt Palo Alto's platform approach. These "discount[s]" or "free offer[s]," as Arora put it in February 2024, would mean "about

6 months' worth of free product capabilities to our customers." Giving products away for free, unlike the "strategies" Arora said Palo Alto could use to "navigate the environment" (deferred payment terms and financing) would have more than a "cosmetic impact" on Palo Alto's finances and would impact the Company's billings for 12–18 months. Arora omitted to reveal these material facts concerning the challenges facing platformization which the Company had been working to fix for an entire fiscal quarter. Accordingly, while Defendants were assuring investors that Palo Alto could avoid offering discounts by allowing customers to pay substantially in full on a deferred basis, the Company was already planning to offer significant discounts to induce customers to adopt platformization.

75.     Additionally, as FE 2 recounted, Palo Alto Networks was experiencing slowing sales in the final months of 2023 and the "numbers weren't very good" that quarter. FE 5 agreed that Palo Alto Networks' sales representatives knew platformization "wouldn't work" and were reporting in monthly meetings that they were not selling much product. Palo Alto's competitors, meanwhile, were offering customers lower prices; three times lower in the case of Prisma according to FE 4. Despite Arora's assurances that Palo Alto was offering deferred payment plans and financing—"cosmetic" methods which, unlike discounting, would not harm the Company's "annual revenue" or metrics— the Company had noticed "[k]ey friction points" above and beyond rising interest rates. The Company was actively planning a shift in strategy to use steep discounts, amounting to approximately 6-months-worth of free product, to entice customers to replace their legacy security vendors with Palo Alto's platforms.

76.     Later during the November 15, 2023 Earnings Call, an analyst revisited the issue of the "higher cost of money" and asked how Palo Alto management had "thought about factors like pipeline, like close rates and very importantly, billings duration for the rest of the year, as we just try to get comfortable with how much that billings guide has maybe been de-risked." Arora replied:

> I think repetition doesn't spoil the prayer, so I will repeat. The ***billings difference is not a change in demand for us or not a function of our pipeline***. The billings change is a consequence of negotiations with customers. ***When the customer says, you want me to pay you for 3 years upfront? You got to give me a bigger discount. Do you want to pay me -- do you want me to do a 3-year deal? You got to go finance it with PANFS. Now I could do that.***

*But I could say, just pay me on an annual basis. I'm okay. I'll collect my money every year. If I go in that direction, my billings changes. It does not change anything in my pipeline, in my close rates or in my demand function. Do you see my point?*

So we're just keeping -- giving ourselves flexibility because this quarter, we saw a lot more negotiations around those topics. *We just don't want to be held hostage to those kind of negotiations*, where we have to go finance deals to get TCV in that because billings is a TCV metric. TCV is important if I'm concerned about churn. I have very low churn across my product category.

*I'm very happy to collect my money on an annualized basis if that's what's needed to make sure that I don't get pressure on financing, I don't get pressure on having to give larger discounts.* I retain flexibility. I do a lot of TCV teams. I do a lot of financing. But this allows me the flexibility. So I want to make sure is there is no change in demand function in the market. *There is no change in our revenue forecast*.

77.    Later, during the same call  BTIG analyst Gray Wilson Powell asked Arora about how, in spite of "headwinds" affecting the industry, Palo Alto was "still guiding Q2 billings to about 17% growth. Your closest competitor is guiding to minus 5%. Historically, you've been fairly correlated with them. . . . can you talk about what's different on your side? Why you're more insulated?" Arora's answer stressed that nothing was changing apart from customers paying on a deferred basis: "As I said, the demand function is not going down for cybersecurity across the board. *The only thing that's changing is people say, I'll do a 2-year, 1-year deal or a 3-year deal or a 5-year deal. I'll pay you later. You finance it around year-over-year. That's the only confusion you're seeing.*"

78.    The italicized statements identified above in ¶¶76, 77 were materially misleading and omitted material facts when made for the reasons identified in ¶¶74–75. Despite Defendant Arora claiming Palo Alto Networks was using deferred payment terms as an alternative to discounts and did not want to be "held hostage" to those types of customer negotiations, in fact the Company had found its platformization strategy was not working and had been planning for months to address the frictions in platformization sales, including offering prospective customers large discounts to make it more palatable to switch to Palo Alto Networks' platforms.

## THE TRUTH EMERGES

79.    On February 20, 2024, Palo Alto Networks issued a press release, filed on Form 8-K with the SEC, which announced that the Company had drastically reduced its billings guidance for the third quarter of 2024 and full FY 2024, reporting expected total billings growth of 2-4% and

revenue growth of between 13-15% for the third quarter, and billings growth of just 10-11% and revenue growth of 15-16% for FY 2024 .

80.    During a conference call with analysts held the same day, Defendant Arora revealed the Company's lowered guidance was a result of accelerated platformization and consolidation and "activating our AI leadership," as well as deals with the federal government failing. As he told an analyst: "just to be clear . . . from a billings perspective, part of the billings guidance is related to the Fed . . . part of it is also because of the platform initiatives -- platformization initiatives per se, but also part of it is we just expect there to be more deferred payments like annual billings, things like that as we roll out these programs. That's what makes it up."

81.    During the call, Arora stated in his opening remarks, "Our guidance is a consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership."

82.    Defendant Arora revealed that high interest rates were not the only challenge to platformization. Instead, friction arose from platformization's fundamental characteristics. Customers relying on various vendors for different security functions could not easily switch over to Palo Alto's platforms. Customers often had contracts that ended at different times. Switching everything over to Palo Alto would mean paying double for the same security products: once to Palo Alto and again to the legacy vendors until their respective contracts expired. Deferred payments would not address this problem—customers would still be "double paying" albeit on a delayed timeline.

83.    As Defendant Arora explained "we're beginning to notice customers are facing spending fatigue in cybersecurity. This is new. As adding incremental point products is not necessarily driving a better security outcome for them. This is driving a greater focus on ROI and total cost of ownership amongst most customers." Defendant Arora continued, explaining that Palo Alto's competitors had begun to lower prices, often "resorting to uneconomic pricing" to "retain their customers," thereby thwarting Palo Alto's efforts to service all of its customers' security needs through platformization.

84.     Arora explained that selling customers on the idea of platformization therefore required not just allowing them to defer payments, but to have discounts and lengthy periods of time in which customers would be using multiple Palo Alto products for free before billing even started. Arora revealed that "[o]ver the last 6 months," Palo Alto had been "quietly developing programs" to overhaul its platformization strategy. As Arora explained:

> With all the promise that platformization holds, **adoption is not always easy for many of our customers**. Until now, we have primarily assumed that our customers adopt our platforms in their own pace. The crux of challenge is around execution. Customers face risk in executing or making significant changes to their environments as well [as] economic exposure from these changes. **Key friction points we've noticed include the challenge of replacing multiple products simultaneously as well as the issues around double playing while working through complex contract terms**.

> **Over the last 6 months, we have been quietly working to develop programs that enable us to help minimize and even share in the risk of our customer space**. You will see us tomorrow launching a significant number of platform offers to our customers to help drive this consolidation and platformization strategy.

> We believe we can build customer confidence in our platforms by approaching them well before their point product contracts expire. After we gain their contractual commitment, we have offered an extended rollout period where we can demonstrate our ability to deliver these platform benefits. **Customers can then start paying us after the obligation of legacy vendors ends**.

> **With the experience we have gained over the last 6 months**, we believe now is the right time to accelerate programs across our portfolio to drive this platformization. All these programs will have mechanisms to reduce customer friction, accelerate product deployment, help customers realize the value of our platforms and consume new innovation sooner. While this is not an exhaustive list, I wanted to give you some examples.

> **We have begun to launch programs already that include legacy trade-ins, no cost introductory offers and product add-ons and incentives** to accelerate estate standardization. Each of these programs is elements of reducing execution risk and dealing with economic exposure that concern our customers. In that sense, we must bear the cost of the transition through lower upfront financial outcomes, but we are convinced these will yield amazing outcomes for us in the mid- to long term.

> We have developed these programs across all 3 platforms.

> *          *          *

> **We expect a typical customer entering into a platformization transaction will not pay us for our technology for a period of time**.

85.     Arora's admission that Palo Alto had been working "quietly" for 6 months to develop programs for the stated purpose of minimizing the "risk of our customer space" (or "programs to

alleviate friction with customers," as Golechha later described them on the call) implied that Palo Alto was aware of these risks at a minimum 6 months earlier. Arora explained that the conditions causing sales "friction" arose from the "challenge[s]" to customers "of replacing multiple products simultaneously" and "double playing" before legacy contracts expired. Presumably, Palo Alto understood that these sources of "friction" existed before it started developing programs for the explicit purpose of correcting them in August 2023. Defendants certainly knew, or recklessly disregarded, that these risks existed when, 3 months into developing programs for the explicit purpose of mitigating them, Arora assured the market that the "only thing that's changing is [customers] say . . . I'll pay you later," as well as when, in the month following that statement, Arora sold $160.25 million worth of shares to investors. Moreover, Arora stated on February 20, 2024 that certain programs, including "no cost introductory offers" and "incentives" had begun "already."

86.    Golechha expanded on the discounts Palo Alto was being forced to give to induce customers to embrace platformization:

> Nikesh [Arora] talked about our programs to alleviate friction with customers. We believe that by moving from a deal-by-deal approach to a program-based and systematic approach, we can accelerate platformization with our customer base and drive then the consolidation faster by mitigating platformization friction. . . .
>
> For the customer, they are able to execute on the platform deployment with lower risk and consolidate vendors while benefiting from a lower cost -- total cost of ownership and the better security posture. As Nikesh [Arora] gave you the high-level trajectory in our pipeline, I want to help you understand how we think about the medium term. Our platformization offers to drive consolidation **effectively provide customers a period of the contract for free as part of their commitment. We expect we may see a period of 12 to 18 months of pressure on our top line growth rate, notably billings**. Some of our platformization programs embed deferred payments into deal structures, which we have spoken about in the past. We expect this will persist through fiscal year '25 as we anniversary the rollout of these programs and result in billings below the target we provided in August of 2023.

87.    Analysts homed in on the surprising news that Palo Alto was finding it necessary to offer discounts to sell customers on platformization, which it had advertised as a win-win. JP Morgan Chase analyst Brian Lee Essex asked: "one thing that caught my ear was the comment about discounting or offering a free period upfront for a certain period of time. Wanted to get a sense of what kind of headwind within that billings guidance is attributable to some of that discounting?" Arora replied:

I think let me clarify in terms of the discounting notion. What's happening today is when I go to a customer and say, listen, I'd like to replace your estate with the entire platform. The customer says, 'Wait, wait a minute, I got this vendor for IPS, this for SD-WAN, this for SSC. And I got half of my firewalls from another vendor, and they all expire at different points in time. I'd love to deploy Zero Trust but it's going to take me 2, 3 years as the end of life, so these vendors happen. And I'm scared that if I rip and replace this at this point in time, is going to create execution risk, not just that, it's going to hit economic risk.'

So the propositions we're going to customers is, listen, let's lay out a 2-year, 3-year cybersecurity consolidation and platformization plan. We'll go start implementing today, you pay us when they're done. So what it is, is more of a sort of like you can use our services until you have to keep paying the other vendor, we'll take it from there. But that's taking away a lot of the economic exposure and the execution risk for our customers. **Now you can call that discount or you can call that a free offer. Our estimate is approximately it works out at about 6 months' worth of free product capabilities to our customers on a rolling basis**. I think in about 12 months, as our offers start lapping each other, we should go back to our growth rate we've been talking about. And I think the right metric is the time frame is to look at RPO.

(emphasis added)

88.     A slide accompanying the February 20, 2024 conference call demonstrated how Palo Alto was offering free products to customers for a period of time while their legacy contracts with other vendors ran out. Palo Alto Networks would complete "Platform Implementation & operationalization" before "Economic considerations begin" following the expiration of incumbent vendors' remaining contract durations:



89.    On this news, the price of Palo Alto common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024. This was the worst trading day in Palo Alto Networks' 12-year history as a public company.

90.    As one observer summarized Palo Alto's "horrendous" new guidance and outlook in an article posted on *Seeking Alpha* on February 21, 2024: "The company apparently feels the need to help customers transition from point products to the platformization concept with financial incentives of sharing the costs to end legacy contracts, including not charging customers for a period of time. . . . Palo Alto has to provide customers incentives in what was supposed to be overflowing AI demand."

91.    Several analysts independently questioned the timing of Palo Alto's discounting announcement. Citigroup analyst Fatima Aslam Boolani pointedly asked during the earnings call what the "catalyst was for this to be a midyear change" and what Palo Alto had been "hearing from customers where you said we've got to pull the trigger in the middle of the year because it's **admittedly atypical**."

92.    Others were similarly confounded by the timing. In a research note issued on February 20, 2024, Barclays analysts called the billings cut "unexpected" and estimated that Palo Alto's announcement regarding customer discounts was a major contributing factor. Barclays wrote: "PANW's explanation around free trials to reduce friction in platform deals and prevent customers from double-paying makes sense on paper … but until we see examples of this, the debate will be 'is this giving it away for free?' or 'is this short-term pain for long-term gain?' and **the issue is this big of a change is being done unexpectedly in the middle of the year**." Barclays called Palo Alto's announcement that it was offering discounts to customers while their legacy contracts with other vendors were still in effect "**the part of the call that was most unexpected**" and estimated it contributed to $600 million of the cut to Fiscal Year 2024 billings.

93.    Several other analysts reacted with surprise and disappointment to the news that Palo Alto was finding it necessary to offer discounts to support its platformization strategy. Piper Sandler lowered its rating of Palo Alto from overweight to neutral, explaining that the need to offer customers

1    free products while their legacy contracts expired would "negatively impact the business for 12-18

2    months - eliminating $600M from billings estimates in the back half of this year."

3        94.    Guggenheim wrote the same day, February 20, 2024, that Palo Alto attributed the

4    guidance cut to "a strategic shift to a new word called 'platformization,' which when described sounds

5    like what they've been doing all along." Guggenheim further noted: "this raises questions: (1) Why

6    does PANW have to do this when other companies embark on similar paths of consolidation without

7    having to give away product for a time, but they instead increase revenue from the start – CRWD

8    comes to mind. (2) **Why drop this major change on a quarterly conference call when results are**

9    **weak? Why didn't they do it at their Friday night call in August?**"

10                          **ADDITIONAL SCIENTER ALLEGATIONS**

11       95.    As alleged herein, Defendants acted with scienter in that they knew the public

12   documents and statements issued or disseminated in the name of the Company were materially false

13   and misleading; knew that such statements or documents would be issued or disseminated to the

14   investing public; and knowingly and substantially participated or acquiesced in the issuance or

15   dissemination of such statements or documents and in actions intended to manipulate the market price

16   of Palo Alto's common stock as primary violations of the federal securities laws. As set forth

17   elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true

18   facts regarding Palo Alto, their control over, and/or receipt or modification of, the Company's

19   allegedly materially misleading misstatements, and/or their associations with the Company that made

20   them privy to confidential proprietary information concerning Palo Alto, participated in the fraudulent

21   scheme alleged herein. The adverse events at issue also involved the Company's key billings metric

22   and core platformization strategy.

23       96.    As such, the Defendants knew or were reckless in not knowing of the undisclosed facts

24   detailed herein.

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**A. Defendant Arora's Pre-Planned Trades Provided a Strong Motive to Conceal Material Information from the Market During the Class Period.**

97.     Defendant Arora engaged in large-scale stock transactions during the Class Period which allowed him to reap over $123 million in profit as a result of his own false and misleading statements.

98.     According to disclosures made on Form 4s filed with the SEC dating back to June 2018, and excluding sales made to satisfy tax obligations, Defendant Arora had never sold more than 30,000 shares in a single day prior to June 7, 2023. Nor, in that same five-year period, had he ever sold 50,000 shares or more within a month.

99.     Arora had never made more than $10.9 million in stock sales in a single month prior to June 7, 2023. The total revenue from *all* of Arora's stock sales prior to that date was less than $56.9 million.

100.    Then, on June 7, 2023, Arora exercised options to acquire 474,300 shares for $66.17 and immediately sold 530,169 shares in a single day—approximately three times the volume of all his prior sales combined—for $116.3 million in total revenue and $95.6 million in net profit. Arora's June 7, 2023 stock sales were not made pursuant to a Rule 10b5-1 trading plan.

101.    The following day, June 8, 2023, Arora adopted a Rule 10b5-1 trading plan. According to a Form 10-K annual report Palo Alto Networks filed with the SEC on September 1, 2023, Arora's trading plan was set to expire "August 30, 2024 or when all shares have been sold" and established that a total of 2 million shares would be sold under the plan. Arora did not disclose other details of his trading plan, such as when and in what amounts sales were to be made, whether Arora had discretion over his sales, and whether Arora had discretion to amend, modify, or terminate the trading plan.

102.    Under SEC Rule 10b5-1(c), corporate insiders may create plans to trade securities in the future. To use the plan as an affirmative defense, the plan must specify the "amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold;" or include "a written formula . . . for determining the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or

1  sold;" or remove discretion from the executive over "how, when, or whether to effect purchases or

2  sales." The defense is available only to executives who acted in good faith with respect to their trading

3  plans.

4       103.   10b5-1 trades typically specify the times or conditions under which trades will occur.

5  For example, trades may occur at pre-scheduled dates, or according to algorithms or formulas that

6  trigger when a stock price hits a pre-determined benchmark or rises by a certain dollar amount.

7  Executives are not required to disclose the particular instructions under which their 10b5-1 plans

8  operate. Additionally, executives may modify their 10b5-1 plans without disclosure so long as they

9  are not in possession of material, non-public information at the time of the modification.

10      104.   Rule 10b5-1(c) was intended to reduce opportunistic trading on the basis of non-public

11  information. However, recent scholarship exposed how insiders often take advantage of Rule 10b5-1

12  trading plans in order to engage in opportunistic trades. *See* M. Todd Henderson et. al., *Offensive*

13  *Disclosure: How Voluntary Disclosure Can Increase Returns from Insider Trading*, 103 Geo. L.J.

14  1275, 1278 (2015) ("In fact, we find that the rule has had the opposite effect of increasing

15  opportunities for insider trading. . . . insiders who use and disclose 10b5-1 plans seem to time their

16  sales ahead of drops in stock prices in ways that insiders who use the plans but do not disclose do not,

17  and in ways that are not likely explained by chance or any explanation other than their knowledge

18  and use of material nonpublic information."); David F. Larcker, Bradford Lynch, Phillip Quinn, Brian

19  Tayan, & Daniel J. Taylor, *Gaminig the System: Three 'Red Flags' of Potential 10b5-1 Abuse*, Rock

20  Center for Corporate Governance at Stanford University (Jan. 19, 2021), *available at*

21  https://ssrn.com/abstract=3769567 ("We show that a subset of executives use 10b5-1 plans to engage

22  in opportunistic, large-scale selling of company shares."); *see also* Tom McGinty & Mark Maremont,

23  *The Routine Executive Stock Sales That Raise Questions of Insider Trading*, The Wall Street

24  Journal (June 29, 2022) ("[T]rades made under preset plans on average outperform trades not

25  conducted under such plans.").

26      105.   The mounting evidence that Rule 10b5-1(c) was having the "unintended consequence"

27  of "allow[ing] corporate insiders to hide behind these trading plans" as if they were "get-out-of-jail-

28

free card[s]" prompted the SEC to adopt new disclosure rules.[1] As then-SEC Chairman Gary Gensler explained the need for the amendments: "About 20 years ago, the SEC established Exchange Act Rule 10b5-1. This rule provided affirmative defenses for corporate insiders and companies to buy and sell company stock as long as they adopted their trading plans in good faith — before becoming aware of material nonpublic information . . . Over the past two decades, though, we've heard from courts, commenters, and members of Congress that insiders have sought to benefit from the rule's liability protections while trading securities opportunistically on the basis of material nonpublic information."[2]

106.    The final amended regulations, published December 29, 2022 and made effective April 1, 2023, mandate that, among other things, officers and directors observe lengthy "cooling-off" periods following the adoption of their 10b5-1 plans in which they must not trade and that companies list in their quarterly financial reports the existence of any 10b5-1 plans, the dates of their adoption and/or termination, the duration of the trading plans, and the number of shares to be traded.[3] Palo Alto disclosed only these required details about Arora's 10b5-1 plan in its SEC filings.

107.    Among the academic research the SEC cited in its December 29, 2022 final rule was a 2015 study by M. Todd Henderson et. al. that tested the correlation between various levels of disclosure of 10b5-1 plans, ranging from non-disclosure to full disclosure, and opportunistic trading activity. The article explained that a "Limited Disclosure Case," one in which, as with Arora's, the 10b5-1 plan's existence is disclosed but with only with limited details provided, might follow from a situation in which an executive does not necessarily have valuable information when adopting the plan but may anticipate trouble ahead. "Because this strategy might reveal a suspicious trade pattern if the bad outcome does materialize (that is, trading before bad news), the insider would likely value

---

[1] Jonathan Weil, *New SEC Rules Target Corporate Insider Trading*, THE WALL STREET JOURNAL (Feb. 13, 2023), *available at* https://www.wsj.com/articles/new-sec-rules-target-corporate-insider-trading-4f1c64e8.

[2] S.E.C., *Press Release: SEC Adopts Amendments to Modernize Rule 10b5-1 Insider Trading Plans and Related Disclosures* (Dec. 14, 2022), https://www.sec.gov/newsroom/press-releases/2022-222.

[3] Insider Trading Arrangements and Related Disclosures, 87 Fed. Reg. 80362 (Dec. 29, 2022) (codified at 17 C.F.R. pts. 229, 232, 240, 249).

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

some incremental legal benefit from disclosure. And because a key element to this strategy is preserving the termination option, this insider would not prefer for the firm to disclose specific details about her 10b5-1 plan. . . . This insider would prefer the firm only disclose limited detail, because this provides some incremental litigation-risk reduction and yet preserves the termination option at relatively low cost."

108.    The SEC similarly expressed concerns about insiders cancelling their trading plans on the basis of insider information:

> We are concerned that some corporate insiders use Rule 10b5-1 plans in ways that are not consistent with the objectives of the rule, and that harm investors and undermine the integrity of the securities markets. As the use of Rule 10b5-1 plans has become more widespread, commentators have raised concerns that the design of Rule 10b5-1(c)(1) has enabled corporate insiders to trade on the basis of material nonpublic information while avoiding liability under Section 10(b) and Rule 10b-5. Several commenters on the proposals reiterated those concerns. These concerns stem from, among other things, the ability of corporate insiders to adopt multiple Rule 10b5-1 plans at a time when they lack material nonpublic information, and **subsequently terminate some of the plans based on later-obtained material nonpublic information (notwithstanding the provision of the current affirmative defense that it is applicable only when the contract, instruction, or plan was entered into in good faith).** For example, such plans might take financial positions that authorize trades at price points above and/or below the issuer's current stock price. **When the insider becomes aware of material nonpublic information indicating likely future changes in the company's stock price, the insider could cancel the less advantageous plan or plans.** Corporate insiders also could adopt multiple Rule 10b5-1 plans that direct trades only at price points above the current share price, anticipating that they will subsequently learn material nonpublic information that would reveal which of the plans would be most profitable. Then, when they become aware of material non-public information, they might cancel the less profitable ones. **We are concerned that, in these situations, an insider's awareness of material nonpublic information may still 'factor into the trading decision,' even if the insider's plans appear to satisfy the requirements of Rule 10b5-1(c)(1).**[4]

109.    Other than the details required by the SEC's new rule, Arora did not disclose the details of his 10b5-1 trading plan such as the timing or triggers for his trades or what discretion he may have retained, so it is not possible to determine based on publicly available information whether Arora's Class Period transactions complied with his 10b5-1 plan nor whether his trading plan met the requirements to qualify as an affirmative defense under Rule 10b5-1(c) as amended. What is discernable, however, is that Arora did not adhere to the publicly-disclosed conditions of his 10b5-1

---

[4] Insider Trading Arrangements and Related Disclosures, 87 Fed. Reg. 80362 (Dec. 29, 2022) (codified at 17 C.F.R. pts. 229, 232, 240, 249).

plan. Instead, he terminated the plan long before its original August 2024 end date and shortly before Palo Alto disclosed challenges to its business.

110.    At the time of his misstatements, Arora would have known about his 10b5-1 plan because it was adopted prior to the start of the Class Period, on June 8, 2023. This created a strong motivation to preserve or further inflate Palo Alto's stock price until Arora could execute his pre-existing plan to sell stock.

111.    After making nine-figure profits on his 10b5-1 plan in late 2023, Arora abruptly terminated his 10b5-1 plan shortly before Palo Alto's stock experienced its worst day ever. At its next earnings release following Arora's plan cancellation, on February 20, 2024, the Company announced that after six months of planning, Palo Alto would offer enormous discounts to customers notwithstanding Arora's earlier insistence that Palo Alto could manage its only challenge to selling platformization (high interest rates) with deferred billing plans. Had Palo Alto disclosed the friction it was experiencing with selling its platformization approach and that this friction had caused the Company to begin working on new sales strategies—as analysts suggested it should have—its share price would have deflated before Arora could make record profits.

112.    Pursuant to the 10b5-1 plan Defendant Arora adopted on June 8, 2023, Defendant Arora sold 555,240 shares of Palo Alto Networks stock during the Class Period for a total of approximately $160,250,210. Arora's sales took place on five dates spread out over less than three weeks between November 22, 2023, and December 12, 2023.

113.    During this time period, according to FE 2, Palo Alto Networks' sales were slowing. And as Arora admitted, in the 6 months preceding February 20, 2024, Palo Alto had "been quietly working to develop programs that enable us to help minimize and even share in the risk of our customer space." This strategic shift in its platformization sales strategy, which Arora would have known about for months by November 2023, would require an approximately $600 million downward revision in its FY 2024 billings guidance. Although the Company revised its guidance downwards slightly on November 15, 2023, it curiously did not incorporate the full impact of the strategic shift

into its guidance until February 20, 2024, after Arora had been able to execute on his recently-adopted trading plan while the market price for Palo Alto's shares was still reaching all-time highs.

114.    In each transaction during the Class Period, Arora exercised an option to acquire Palo Alto shares at a price of $66.17 per share, and immediately sold the entire allotment in a single day. **In SEC filings dating back to June 2018, Arora had never exercised and sold options in this manner or amount, with the sole exception of one day, June 7, 2023. In fact, until June 2023, Arora had never sold more than 60,000 shares in a two-month period (excluding sales denoted as made to satisfy tax obligations), let alone less than three weeks.** Arora's class period trades were as follows:

| Date | # of Shares Acquired at $66.17 | Total Cost of Acquired Shares (Rounded) | # of Shares Sold | Average Prices of Shares Sold (Range) | Total Revenue from Shares Sold (Approx.) | Net Profit (Approx.) |
|---|---|---|---|---|---|---|
| Nov. 22, 2023 | 40,848 | $2,702,777 | 40,848 | $266.55 to $268.07 | $10,909,267 | $8,206,491 |
| Nov. 24, 2023 | 30,678 | $2,029,862 | 30,678 | $266.15 | $8,164,827 | $6,134,965 |
| Nov. 27, 2023 | 178,474 | $11,809,036 | 178,474 | $267.06 to $269.62 | $47,865,346 | $36,056,310 |
| Dec. 11, 2023 | 5,240 | $346,714 | 5,240 | $300.01 | $1,572,060 | $1,225,347 |
| Dec. 12, 2023 | 300,000 | $19,850,010 | 300,000 | $300.44 to $307.32 | $91,738,710 | $71,888,700 |
| **TOTAL:** | 555,240 | $36,738,399 | 555,240 | $266.55 to $307.32 | $160,250,210 | $123,511,812 |

115.    By almost every measure, Arora's class period trades were extreme outliers compared with his prior trading activity. Prior to the Class Period, Arora had sold a total of 710,933 shares. He then sold 555,240 shares in a twenty-day span between November 22, 2023 and December 12, 2023. Arora's Class Period sales were also by far his most lucrative. Arora brought in almost as much revenue in three weeks during the Class Period ($160.25 million) as from all of his pre-Class Period sales combined ($173.19 million), including his large sales on June 7, 2023.

116.    The only data point from five years' worth of Arora's trading disclosures which compares with his Class Period trades is June 7, 2023. However that date is both related to Arora's Class Period transactions and is itself unrepresentative of Arora's overall trading activity. According to SEC disclosures, Arora entered into the 10b5-1 plan under which he made his Class Period sales the day after he executed his June 7, 2023 trades. Accordingly, immediately after he realized his largest gain from selling Palo Alto stock, Arora set himself up to do so again. In order to capitalize, however, Palo Alto's share price would need to stay high and/or keep climbing until Arora could exercise his options and execute his pre-planned 10b5-1 trades. Arora began executing these trades on November 22, 2023, just a week after he assured investors that the "only thing that [wa]s changing" was Palo Alto's increased use of deferred billing plans to mitigate rising interest rates.

117.    Furthermore, the June 7, 2023 mass stock sale was not representative of Arora's ordinary trading activity and was itself an extreme outlier. The red points on the chart below represent Arora's Class Period sales. The green point represents his sales on June 7, 2023. The blue points represent all other transactions before the class period.



118.    Moreover, Arora's Class Period sales came in unusually quick succession over the course of just 20 days. Yet again, the only point of comparison that comes even remotely close is the

outlier on June 7, 2023. Arora sold over three times more shares in the month following his November 15, 2023 statements than he did in the five-year period before June 7, 2023.



119.    If the two largest outliers—Arora's sale on June 7, 2023 before the Class Period and Arora's largest sale *during* the Class Period on December 12, 2023—were removed from the dataset, Arora's remaining Class Period stock sales (255,240) would still be 40% greater than the combined total of all his pre-Class Period sales (180,764).

120.    The 555,240 shares Arora sold in less than three weeks during the Class Period is also 53% greater than the total number of shares he sold in the eight months following the Class Period (363,174).

121.    Moreover, Defendant Arora's Class Period sales were by far his most lucrative. When Defendant Arora sold his shares on December 12, 2023, Palo Alto stock had, to that point, never been priced higher.[5] Defendant Arora sold his shares that day in eight tranches. The shares in the first

---

[5] When prices are adjusted to account for the effects of Palo Alto Networks' 3-to-1 reverse stock split effected September 13, 2022.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

tranche sold on December 12, 2023 were sold for an average price of $300.11, the lowest price Arora fetched for any of the eight tranches sold that day but still higher than Palo Alto's peak share price at any point in time since its Initial Public Offering ("IPO") in July 2012. Defendant Arora sold his last tranche of shares at an average price of $307.32 per share, just 56 cents below the then-historic high of $307.88 Palo Alto's stock hit on December 12, 2023, and higher than its close of $305.58/share.[6]

122.    Before November 22, 2023, Arora held 866,395 shares of Palo Alto stock. Although his holdings did not substantially change given the in-and-out nature of his transactions, the 555,240 shares he sold were the equivalent of 64% as many shares as Arora held before and after the Class Period sales.

123.    While Defendant Arora did not disclose the details of his 10b5-1 trading plan, it is possible to infer that his trades were either triggered by Palo Alto's share price reaching certain thresholds or were scheduled for particular dates. Arora's sales on November 22, 24, and 27, 2023 all occurred on three subsequent trading days where Palo Alto's per-share price was at or above $266 and in the aggregate amounted to 250,000 shares. Arora's sales on December 11 and 12, 2023, meanwhile, occurred after Palo Alto's share price rose to $300 and amounted to 305,240 total shares.

124.    In either event, Defendant Arora's pre-planned trades would have provided a significant motivation to inflate or maintain the inflation in Palo Alto's share price. Arora's Class Period sales were substantial by comparison to his prior trading history as well as any objective measure of individual wealth. Had Palo Alto disclosed the challenges it was facing with platformization on or before November 15, 2023, Palo Alto's share price would have declined and Arora's trading plan either would not have triggered at all or his sales would have occurred at substantially lower prices.

125.    When Palo Alto belatedly disclosed the challenges it was facing with selling its platform products in February 2024, it estimated that the downturn in Palo Alto's financial metrics from the Company's proposed solution of offering free products would last 12–18 months. Therefore,

---

[6] *See* YAHOO!FINANCE, *Palo Alto Networks, Inc. (PANW)*, (last visited Sept. 24, 2024), https://tinyurl.com/3betnkfj.

1    if Defendants had announced the corrective measures when they identified the problem in August

2    2023, or three months later in November 2023, the downturn would have extended through the

3    scheduled end of Arora's 10b5-1 trading plan in August 2024.

4         126.    On December 13, 2023, Arora filed a Form 4 with the SEC disclosing his December

5    11-12, 2023 sales of over $93 million in Palo Alto stock. The Form 4 stated that these sales "were

6    effected pursuant to a Rule 10b5-1 trading plan" established on June 8, 2023, and that "[o]n December

7    13, 2023, the Reporting Person [Arora] terminated such Rule 10b5-1 trading plan." Arora therefore

8    cancelled his 10b5-1 plan nearly 8 months before it was scheduled to end (August 30, 2024) and well

9    before the alternative condition of 2 million shares sold was reached.

10        127.    The timing of Arora's adoption and implementation of the 10b5-1 trading plan

11   strongly suggest it was a discretionary choice to exercise and sell options on the dates described above

12   and to terminate the plan before the disclosure of adverse information in February 2024. No other

13   sales were made according to this short-lived 10b5-1 trading plan despite Palo Alto's disclosure on

14   September 1, 2023 that Arora intended to trade 2 million shares under the plan. Arora's trading plan

15   conspicuously allowed him to trade after his reassuring statements on November 15, 2023 but

16   terminated before Defendants' disclosures on February 20, 2024 caused a sharp decline in Palo Alto's

17   share price.

18        128.    SEC filings dating from June 2018 do not reveal a single other instance before

19   December 2023 in which Defendant Arora ever terminated a 10b5-1 plan early.

20        129.    As "personal financial gain may weigh heavily in favor of a scienter inference,"[7]

21   Defendant Arora's unusual trades, timed to maximize Arora's personal benefit as they coincided with

22   Palo Alto Networks' highest share prices since its 2012 Initial Public Offering, and terminated before

23   Palo Alto experienced its largest-ever single-day stock price drop, strongly suggest his scienter.

24

25

26   _____

27   [7] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007).

28

**B. Defendant Arora Was A Hands-On Manager Who Was Personally Involved in Overseeing Sales.**

130.    When Defendant Arora made the misleading statements described above in ¶¶73-78 and sold over $160 million worth of Palo Alto shares, he would have known Palo Alto's billing was unsustainable, that "[k]ey friction points" were impeding platformization sales, and that the Company was planning a strategic pivot to offer discounts to customers, thereby taking a substantial hit in the near and medium term.

131.    On February 20, 2024, Arora admitted that the Company's decision to offer free products to customers until customers' contracts with legacy vendors ran out was far from a new or sudden decision. Palo Alto Networks, he admitted, had been "quietly working" on the strategy "*[o]ver the last 6 months*," *i.e.* during the entirety of the Class Period and for an entire fiscal quarter beforehand. Accordingly, Defendants knew, or recklessly disregarded, that Palo Alto's platformization strategy was not working throughout the Class Period, and indeed were planning all the while to begin offering large discounts in a manner that would cannibalize the Company's billings. Yet Defendants told investors that platformization was driving growth and the headwinds (which they attributed to rising interest rates) were being successfully managed through deferred payment plans and financing.

132.    Arora knew or was reckless in not knowing that Palo Alto's platformization sales strategy was underperforming because he exercised close oversight of Palo Alto's sales teams and figures. FE 2 described Arora as a "command-and-control" manager who had "his pulse on the business." Arora led quarterly business review meetings, which FE 2 attended, in which Arora led discussions of Palo Alto's sales figures and projections. FE 2 described Arora as having high expectations and being a hands-on manager. If FE 2 provided sales figures which were below Arora's target, for example if FE 2 provided $450 million when the target was $500 million, Arora would respond: "What do we have to do to close that to $500 million?" Arora would also require FE 2 to prepare six slides to present for each large account. Accordingly, the strongest inference is that Arora either knew or recklessly disregarded that Palo Alto was experiencing challenges with selling its platforms to customers because of the difficulty and costs of switching multiple security functions

over to a single platform simultaneously, and that Palo Alto's sales were slowing by the last quarter of 2023. Given Arora's hands-on control and involvement in sales, it is fair to infer that he knew about the 6-month planning process to change Palo Alto's platformization sales strategy.

133.    FE 1 also confirmed that there was a formal internal process at Palo Alto to approve its platformization agreements that included giving products away for free. These deals had to be reviewed by the Deal Desk, the CFO and the Sales Operations and Revenue Desk. Additionally, on a quarterly basis, all sales staff had to sign a letter stating that they would follow only ethical sales practices. FE 1 also stated that Defendant Arora knew about the impact of platformization and considered related strategy.

### DEFENDANTS EMPLOYED DEVICES, SCHEMES, AND ARTIFICES TO DEFRAUD INVESTORS IN VIOLATION OF RULE 10B-5(a) AND (c)

134.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they knowingly and/or recklessly engaged in acts and courses of business in furtherance of a scheme to defraud investors and artificially inflate and/or maintain inflation in the price of Palo Alto's common stock.

135.    In furtherance of this scheme, Defendants substantially delayed the disclosure of material, non-public information and/or misrepresented rising interest rates as the primary source of sales friction in order to keep Palo Alto's share price inflated throughout the Class Period so that Defendant Arora could make over $123 million in net profit from executing his pre-planned trades.

136.    Defendant Arora sold 530,169 shares of Palo Alto stock on June 7, 2023, after exercising 474,300 options. This was Arora's largest single-day sale of Palo Alto stock by far at the time. Arora's June 7, 2023 trades were not made pursuant to a Rule 10b5-1 trading plan.

137.    The next day, June 8, 2023, Arora established a 10b5-1 trading plan. Arora's trading plan, as established on June 8, 2023, was scheduled to end on either August 30, 2024, or when Arora sold 2 million shares pursuant to the plan.

138.    Under the plan, Arora would acquire options at the set price of $66.17 and then sell at the market price for Palo Alto common stock. Palo Alto did not disclose the triggering event for Arora's trades under his 10b5-1 plan (*e.g.* date, stock price, or other event). Regardless, the higher

1    the price of Palo Alto's shares, the more Arora would gain under his trading plan. Arora would not

2    execute any trades under this trading plan until November 2023.

3    139.    However, a problem emerged before Arora could capitalize on his pre-planned 10b5-

4    1 trades. Entering FY 2024, Palo Alto's share price was elevated based on highly favorable market

5    assumptions about the Company's prospects for the coming year. As Wedbush analysts explained in

6    an August 2023 note, just before Palo Alto announced its guidance for FY 2024, the Company

7    "need[ed] to grow Billings ~19% y/y in FY24E to ~$11b" to justify its then-current valuation because

8    its stock was already "pricing in almost a 'best-case' scenario for FY24E numbers." Consequently,

9    the market was not expecting significant challenges and Palo Alto's shares were not priced to absorb

10    negative news. In particular, disappointing projections for its financial metrics could deflate Palo

11    Alto's share price.

12    140.    By no later than August 2023, and certainly several months before November 2023,

13    according to Arora's later admission, Palo Alto had begun to appreciate that customers could not

14    easily transition to Palo Alto's consolidated security platforms. The "[k]ey friction points" came from

15    the inherent difficulty of replacing "multiple products simultaneously." Customers who had contracts

16    of different durations with different vendors would end up paying "double" if they simultaneously

17    switched multiple, disparate security functions over to Palo Alto's platforms. Meanwhile, Palo Alto's

18    competitors were offering lower prices to the business customers Palo Alto hoped to convert to

19    platformization. For platformization to work and customers to come on board, the Company had to

20    absorb the downside onto its own books.

21    141.    Accordingly, and as Defendant Arora belatedly admitted on February 20, 2024, Palo

22    Alto began "quietly working to develop programs" to mitigate the "[k]ey friction points" and share

23    in customers' financial risks three months prior to November 2023. It follows that if Palo Alto was

24    working to correct these "friction points" and risks, *i.e.* the costs to customers of converting multiple

25    security functions simultaneously, Palo Alto had already identified the existence of these friction

26    points. The Company ultimately centered its strategy on offering lengthy customer discounts which

27    amounted to a half-year's "worth of free product."

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

142.    The free-product strategy would come with a significant downside. As Arora noted during a September 7, 2023 conference call in which he suggested Palo Alto was using deferred payment plans instead, offering discounts would mean "tak[ing] a hit on bookings and revenue." By transferring the risk and costs of adopting platformization onto itself, Palo Alto would experience a projected period of "12 to 18 months of pressure on our top line growth rate, notably billings."

143.    Palo Alto therefore could not disclose the "friction" it was experiencing selling platformization, nor the "programs" it was developing to aid its sales, nor the consequences of the foregoing for its billings and revenue, without causing its elevated stock price to collapse. Even if the downturn was temporary, and even if it was far shorter than the estimated 12–18 months, the swoon would jeopardize Arora's upcoming, massive-scale 10b5-1 options trades. A 12–18 month decline, if it began in or after August 2023, would extend through the scheduled end of Arora's 10b5-1 trading plan.

144.    Instead of disclosing the issues, Arora and the Company kept the challenges to platformization and Palo Alto's discounting solution "quiet[]" from the market for "6 months."

145.    On Friday, August 18, 2023, after trading in the stock market closed, Palo Alto issued a press release announcing its financial results for its fiscal 2023 fourth quarter and its guidance for FY 2024, and held an earnings call shortly thereafter. Palo Alto's FY 2024 guidance projected billings of $10.9 billion to $11 billion, for year-over-year growth of 19% to 20%—precisely in line with the figures analysts projected as being necessary to maintain the Company's heightened share price.

146.    Defendants' representations prior to the Class Period set investor expectations about the challenges Palo Alto faced and the tools it could effectively use to meet them, and that discounting would not be necessary. During the August 18, 2023 Q4 Earnings Call, Defendant Arora stressed higher interest rates as the primary challenge. Defendant Arora claimed on the call that interest rates were a challenge Palo Alto could overcome by accepting payment from customers later rather than demanding it up-front. Therefore, Arora said, Palo Alto was offering more "deferred payment terms" and financing to customers to allow them to hold onto cash longer.

147.     Arora repeatedly presented deferred payment plans as an alternative to discounts prior to and during the Class Period. According to Arora, discounts and deferred payments could both sufficiently allow customers to take advantage of the higher cost of money, so "you have a choice" between the two.

148.     During the August 18, 2023 Q4 Earnings Call, for example, Arora explained: "*either* [customers'] cost has to be lower . . . *or* you'[re] going to allow [customers] to pay you later." Then, when asked about whether multi-year plans would involve "discounting," Arora again stressed that the Company was "effectively" using deferred payment plans and that the cost of money presented a choice: "I can take the money up front and let the customers get a discount . . . *or* I can let them pay when they're ready to pay and I can extract a better economic outcome in that context."

149.     Accordingly, entering the Class Period, investors had been repeatedly assured Palo Alto could use deferred payment plans to effectively "navigate" the high interest rates that were the notable source of sales friction. However, despite being three-months into planning to correct other, more serious and fundamental flaws in the platformization strategy, Defendants did not disclose the pressure Palo Alto was experiencing from the "[k]ey friction points" Arora would later identify.

150.     On November 15, 2023, three months into Palo Alto Networks' "quiet[]" development of programs to overcome customer hesitancy to adopt platformization, Palo Alto announced its financial results for the first quarter of FY 2024 and updated its guidance, purportedly because its "billings were impacted by the cost of money." During a conference call held that day, Arora stated that Palo Alto could use a "mix of strategies" including "annual billing plans, financing though [Palo Alto Networks Financial Services] and partner financing" to "navigate" the higher cost-of-money environment. Arora stressed that these methods "do[] not impact our business demand or impact to annual revenue or annual metrics" but acknowledged they did "create variability on total billings" depending in part on the duration of contracts, as money would be collected at a later time. Accordingly, Arora assured investors: "this is a cosmetic impact to our business."

151.     Palo Alto adjusted its billings guidance to $10.7 billion to $10.8 billion (16% to 17% year-over-year growth). Yet, consistent with Arora's representations that the effects of deferred

payments were merely "cosmetic," Palo Alto Networks maintained its revenue projections of $8.15 billion to $8.20 billion for 18% to 19% year-over-year growth.

152.     When asked why Palo Alto was still guiding to 17% billings growth when its competitors were expecting downturns, Arora stressed: "***The only thing that's changing is people say, I'll do a 2-year, 1-year deal or a 3-year deal or a 5-year deal. I'll pay you later. You finance it around year-over-year. That's the only confusion you're seeing***." On the same call, Arora again stressed that Palo Alto had a choice between discounts and deferred payments and stated: "I'm very happy to collect my money on an annualized basis if that's what's needed to make sure that I don't get pressure on financing, I don't get pressure on having to give larger discounts."

153.     In the weeks following November 15, 2023, Palo Alto's share price reached new highs. Approximately one week after assuring investors deferred payments were "[t]he only thing that's changing," thereby maintaining the inflation in Palo Alto's share price, Arora began to exercise and sell Palo Alto stock options pursuant to the 10b5-1 plan he adopted on June 8, 2023.

154.     In a 20-day period between November 22, 2023, and December 12, 2023, Arora exercised and sold 555,240 options, for approximately $160.25 million in total revenue and $123.51 million in net profit. Arora sold his last batch of 300,000 shares on December 12, 2023, for over $300 per share, a new record high price for Palo Alto's shares.

155.     In a filing made on SEC Form 4 the next day, Arora represented that he had "terminated [his] Rule 10b5-1 trading plan" as of that date, December 13, 2023. Arora cancelled his plan 8 months before its scheduled end date of August 30, 2024.

156.     At Palo Alto Networks' very next earnings release, on February 20, 2024, the Company announced its financial results for the second quarter of 2024 and lowered its third quarter and full-year billings and revenue guidance, with FY 2024 billings growth cut to 10% to 11% and revenue revised down to $7.95 billion to $8.00 billion, for year-over-year growth of 15% to 16%.

157.     Arora explained that the downward guidance revisions were the result of new "programs" Palo Alto had started to implement to address the "[k]ey friction points we've noticed" which were making it challenging for customers to embrace platformization. These friction points

included "the challenge of replacing multiple products simultaneously as well as the issues around double playing while working through complex contract terms." Arora stated that Palo Alto had been "quietly working to develop programs" to share customer "risk"—*i.e.* move the costs of switching to platformization from customers' balance sheets to Palo Alto's—"[o]ver the last 6 months." The programs revolved around giving free product to customers for about half a year.

158.    On the next trading day, Palo Alto common stock experienced its largest ever drop in Palo Alto's history as a public company. The Company's share price declined by $104.12 per share, or approximately 28%.

159.    The market, which had been repeatedly told that interest rates were the main challenge to platformization and deferred payments were the "only thing that's changing," was stunned. A Barclays analyst report called Palo Alto's announcement that it was offering lengthy discounts to customers "the part of the call that was most unexpected." Piper Sandler lowered its rating of Palo Alto from overweight to neutral, explaining that the need to offer customers free products while their legacy contracts expired would "negatively impact the business for 12-18 months - eliminating $600M from billings estimates in the back half of this year."

160.    Multiple analysts questioned the unusual timing of the announcement, coming in the middle of Palo Alto's fiscal year and six months after Palo Alto admitted it had begun working on programs to address customers' costs to switch to platformization. A Citigroup analyst stated during the February 20, 2024 earnings call that the "middle of the year" timing was "admittedly atypical." Barclays also commented on the unusually delayed timing, writing in a research note: "the issue is this big of a change is being done unexpectedly in the middle of the year." And a Guggenheim analyst note bluntly asked: "Why drop this major change on a quarterly conference call when results are weak? Why didn't they do it at their Friday night call [o]n August [18, 2023]?"

161.    By delaying the disclosure of the "[k]ey friction points" Palo Alto was experiencing with its platformization sales strategy, and instead insisting friction was arising from interest rates and could be overcome with deferred payment plans, Defendants delayed the predictable downturn

1   in Palo Alto's share price just long enough for Defendant Arora to execute the prearranged and

2   enormously profitable trades outlined in his 10b5-1 plan.

3       162.   At the time Defendant Arora sold his shares, between November 22, 2023 and

4   December 12, 2023, Palo Alto had been planning programs to address the costs of switching to

5   platformization, over and above deferred payment terms, for over three months. Furthermore, given

6   Arora's acknowledgement on September 7, 2023 that discounts would drag down Palo Alto's

7   "bookings and revenue" figures, it can be inferred that Arora was aware that the concealed

8   information would likely decrease the value of the shares he sold to investors during the Class Period.

9       163.   The scheme and course of conduct therefore created and/or maintained artificial

10  inflation in Palo Alto's share price such that Defendant Arora could make tens of millions of dollars

11  from unwitting investors by executing his pre-planned options trades. Had Palo Alto disclosed the

12  trouble it was experiencing selling platformization related to double-paying, or the discounting

13  solution it devised, Arora's ability to cash-in on his pre-planned trades would have been in question.

14  **LOSS CAUSATION/ECONOMIC LOSS**

15      164.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the

16  economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the Class.

17      165.   As described more fully in ¶¶79-94, on February 20, 2024, Palo Alto drastically

18  reduced its billings guidance for the third quarter, reporting expected total billings growth of 2-4%

19  and revenue growth of between 13% and 15%. The facts revealed on February 20, 2024 exposed

20  omitted facts and demonstrated the falsity of Defendants' statements regarding the Company's ability

21  to reduce sales friction, which the Company primarily attributed to the cost of money rather than

22  competition or platformization itself, by offering deferred payment terms and financing rather than

23  large discounts.

24      166.   For example, during a conference call with analysts held after market close on

25  February 20, 2024, Defendant Arora revealed Palo Alto's reduced guidance was "a consequence of

26  us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation

27

28

and activating our AI leadership." These disclosures in part corrected, or were a materialization of a known risk concealed by, Defendants' misstatements.

167. Moreover, Defendant Arora explained during the call that competitors were lowering prices to prevent Palo Alto from dislodging them as security vendors. Selling customers on the idea of platformization therefore required offering "a free offer" of products for extended periods of time ("about 6 months' worth of free product capabilities") before billing even started. Defendant Arora stated that Palo Alto had been developing the new platformization strategy "[o]ver the last 6 months." Golechha further elaborated that the new strategy "to drive consolidation effectively provide[s] customers a period of the contract for free as part of their commitment" which the Company expected to cause "a period of 12 to 18 months of pressure on our top line growth rate, notably billings." These disclosures in part corrected, or were a materialization of a known risk concealed by, Defendants' misstatements about the demand for and challenges facing platformization and the Company's ability to reduce sales friction without resorting to significant discounts.

168. Market observers were surprised by Palo Alto's announcement. One observer summarized: "Palo Alto has to provide customers incentives in what was supposed to be overflowing AI demand." Analysts called the billings cut "unexpected." Barclays noted that the announcement of significant discounts was "the part of the call that was most unexpected" and questioned why "this big of a change" was "being done unexpectedly in the middle of the year." Guggenheim questioned why Palo Alto had not announced the new strategy six months earlier "at their Friday night call [o]n August [18, 2023]?"

169. Barclays attributed about $600 million worth of the cut to FY 2024 billings to the strategic shift in platformization.

170. On this news, the price of Palo Alto common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024 to close at $261.97 on February 21, 2024. This was the worst trading day in Palo Alto Networks' 12-year history as a public company.

171. The decline in Palo Alto's stock price is directly attributable to the announcements about the strategic shift in platformization and reduced guidance.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

172.     Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)  The omissions and misrepresentations were material;

c)  The Company's common stock traded in efficient markets;

d)  The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e)  Lead Plaintiffs and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

173.     At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Lead Plaintiffs and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

**NO SAFE HARBOR**

174.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. First, the statutory safe harbor does not apply to any statements alleged to be false and misleading which relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified

as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

175.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

176.    In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

177.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.

178.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer who knew that the statement was false when made. As detailed herein, Defendants were not only aware of factors undermining their forward-looking projections but were actively planning a strategic shift which would render them false.

**CLASS ACTION ALLEGATIONS**

179.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Palo Alto Networks common stock between November 16, 2023 through February 20, 2024, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

180.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

181.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a)  Whether Defendants violated the Exchange Act;

    b)  Whether Defendants omitted and/or misrepresented material facts;

    c)  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d)  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e)  Whether Defendants deployed schemes, devices, or artifices to defraud;

    f)  Whether the price of the Company's stock was artificially inflated; and

    g)  The extent of damage sustained by Class members and the appropriate measure of damages.

182.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

183.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

184.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder
### (Against All Defendants)

185.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

186.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading.

188.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiffs and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II
### For Violation of §10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### (Against All Defendants)

189.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

190.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiffs need not allege in this Court nor prove in this case that any

1  Defendant made any misrepresentations or omissions of material fact for which they may also be

2  liable under Rule 10b-5(b) and/or any other provisions of law.

3    191.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they

4  (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a

5  course of business which operated as a fraud and deceit upon those who purchased or otherwise

6  acquired the Company's securities during the class period.

7    192.    During the Class Period, Defendants carried out a scheme and unlawful course of

8  conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and

9  the Class; (ii) artificially maintain and introduce inflation into the price of Palo Alto common stock;

10  (iii) allow Defendant Arora to capitalize on his pre-planned 10b5-1 trades to make over $123 million

11  in net profit while in possession of material, non-public information; and (iv) cause Lead Plaintiffs

12  and the Class to purchase Palo Alto common stock at artificially inflated prices.

13    193.    In furtherance of this plan, Defendants employed devices, schemes and artifices to

14  defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of

15  business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with

16  their purchases of Palo Alto common stock, in violation of Section 10(b) of the Exchange Act and

17  Rule 10b-5(a) and (c) promulgated thereunder.

18    194.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and

19  course of business included the knowing and/or reckless suppression and concealment of material

20  information. In particular, Defendants substantially delayed the disclosure of significant challenges

21  to platformization sales (the "[k]ey friction points"), and need to resort to customer incentives to

22  overcome this friction, which the company recognized and began "quietly" working to counteract at

23  least three months before Defendant Arora sold $160 million worth of shares at historically high

24  prices, and which the Company disclosed shortly after Arora prematurely cancelled his 10b5-1 trading

25  plan.

26    195.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity

27  of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiffs

28

and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' fraudulent scheme and course of conduct.

## COUNT III
### For Violation of §20(a) of the Exchange Act
### (Against Defendant Arora)

196.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

197.    Defendant Arora acted as controlling person of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of his high-level position at the Company, Arora had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. Arora was provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Lead Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. By reason of his senior management position, Arora had the power to direct the actions of, and exercised the same to cause, Palo Alto to engage in the unlawful acts and conduct complained of herein. Because of his position of control and authority as senior officer, Arora was able to, and did, control the contents of the various reports, press releases, public filings, and other public statements which Palo Alto disseminated. Arora exercised control over the general operations of Palo Alto and possessed the power to control the specific activities, including statements made over telephone and through SEC filings, which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain. By reason of such conduct, Arora is liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory and punitive damages in favor of Lead Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.    Awarding Lead Plaintiffs and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D.    Awarding Lead Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury.

May 9, 2025                                   Respectfully submitted,

*/s/ Jacob A. Walker*
Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

Jeffrey C. Block (*pro hac vice*)
Sarah E. Delaney (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
sarah@blockleviton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS